IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

DIANA MEY, on behalf of herself
and a class of others similarly situated,

      Plaintiff,

v.                                   Civil Action No. 5:23-cv-281

LIBERTY HOME GUARD, LLC and
BENJAMIN JOSEPH,

      Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In running through its defenses, Liberty returns to a familiar refrain: that its repeated solicitations to Mey were harmless mistakes shielded by the TCPA's safe harbor. But the record doesn't support Liberty's attempt to rebrand deliberate conduct as a simple mishap. After Mey notified Liberty that it was calling the wrong person, the company made a conscious decision to keep texting her, dismissing her warning as a "phishing attempt." That was a calculated choice, not a technical error. The TCPA's safe harbor protects inadvertent missteps, not indifference masquerading as mistake. And even if Liberty's suspicions were genuine, the defense still fails: the safe harbor applies only to companies that had compliant procedures in place *before* the violations, not ones that retrofitted policies years later. The record forecloses the defense outright as to several requirements and, at minimum, raises material factual disputes on the rest. Either way, Liberty has not met its burden to

show that the violations were both inadvertent and made under a compliant system. And just as Liberty's principal defense fails, so too do the rest of its arguments, each falling short as a matter of law or evidence. The motion should be denied in its entirety.

## BACKGROUND

In Count I, Mey alleges, individually and on behalf of a proposed class, violations of the TCPA's Do-Not-Call Rules, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2). [ECF No. 44]. In Count II, she alleges individuals claims under the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code §§ 46A-6F-101, et seq. She seeks statutory damages under both the TCPA and WVCCPA.

As noted in her motion for class certification, Mey voluntarily abandoned any claims tied to communications sent before her March 4, 2022 email notifying Liberty that her number was on the DNC Registry and that she had not consented to such outreach. [ECF No. 94, at 6]. Her claims are thus limited to the nine promotional text messages Liberty sent after that explicit notice. Additionally, Mey voluntarily abandons any claim that Liberty failed to comply with the TCPA's caller-identification requirements at 47 C.F.R. § 64.1200(d)(4).

### Calls/Texts from Liberty to Mey

Liberty is a home warranty company that sells warranty plans for home appliances and systems. To market its products, Liberty places calls and sends text messages to prospective customers nationwide, including in West Virginia. (Ex. 1, Joseph Dep. at 20:9-11).

On February 10, 2022, Mey received the first call from Liberty. (Ex. 2). She did not answer, so the call was forwarded to voicemail. (Ex. 3). A live male caller indicated that he was calling on behalf of Liberty, and was trying to reach Geoff, who supposedly made a recent online inquiry. (*Id.*) The caller requested a call back before terminating the call. (*Id.*)

That same day, Mey received at least seven additional calls from Liberty, each of which were forwarded to voicemail. (Ex. 2). Several of the callers identified themselves as Liberty representatives and/or requested to speak with the individual referenced in the first call. (Ex. 3).[1]

Following those calls, from February 15 to February 22, 2022, Mey received at least four promotional text messages from Liberty, two of which are reproduced below.



797979

Geoff, check out our Valentine's Week savings event!Sign up for a home warranty TODAY to receive: $200 OFF + 2 FREE Bonus Months of Coverage+ Free Roof Leak Coverage+ Free Valentines Day GiftGet Home Warranty coverage from America's #1 rated home warranty provider by U.S. News & World Report!Give us a call! (866) 288-3920Learn more: https://www.libertyhomeguard.com/thebesthomewarranties/Restrictions apply.Msg & data rates may apply. Text 'STOP' to unsubscribe. https://tapit.us/SeTvJV

---

[1] There is no dispute that Mey received the alleged communications and that said communications were initiated by Liberty. Ex. 4, at Interrog. 8 ("all communications at issue in this action were made by Defendant to Plaintiff"); ECF No. 55, at 5 ("It is undisputed that Ms. Mey received unsolicited communications from Defendants.").

(Ex. 5).

On February 23, 2022, Mey received another voicemail from a Liberty representative asking for the same individual referenced in the prior calls. (Exs. 2 and 3). That call was then followed by two additional promotional texts from Liberty on March 1 and 3, 2022. (Ex. 5).

On March 4, 2022, Mey emailed Liberty (service@libertyhomeguard.com), advising that she had received multiple telemarketing calls to her wireless number, which has been listed on the National Do Not Call Registry (the "DNC Registry") since 2003. (Ex. 6). Noting that the solicitations were illegal absent her prior express written consent, Mey requested an explanation for the calls and evidence of consent. (*Id.*)

Liberty did not respond to Mey's email. Instead, it continued to send Mey promotional texts, sending her nine additional text messages from March 8 through April 7, 2022. (Ex. 5).

## DISCUSSION

### I. Liberty Fails to Satisfy the Safe Harbor Defense

Liberty suggests that it is shielded by two independent "safe harbors"—one under 47 U.S.C. § 227(c)(5) and another under 47 C.F.R. § 64.1200(c). That framing

is mistaken.[2] Section 227(c)(5) establishes a single statutory safe harbor, whereas the regulation at Section 64.1200(c)(2)(i) specifies the baseline practices and procedures a telemarketer must have in place in order to invoke that statutory safe harbor. Courts—including those cited by Liberty—have uniformly treated the statute and regulation as interlocking, not as two separate layers of immunity.[3] Properly framed, a safe harbor defense requires that Liberty demonstrate that (1) the violations were the result of "error" and (2) it satisfied the minimum compliance standards enumerated at § 64.1200(c)(2)(i). *Id.* Liberty's defense fails on both fronts.

### A. Whether the Violations Were a Result of "Error"

The relevant communications fall into two distinct periods: those sent before Mey's March 4, 2022 email, and those sent after. Even if the former communications can be attributed to error—intended for Mr. Skadra rather than Ms. Mey—the latter ones cannot. By March 4, Liberty had clear notice that it was contacting the wrong person, yet it chose to disregard that notice by dismissing Mey's email as a "phishing attempt." That excuse collapses under scrutiny. Even then, once Liberty made the

---

[2] Liberty's "double protection" theory is based on a mistaken reading of *Loper Bright*, which held that courts may not reflexively defer to an agency's interpretation of an ambiguous statute under *Chevron. See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). It did not curtail Congress's power to delegate rulemaking authority or an agency's ability to promulgate rules pursuant to that authority. Because § 227(c) expressly directs the FCC to issue implementing regulations, § 64.1200(c) is part and parcel of the statutory safe harbor—not "additional conditions" that courts may ignore.

[3] See, e.g., *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019); *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 129-31 (D. Conn. 2016); *Johansen v. Efinancial LLC*, 2022 WL 168170, at *5-6 (W.D. Wash. Jan. 18, 2022); *Morris v. Hornet Corp.*, 2018 WL 4781273, at *7 (E.D. Tex. Sept. 14, 2018).

conscious decision to ignore her complaint, its subsequent solicitations were no longer inadvertent "errors" but deliberate acts beyond the reach of any safe harbor.

First, Liberty offers no real explanation for its suspicions. It says only that Mey's email was "suspiciously worded and contained very little information." (ECF No. 96, at 11). But Mey provided her phone number and identified the precise time period in which Liberty had contacted her. (Ex. 6). Liberty's own records confirmed multiple calls to that exact number during that exact time frame. (Ex. 7). If anything, the email's accuracy should have heightened Liberty's concern, not justified dismissing it as fraudulent.[4]

Second, Liberty's supposed suspicion was unreasonable on its face. Mey's email contained no links, no request for money, and no demand for sensitive personal information. (Ex. 6). It simply stated that she had received calls despite being on the DNC Registry and asked that Liberty explain its basis for contacting her. (*Id.*) That is not a plausible phishing attempt but a textbook do-not-call complaint.[5] Liberty's fallback justification—that it could not provide the requested consent without divulging Mr. Skadra's private information—fares no better. Liberty did not need to

---

[4] Liberty argues that Mey should have replied "STOP" to its text messages. But nothing in the TCPA or its regulations allows a telemarketer to violate the statute and then dictate the consumer's manner of objection. Mey's March 4 email went well beyond a one-word opt-out: she identified her number, confirmed its placement on the National DNC Registry, and explained that she had already received multiple unlawful solicitations. Yet, that request was ignored.

[5] Liberty suggests that Mey's email was not a valid "revocation of consent." (ECF No. 96, at n.3). But that argument presumes consent existed in the first place. Mey never consented, so there was nothing to revoke, making its "revocation" argument wholly irrelevant.

disclose Mr. Skadra's information to Mey in order to confirm internally that it was calling the wrong number and stop.[6]

Third, if Liberty truly needed more information (it never says what), the obvious first step would have been to respond to Mey's email and request clarification. It did not. Instead, Liberty excluded the single most reliable source of information—Mey herself—from its supposed investigation. Worse still, Mey sent her email on a Friday, and by the following Tuesday Liberty had resumed sending her promotional texts. (Exs. 6 and 7). Whatever "investigation" Liberty claims to have undertaken was either perfunctory or entirely nonexistent.

Fourth, even if Liberty's concerns were genuine—a factual question for the jury—the ensuing communications were not "errors." Liberty weighed the risk that Mey's email was genuine, chose to disregard that risk, and pressed ahead with further solicitations. That was a deliberate judgment call, not an inadvertent mistake. The decision may have been wrong, but poor judgment is not an "error" that the TCPA's safe harbor was designed to excuse.

Ultimately, the text messages that following Mey's March 4 email were deliberate and not inadvertent errors. Even then, it is for the jury to decide whether Liberty's "phishing" theory reflects a genuine concern or a post hoc excuse. A reasonable jury could reasonably find the latter, foreclosing any reliance on the

---

[6] There is no plausible incentive for a scammer to pose as a consumer seeking to *stop* telemarketing calls, and it is difficult to envision what a supposed scammer could have gained from collecting Mr. Skadra's *contact* information, much of which is readily available by simple internet search.

TCPA's safe harbor and supporting a finding that the violations were willful and knowing.

### B. *Whether Liberty Satisfied the Minimum Compliance Standards*

Because the solicitations between March 8 and April 7, 2022 were not a product of justifiable error, this Court's safe harbor analysis may end there. But even if those communications were a product of justifiable error, Liberty has not demonstrated that it had implemented the minimum compliance requirements at § 64.1200(c)(2)(i). *See Benzion v. Vivint, Inc.*, 2014 WL 11531368, at *6 (S.D. Fla. Jan. 17, 2014) (providing that the safe harbor is an affirmative defense for which defendant has the burden of proof).

"Written Procedures": Liberty must demonstrate that "[i]t has established and implemented written procedures to comply with the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(A). To satisfy this element, Liberty relies upon the Declaration of Benjamin Joseph and its attached exhibits. (ECF No. 95-4). But the declaration raises more questions than it answers. For example, Joseph claims that Liberty "consistently implemented" compliance policies since its founding, yet concedes that Liberty "did not formally memorialize *all* of its policies and procedures" until 2023. (ECF No. 95-4, at ¶12) (emphasis in original). Notably, Joseph does not identify which, if any, written procedures existed in Spring 2022, leaving it unclear whether Liberty had the required written policies during the relevant period.[7]

---

[7] Joseph explains that the "Telemarketing Policies and Procedures" (ECF No. 95-4, at pp. 33-41) were not created until sometime in 2023 (ECF No. 95-4, at ¶ 12).

"<u>Training of Personnel</u>": Liberty must demonstrate that "[i]t has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(B). Again, Liberty's motion and declaration embrace strategic ambiguity.

Liberty points to the Sales Training Manual (Decl. Attachment A, Liberty000045-69), which "represents the training manual provided to salespersons in early 2021." (ECF No. 95-4, at ¶16). The unredacted portions of the manual, however, do not actually reflect training on DNC compliance or evidence any written DNC compliance procedures. (*Id*. at pp. 7-31). Rather, they simply describe the capabilities and features of Liberty's lead routing and customer management platforms. (*Id*. at pp. 20-22). The remainder of the manual is heavily redacted without explanation, preventing any verification that DNC training existed within the withheld sections.

Liberty points to a 15-slide training presentation, which, according to it, "represents the training presentation provided to salespersons since late 2021." (ECF No. 95-4, at ¶ 17). Yet, one slide carries an embedded 2024 copyright watermark. (*Id*. at p. 52). Joseph explains that the watermark "indicates when the pdf of the document was compiled, not when the document itself was created or came into existence." (*Id*. at ¶ 17). But that makes little sense. Converting a PowerPoint to a PDF would not alter a copyright date embedded on a slide or simply add one from scratch. The more likely explanation is that the presentation—or at least the slide carrying the 2024

mark—was created or modified in 2024 or later.[8] Even then, regardless of when the presentation was actually created, the content of the presentation has nothing to do with DNC compliance training. Aside from the cover slide and table of contents, only two substantive slides are unredacted. (*Id.* at pp. 42-56). One of those (the one containing the 2024 copyright) is simply a screenshot of the VanillaSoft user interface, and the second simply defines the various lead result descriptions used within that platform. (*Id.* at pp. 52-53). As the title "VanillaSoft/Sales Syco System Training" suggests, the presentation appears to train sales staff on Liberty's lead-management system, not DNC compliance.[9]

Like the declaration, the motion itself is notable ambiguous as to what, if any, training was provided to its salesforce in Spring 2022. (ECF No. 96, at 14-15). The question is not whether TCPA compliance training is currently implemented, but whether it was implemented in Spring 2022 when the offending solicitations were made. Notably, Liberty's own expert noted in her report that Liberty reported to her "via telephone that [Liberty] trains its agents and employees on TCPA compliance but could not locate records of such trainings." (Ex. 8, at n.1).

---

[8] On September 18, 2025, Mey's counsel requested that Liberty produce—in native format—each of the training materials and written procedures attached to Mr. Joseph's declaration. The creation date and implementation history of these materials are directly relevant to Liberty's asserted safe harbor defense, and such request for native documents is plainly contemplated under the Joint Report of Initial Planning Meeting. ECF No. 40, at ¶ 5. Liberty has ignored that request.

[9] To the extent Liberty contends that the "Remove/DNC" lead result description referenced in the slides constitutes training on do-not-call compliance, that argument misses the mark. At most, it suggests that Liberty trained its sales staff on how to mark leads for removal from its *internal* list. Maintaining an internal do-not-call list under § 64.1200(d) is not a substitute for compliance with the broader do-not-call rules under § 64.1200(c).

"Recording": Liberty must demonstrate that "[i]t has maintained and recorded a list of telephone numbers that the seller may not contact." 47 C.F.R. § 64.1200(c)(2)(i)(C). Though it has demonstrated the technical ability to create an internal do-not-call list, Liberty's motion is devoid of any records or written procedures demonstrating actual creation and implementation of an internal do-not-call list in Spring 2022. Joseph's isolated statement—that "Liberty has always maintained an internal do-not-call list for individuals who request not to be contacted or to be removed from the call list"—standing alone is insufficient to satisfy this element as a matter of law. (ECF No. 95-4, at ¶ 7).

"Accessing the National Do-Not-Call Database": Liberty must demonstrate that "[i]t uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process." 47 C.F.R. § 64.1200(c)(2)(i)(D). Liberty admits it did not subscribe to the DNC Registry until 2024—long after the calls and texts to Mey. (ECF No. 95-4, at ¶ 13). Its fallback, that scrubbing was unnecessary because it never cold-called consumers, is belied by its failure to attach a single consent record for any putative class member.

"Purchasing the National Do-Not-Call Database": Finally, Liberty must show that it lawfully purchased access to the DNC Registry from the administrator and did not participate in prohibited cost-sharing arrangements. 47 CFR § 64.1200(c)(2)(i)(E).

Again, Liberty admits it did not purchase access to the DNC Registry until 2024 (ECF No. 95-4, at ¶ 13), and the failure to do so is fatal to its safe harbor defense. *See Morris*, 2018 WL 4781273, at *8 ("Defendant has not and cannot present any evidence that it 'purchases access to the relevant do-not-call data from the administrator of the national database' as required by the TCPA error defense regulations").

In sum, Liberty has not shown compliance with any—let alone all—of the statutory or regulatory prerequisites of the safe harbor defense. As the party asserting this affirmative defense, Liberty bears the burden of proving that it fully satisfied each element of the defense. On this record, it has not come close. At a minimum, the existence of factual disputes as to when Liberty's compliance measures were adopted, implemented, and applied preclude summary judgment.

## II. Mey Falls Within the TCPA's Zone of Interest

Liberty's motion begins by commending Mey for her consumer advocacy, only to quickly pivot and argue that this very advocacy disqualifies her from the TCPA's protections. According to Liberty, consumers enjoy only a finite allotment of TCPA claims, and once they have exhausted that allotment, they somehow lose the right to enforce them ever again. The contradiction is glaring: under Liberty's theory, the more effective a consumer is in enforcing the TCPA's protections, the sooner they forfeit them—eventually leaving themselves exposed to unlawful solicitations without any recourse. Courts, including this one, have repeatedly rejected the notion

12

that an individual's standing diminishes with each successive lawsuit.[10] This Court should do so again here.

Liberty likens this case to *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016), where the plaintiff openly admitted that she bought a shoe box full of phones solely to manufacture TCPA lawsuits. That extreme scenario bears no resemblance to this case. Mey did not invite, solicit, or manufacture Liberty's calls or texts. To the contrary, she warned Liberty of its mistake, and Liberty ignored her. Even under Liberty's own theory of the case, the solicitations were the result of its own error—not some trap laid by Mey.

In any event, this Court has already declined to follow *Stoops. See Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 784 (N.D.W. Va. 2017) ("This Court declines to follow Stoops."). Undeterred, Liberty urges the Court to revisit *Venture Data*, asserting that Mey's "lawsuit mill has grown in both size and sophistication" since that decision. (ECF No. 96, n.7). Liberty doesn't actually explain how it arrived at that conclusion (not that it would matter), suggesting only that Mey has filed

---

[10] *See, e.g., Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (rejecting "the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."); *Dobronski v. Fam. First Life, LLC*, 2024 WL 1342668, at *5 (E.D. Mich. Mar. 29, 2024) ("Adopting defendant's position would require drawing lines regarding when a TCPA plaintiff becomes a 'professional' litigant and loses standing to bring any claims based on alleged violations of the statute"); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1195 (M.D. Tenn. 2017) ("Litigation is not college athletics: there is no 'amateurs only' rule"); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 784 (N.D.W. Va. 2017) ("While defendant is understandably frustrated by Ms. Mey's efficacy, she is doing exactly what Congress intended—enforcing the law"); *Abramson v. Oasis Power LLC*, 2018 WL 4101857, at *5 (W.D. Pa. July 31, 2018) ("the Court rejects any suggestion that plaintiff's prolific history of filing TCPA lawsuits distinguishes this case and demonstrates the lack of an injury-in-fact").

additional cases since *Venture Data*. Yet, that argument simply repackages the same flawed premise this and other courts have rejected before: that standing diminishes with each successive enforcement. That premise was illogical in 2017, and it remains illogical today.

What Liberty lacks in reasoned analysis, it makes up for in rhetoric, branding Mey a "professional plaintiff" who sets "flytraps" then "lies in wait" to "snare" and "entrap" "legitimate businesses." (ECF No. 96, at 18–19). Such caricatures do not reflect legal analysis, but rather frustration with the proficiency with which Mey enforces the TCPA once those protections have been violated. The TCPA does not immunize offenders simply because their targets are vigilant. And Mey's enforcement record shows persistence, not bad faith. This Court has consistently rejected attempts to discredit Mey for successfully invoking the TCPA's protections and strip her of standing. The result here should be no different.

### III.    Text Messages Are Actionable Under Section 227(c)

Congress authorized the Federal Communications Commission ("FCC") to establish the National Do Not Call Registry and, in doing so, expressly delegated rulemaking authority to prescribe regulations necessary "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c). Congress then created a private right of action for any person "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [those regulations]." 47 U.S.C. § 227(c)(5). Since the statute's enactment, courts across the country have consistently

held that a text message constitutes a "call" within the meaning of § 227(c)(5). Liberty nonetheless urges this Court to revisit that settled question in light of the recent decisions in *Loper Bright* and *McLaughlin*.[11] But regardless of the level of deference afforded, the result is the same: a text message is a "call" under the TCPA.

First, the statutory text supports treating texts the same as calls. Section 227(c) concerns "telephone solicitations," protecting consumers' "privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The TCPA defines "telephone solicitation" as "the initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. 227 (a)(4) (emphasis added). By explicitly including "messages," Congress made clear that the statute's protections extend beyond traditional voice calls. *See Hudson v. Palm Beach Tan, Inc.*, 2024 WL 4190513, at *7 (M.D.N.C. Aug. 12, 2024) (explaining that the statutory text of the TCPA supports the conclusion that text message are actionable under Section 227(c)).

Second, the broader TCPA structure confirms that calls are inclusive of texts. The Supreme Court has assumed, and other courts have held, that "calls" under Section 227(b) encompass text messages. *See Facebook, Inc. v. Duguid*, 592 U.S. 395,

---

[11] In *Loper Bright*, the Supreme Court overturned the *Chevron* deference doctrine, holding that courts must exercise independent legal judgment to determine the meaning of statutes and need not defer to an agency's interpretation of an ambiguous statute. *See Loper Bright*, 603 U.S. at 402. In *McLaughlin*, the Supreme Court held that the Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of a relevant statute is correct and that district courts should interpret the TCPA under ordinary principles of statutory interpretation, "affording appropriate respect to the agency's interpretation." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025).

400 n.2 (2021) (assuming that the TCPA's prohibitions extend to text messages); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Norton v. 1863 PAC, LTD.*, 2019 WL 5866102, at *2 (N.D.W. Va. July 9, 2019) (Groh, J.) (relying on *Campbell-Ewald* to conclude that "text messages are included in the definition of 'calls' under the TCPA"); *Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017) ("It is uncontested that text messages to a cellular phone constitute 'calls'"); *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) (Text messages to a cellular telephone qualify as a "call" within the meaning of the statute"); *Breda v. Cellco P'ship*, 934 F.3d 1, n.1 (1st Cir. 2019); *Hall v. Xanadu Mktg., Inc.*, 682 F. Supp. 3d 1278, 1285 (N.D. Ga. 2023) ("A text message to a cellular telephone qualifies as a "call" under the TCPA"). There is no reason to assign the same word a different meaning in Section 227(c), given that both provisions protect the same core interest: the consumer's right to be free from unwanted intrusions. *See Gulden v. Liberty Home Guard LLC*, 2021 WL 689912, at *5 (D. Ariz. Feb. 23, 2021) ("[Liberty] fails to cite any law in support of its position that a text message is not a 'telephone solicitation.'").

Third, the FCC's interpretation remains entitled to respect. Consistent with its delegated authority, the FCC has long confirmed that text messages fall within the TCPA's restrictions on calls. *See Hudson*, 2024 WL 4190513, at 7 (detailing history of FCC regulations and guidance)*; Dawson v. Porch.com*, 2024 WL 4765159, at 4 (W.D. Wash. Nov. 13, 2024) (same). Congress expressly empowered the FCC to

"evaluate alternative methods and procedures" and "develop proposed regulations" necessary to protect consumers' privacy, including "do-not-call systems." 47 U.S.C. § 227(c)(1)–(3). The FCC's inclusion of text messages is therefore not an expansion of statutory text, but a reasonable implementation of Congress's mandate.[12]

Under *Loper Bright*, when Congress expressly empowers an agency to decide how to apply a statutory term to specific facts found by the agency—as here—the agency interpretation is entitled to "deferential review." *Loper Bright*, 603 U.S. at 388. And, even if the FCC's interpretation is not entitled to "deferential review" under *Loper Bright*, this Court must, at a minimum, afford "appropriate respect to the agency's interpretation" under *McLaughlin*.

Fourth, the ordinary meaning of "call" also encompasses texts. As the Ninth Circuit observed, the FCC's conclusion that text messages are encapsulated with Section 227(b)'s use of the term "call" is consistent with the dictionary's definition of "call" in that it is defined as "to communicate with or try to get into communication with a person by telephone." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002). Text messaging is indisputably communication by telephone. Courts applying ordinary-meaning principles have thus reached the same result "regardless whether deference

---

[12] Liberty suggests that the FCC has not regulated whether a text is a "telephone call" under Section 227(c). (ECF No. 96, at 19). Not so. *See* 47 C.F.R. § 64.1200(e) (2024) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'")

to the agency's interpretation is appropriate or not." *Dawson*, 2024 WL 4765159, at 6.

Fifth, the TCPA's purpose compels the same result. Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy." *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. July 21, 2025). Section 227(c) recognizes "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1). "With those goals in mind, the 'basis' for the FCC's conclusion becomes abundantly clear: unsolicited text messages invade the privacy and disturb the solitude of their recipients." *Wilson*, 2025 WL 2029274, at *4. They should therefore be included within the purview of the do-not-call protections. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (holding that invasion of privacy arising out of unwanted text messages is "the very harm that the Act is designed to prevent"); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021) ("Telemarketing text messages present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA") (cleaned up).

Finally, the overwhelming consensus is unchanged. Liberty suggests that "multiple" federal courts have revisited Section 227(c)(5) and concluded that text

messages are not actionable.[13] But, to be sure, a greater number of federal courts have come to the opposition conclusion since *Loper Bright*.[14] Indeed, additional courts, interpreting related TCPA provisions in light of shifting deferential standards, have likewise declined to depart from long-held FCC interpretations.[15] They have done so by applying the text, structure, purpose, and context of the TCPA, not by reflexive deference. No matter the interpretive lens, courts keep arriving at the same conclusion: a text message is a "call" under the TCPA.

## IV.  Summary Judgment Must Be Denied as to Mey's WVCCPA Claims

Liberty maintains that Mey's individual claims under the West Virginia Consumer Credit and Protection Act ("WVCCPA") fail because neither Liberty nor Joseph qualify as a "telemarketer." And even if they do, Liberty claims that it nonetheless satisfies the WVCCPA's safe harbor provisions.

---

[13] ECF No. 95, at 20-22 (citing *Jones v. Blackstone Med. Servs., LLC*, 2025 WL 2042764, at *4 (C.D. Ill. July 21, 2025) and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195, at *1 (N.D. Fla. Aug. 26, 2025).

[14] *See Wilson*, 2025 WL 2029274, at *4; *Barton v. Delfgauw*, 2025 WL 2402131, n.1 (W.D. Wash. Aug. 18, 2025); *Hudson*, 2024 WL 4190513, at *7; *Dawson*, 2024 WL 4765159, at *5.

[15] *See Wilson v. Hard Eight Nutrition LLC*, 2025 WL 1784815, at *7 (D. Or. June 27, 2025) (concluding, without deferring to the FCC, that a cell phone is presumptively a residential telephone under the TCPA's do-not-call provisions); *Ragsdale v. LeadPoint, Inc.*, 2024 WL 5424125, at *3 (C.D. Cal. Nov. 5, 2024) (providing that 47 C.F.R. § 64.1200(d)(4), which proscribes the use of "artificial or prerecorded-voice telephone calls," still applies to text messages); *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. Aug. 15, 2025) (providing that, even without agency deference, the TCPA's reference to "residential" phones still encompasses cell phones) (collecting cases).

### A.  Defendants are "Telemarketers"

To start, Liberty seeks refuge from the WVCCPA based on an exception that doesn't actually exist. The WVCCPA broadly precludes any "telemarketer" from engaging in abusive telemarketing practices. W. Va. Code §§ 46A-6F-101, et seq. A "telemarketer" is broadly defined as "any person who initiates or receives telephone calls to or from a consumer in this state for the purpose of making a telemarketing solicitation as defined in section one hundred twelve of this article." W. Va. Code § 46A-6F-113(a). That definition contains several limited exclusions. *Id*. Relevant here, Liberty maintains that it falls within the exception at Subsection (d), which provides that "[a] telemarketer does not include a *salesperson* as defined in section one hundred fourteen of this article." *Id*. (emphasis added). Yet, at no point does Section 114 define "salesperson." *Id*. at § 114.

Instead, Section 114 defines "telemarketer in good standing"—an entirely different term and concept—which means "a telemarketer who, during the previous two years has continually been engaged in the business of telemarketing and who has not been convicted, or pled guilty or nolo contendere to racketeering, embezzlement, fraudulent conversion, misappropriation of property or any violations of state or federal securities laws, a theft offense, or any consumer protection law or telemarketing law." *Id*. at § 114. The term "salesperson" does not even appear within the definition of "telemarketer in good standing." Nor does the term "salesperson" appear to be defined anywhere else within Article 6F ("Telemarketing").

Nevertheless, Liberty borrows the phrase "telemarketer in good standing" and substitutes it for "salesperson," effectively rewriting the statute to exclude itself from the WVCCPA's reach. As the party seeking shelter under one of the statute's exceptions, Liberty bears the burden of proving its entitlement to it. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 694 (2025) (noting the "well-settled" rule of statutory construction that the burden of proving an exception is upon the one asserting it). Liberty has not—and cannot—meet that burden here.[16]

In short, Liberty cannot rely upon an exception that does not actually exist. And it certainly cannot create one, particularly when that proposed exception would gut the overarching act, turning a statute meant to curb abusive telemarketing into one that polices only the recently convicted. For these reasons, this Court should decline Liberty's invitation to create an exception where one does not exist.

### B. Mey is a "Consumer"

Liberty claims in passing that Mey is not a "consumer," which is defined alongside "purchaser," as "a person who is solicited to become or does become obligated to pay for consumer goods or services offered by a telemarketer through telemarketing." W. Va. Code § 46A-6F-103. Liberty reasons that it intended to contact

---

[16] It is unclear how or why Section 113(d) came to reference a non-existent definition in Section 114. The legislative history sheds no light on whether the reference to "salesperson" was a drafting error or the vestige of an earlier bill version. But whatever the cause, it is not for the Court—or Liberty—to repair by substituting different terms. And it certainly should not do so where Liberty's proposed "fix" would hollow out the Act entirely. Under Liberty's reading, only telemarketers convicted of racketeering, embezzlement, or similar crimes within the past two years would remain subject to the WVCCPA, while all others—law-abiding or not—would be exempt. It strains belief to think the Legislature intended to regulate only recently convicted criminals while allowing every other abusive telemarketer to operate with impunity.

Mr. Skadra and therefore did not solicit Mey. But Mey was plainly "solicited" when Liberty directed telemarketing calls and texts to her number, regardless of Liberty's supposed intent to reach Mr. Skadra. The statute turns on the fact of solicitation, not the telemarketer's subjective belief about who was on the receiving end.

### C. Defendants Fail to Satisfy the WVCCPA's Safe Harbor Requirements

The four requirements under the WVCCPA's safe harbor are nearly identical to the TCPA's safe harbor requirements. For the same reasons that it failed to satisfy the TCPA safe harbor defense, Liberty failed to satisfy the WVCCPA's safe harbor defense. *See supra*, ARGUMENT I.B. Like its discussion of the TCPA safe harbor defense, Liberty's discussion of the WVCCPA safe harbor defense is equally unclear as to when written procedures and compliance trainings were actually implemented—in Spring 2022 or more recently. Liberty's discussion of personnel training and maintenance of an internal DNC list is conspicuously in the present tense. But safe harbor compliance must exist *at the time of the offending communications*, not adopted afterward. The statute makes this clear: only where "any *subsequent* call is the result of error" following implementation of the required compliance measures does the defense apply. W. Va. Code § 46A-6F-601(b) (emphasis added).

### CONCLUSION

For the foregoing reasons, Liberty's motion for summary judgment should be denied in its entirety. In any event, because Mey's motion for class certification remains pending, this Court should defer ruling on summary judgment until class

certification is resolved. Proceeding otherwise would risk the "one-way intervention" problem Rule 23 was designed to prevent—allowing absent class members to benefit from a favorable ruling without being bound by an adverse one. *See Alig v. Quicken Loans Inc.*, 2016 WL 10490288, at 7 (N.D.W. Va. Aug. 25, 2016). Although Liberty has not objected to the sequencing of these motions, and defendants are not categorically precluded from seeking a dispositive ruling before certification, prudence counsels deferral here to avoid any potential claim of procedural unfairness. *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, n.3 (7th Cir. 2016).

**DIANA MEY**

By Counsel:

/s/ Andrew C. Robey
Ryan M. Donovan (WVSB #11660)
Andrew C. Robey (WVSB #12806)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
rdonovan@hfdrlaw.com
arobey@hfdrlaw.com

## CERTIFICATE OF SERVICE

I certify that on October 9, 2025, a true copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system which will notify all counsel of record via the Court's ECF filing system.

/s/ *Andrew C. Robey*
Andrew C. Robey (WVSB #12806)