# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### WHEELING DIVISION

DIANA MEY,

      PLAINTIFF,

v.                                                                      CIVIL ACTION NO. 5:23-CV-281

LIBERTY HOME GUARD, LLC and
BENJAMIN JOSEPH,

      DEFENDANTS,


**CORRECTED
DEFENDANTS' RESPONSE IN OPPOSITION
<u>TO PLAINTIFF'S MOTION TO CERTIFY CLASS</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iv

LIST OF EXHIBITS ................................................................................................ x

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

    I.    A Simple Consumer Typo Landed Mey's Number On Liberty's Call List ............. 3

    II.    Liberty's Business Practices Don't Include Cold Calling Or Contacting Consumers Who Request Not To Be Contacted ................................. 6

        A.    Some Consumers Engage Directly With Liberty. ....................................... 7

        B.    Liberty's Marketing Partners Also Get Prior Express Permission And Require Individual Arbitrations. ....................................... 9

            1.    ConsumerAffairs ..................................................................... 9

            2.    Modernize ............................................................................... 10

    III.    Liberty's Trained Sales Representatives Tend To Over-Designate Opt-Outs. ....... 11

    IV.    Consumers Confirmed In Declarations Submitted With This Brief That They Invite Liberty To Contact Them And That They Otherwise Have No Claims For A Variety Of Individualized Reasons. ......................................... 13

LEGAL STANDARD ........................................................................................... 14

ARGUMENT ........................................................................................................ 16

    I.    Mey's Proposed Class Is Riddled with Individualized Issues. ........................... 16

        A.    The Consent and Opt-Out Request Issues Raised Here Demand Individualized Inquiries. ................................................... 17

        B.    Arbitration Will Be a Predominant Issue. ................................................ 22

            1.    Arbitration Provisions Apply To TCPA Claims. ......................... 22

            2.    Arbitration And Waiver Issues Overwhelm Any Common Question. ............................................................. 24

        C.        Additional Individual Issues Plague Mey's Putative Class........................ 25

II.        Mey Has No Method Of Ascertaining A Viable Class............................................ 27

III.      Mey Is Not A Typical Or Adequate Class Representative. .................................... 30

IV.      Mey's Putative Class Action Is Not the Superior Method of Resolving Her Dispute. ....................................................................................................................... 33

CONCLUSION............................................................................................................................. 34

APPENDIX.................................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013).................................................................................... 23, 33

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*,
   96 F.3d 88 (4th Cir. 1996)................................................................................ 23

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. *591 (1997)*........................................................................................ 30

*Andrews v. Am. Tel. &Tel. Co.*,
   95 F.3d 1014 (11th Cir. 1996) ......................................................................... 26

*Andrews v. Ring, LLC*,
   2020 WL 6253319 (C.D. Cal. Sept. 17, 2020)................................................. 31

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)................................. 23, 33

*Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015)...................... 31

*Babineau v. Fed. Exp. Corp.*,
   576 F.3d 1183 (11th Cir. 2009) ....................................................................... 22

*Balthazor v. Cent. Credit Servs., Inc.*,
   2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) ................................................. 35

*Beard v. John Hiester Chevrolet, LLC*,
   640 F. Supp. 3d 420 (E.D.N.C. 2022)............................................................. 19

*Berman v. Freedom Fin. Network, LLC*,
   400 F. Supp. 3d 964 (N.D. Cal. 2019) ................................................. 22, 28, 32

*Bridge v. Credit One Fin.*,
   294 F. Supp. 3d 1019 (D. Nev. 2018) ............................................................. 32

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008).......................................................................................... 27

*Brodsky v. HumanaDental Ins. Co.*,
   269 F. Supp. 3d 841 (N.D. Ill. 2017) .............................................................. 35

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ................................................................ 30

*Burk v. Direct Energy, LP*,
   2021 WL 4267146 (S.D. Tex. Sept. 20, 2021) ........................................ 35

*Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*,
   145 S. Ct. 2845 (2025) ............................................................ 15, 26, 27

*Chennette v. Porch.com, Inc.*,
   50 F.4th 1217 (9th Cir. 2022) ..................................................... 25, 26

*Chinitz v. Intero Real Est. Servs.*,
   No. 18-cv-6100 (N.D. Cal.) ................................................................ 28

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .......................................................................... 14

*Connelly v. Hilton Grand Vacations Co., LLC*,
   294 F.R.D. 574 (S.D. Cal. 2013) ........................................................ 19

*Cordoba v. DIRECTV, LLC*,
   942 F.3d 1259 (11th Cir. 2019) ......................................................... 22

*Davis v. Cap. One, N.A.*,
   2023 WL 6964051 (E.D. Va. Oct. 20, 2023) .......................... 17, 18, 19, 27

*Davis v. Cap. One, N.A.*,
   2025 WL 2445880 (4th Cir. Aug. 26, 2025) ................................... 17, 19

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) .............................................................. 30

*E&G, Inc. v. Mount Vernon Mills, Inc.*,
   2019 WL 4034951 (D.S.C. Aug. 22, 2019) ........................................... 17

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ....................................................... 15, 27

*Forman v. Data Transfer, Inc.*,
   164 F.R.D. 400 (E.D. Pa. 1995) .......................................................... 34

*Fuentes v. DISH Network L.L.C.*,
   2021 WL 4916754 (N.D. Cal. June 24, 2021) ...................................... 31

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) .................................................................................. 16

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ................................................................................... 30, 32

*Gene & Gene LLC v. BioPay LLC*,
  541 F.3d 318 (5th Cir. 2008) ............................................................................ 18, 19

*Ginwright v. Exeter Fin. Corp.*,
  280 F. Supp. 3d 674 (D. Md. 2017) .......................................................................... 17

*Gorss Motels, Inc. v. Safemark Sys., LP*,
  2018 WL 1635645 (M.D. Fla. Apr. 5, 2018)............................................................... 35

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ................................................................................... 32

*Harris v. Rainey*,
  299 F.R.D. 486 (W.D. Va. 2014) ............................................................................. 30

*Hicks v. Client Servs. Inc.*,
  2008 WL 5479111 (S.D. Fla. Dec. 11, 2008)............................................................. 35

*In re Marriott Int'l, Inc.*,
  78 F.4th 677 (4th Cir. 2023) ............................................................................ 22, 33

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013) ......................................................................... 24

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
  206 F.3d 411 (4th Cir. 2000) ................................................................................... 24

*Jeffrey Katz Chiropractic v. Diamond Respiratory Care*,
  340 F.R.D. 383 (N.D. Cal. 2021) ............................................................................. 34

*Johansen v. Efinancial, LLC*,
  2022 WL 168170 (W.D. Wash. Jan. 18, 2022).......................................................... 19

*KHS Corp. v. Singer Fin. Corp.*,
  No. CV 16-55, 2018 WL 4030699 (E.D. Pa. Aug. 23, 2018) .................................... 35

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ............................................................................... 33

*Krakauer v. Dish Network, LLC*,
   925 F.3d 643 (4th Cir. 2019) ........................................................................... passim

*Lawson v. Grubhub, Inc.*,
   13 F.4th 908 (9th Cir. 2021) ..................................................................................... 24

*Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*,
   No. 8:16-CV-3461-MSS-JSS, 2018 WL 1449581 (M.D. Fla. Feb. 16, 2018) ......................... 35

*Lienhart v. Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) ..................................................................................... 16

*Maldini v. Marriott Int'l, Inc.*,
   140 F.4th 123 (4th Cir. 2025) .............................................................................. 23, 24

*Mey v. DIRECTV, LLC*,
   971 F.3d 284 (4th Cir. 2020) ..................................................................................... 23

*Mey v. Principal Law Grp., LLC*,
   2025 WL 1842616 (N.D. W. Va. Jan. 7, 2025) ..................................................... 15, 28

*Mey v. Venture Data LLC*,
   2017 WL 10398569 (N.D.W. Va. June 6, 2017) ...................................................... 28

*O'Connor v. Uber Techs., Inc.*,
   904 F.3d 1087 (9th Cir. 2018) ................................................................................... 24

*Perry v. Thomas*,
   482 U.S. 483 (1987) .................................................................................................. 24

*S.C. Nat'l Bank v. Stone*,
   139 F.R.D. 325 (D.S.C. 1991) .................................................................................... 30

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
   863 F.3d 460 (6th Cir. 2017) ..................................................................................... 35

*Self-Forbes v. Adv. Call Ctr. Techs., LLC*,
   754 F. App'x 520 (9th Cir. 2018) .............................................................................. 20

*Shamblin v. Obama for Am*,
   2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) .......................................................... 33

*Sliwa v. Bright House Networks, LLC*,
   333 F.R.D. 255 (M.D. Fla. 2019) .............................................................................. 22

*Spotswood v. Hertz Corp.*,
2019 WL 498822 (D. Md. Feb. 7, 2019) ............................................................ 24, 31

*Tan v. Grubhub, Inc.*,
2016 WL 4721439 (N.D. Cal. July 19, 2016) .................................................... 24, 31

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) .................................................................. 15, 16, 32

*Ung v. Univ. Acceptance Corp.*,
319 F.R.D. 537 (D. Minn. 2017) ............................................................................ 29

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) ............................................................................................ 23

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir, 2017) .............................................................................. 20

*Vance v. DIRECTV, LLC*,
2022 WL 3044653 (N.D.W. Va. Aug. 1, 2022) .................................................... 16

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*,
274 F.R.D. 229 (S.D. Ill. 2011) ............................................................................ 33

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................................................. 14, 15, 16

*Willis v. Big Lots, Inc.*,
242 F. Supp. 3d 634 (S.D. Ohio 2017) .................................................................. 32

*Wilson v. Badcock Home Furniture*,
329 F.R.D. 454 (M.D. Fla. 2018) .................................................................... 17, 29

*Wu v. MAMSI Life & Health Ins. Co.*,
269 F.R.D. 554 (D. Md. 2010) .............................................................................. 30

*Zachery v. Texaco Expl. & Prod., Inc.*,
185 F.R.D. 230 (W.D. Tex. 1999) .......................................................................... 30

## Statutes

47 U.S.C. § 227 ...................................................................................................... 18, 26

**Rules**

FED. R. CIV. P. 23 ................................................................................................ passim

**Regulations**

47 C.F.R. § 64.1200 ........................................................................... 18, 25, 26

**Other Authorities**

7A *Fed. Prac. & Proc. Civ*. § 1760 (4th ed.) ............................................ 27

## <u>LIST OF EXHIBITS</u>

1.     Exhibit 1: Declaration of Benjamin Joseph, Oct. 13, 2025

    A.     Tab A: Liberty Home Guard Consent Page (LIBERTY000011)

    B.     Tab B: Liberty Home Guard Landing Page URLs

    C.     Tab C: 2018 Liberty Home Guard Privacy Policy

    D.     Tab D: Current Liberty Home Guard Privacy Policy

    E.     Tab E: 2018 T Liberty Home Guard Terms of Use

    F.     Tab F: Current Liberty Home Guard Terms of Use

    G.     Tab G: Consumer Liberty Home Guard Website Flow

    H.     Tab H: Geoffrey Skadra Website Lead (LIBERTY000001–9)

    I.     Tab I: Mar. 4, 2022, Email (LIBERTY000012)

    J.     Tab J: Text Records (LIBERTY000010)

    K.     Tab K: Texts (MEYLIB000018–22)

    L.     Tab L: Apr. 7, 2022, Email (LIBERTY000013)

2.     Exhibit 2: Excerpts of Deposition of Plaintiff Diana Mey, Apr. 11, 2024

3.     Exhibit 3: Excerpts of Deposition of Defendant Benjamin Joseph, Jan. 31, 2024

4.     Exhibit 4: Declaration of Joel Blaski

    A.     Tab A: VanillaSoft Codes (LIBERTY000081)

5.     Exhibit 5: Liberty's Combined Discovery Responses

6.     Exhibit 6: Declaration of Dr. Maria Guevara

7.     Exhibit 7: Declaration of Don Millspaugh

8.     Exhibit 8: Declaration of Jason Rinsky

9.     Exhibit 9: Declaration of Jessica Bustamente

10.     Exhibit 10: Declaration of Zac Carman

    A.     Tab A: ConsumerAffairs Website User Flow

    B.     Tab B: Liberty-Specific Website User Flow

    C.     Tab C: Historical Versions of ConsumerAffairs Terms of Use

11.     Exhibit 11: Declaration of Gregg Hicks

    A.     Tab A: Terms of Use, Effective Oct. 8, 2024

B.      Tab B: Screenshot of Submission Disclaimer

12.     Exhibit 12: Declaration of Frederick David Chazanoff

13.     Exhibit 13: Declaration of Norman Sarfati

14.     Exhibit 14: Declaration of Robert Chin

15.     Exhibit 15: Declaration of Marlon Cantave

16.     Exhibit 16: Declaration of Kate King

17.     Exhibit 17: Declaration of Anthony Pagonis

18.     Exhibit 18: Declaration of Michael Kaufman

19.     Exhibit 19: Declaration of Michele Afshar

20.     Exhibit 20: Declaration of Danielle Digirolamo

21.     Exhibit 21: Declaration of Karen Solomon

22.     Exhibit 22: Expert Report of Anya Verkhovskaya, *Krakauer v. Dish Network, LLC*, No. 1:14-cv-333 (M.D.N.C. Mar. 23, 2015).

## INTRODUCTION

Binding authority and common sense compel the conclusion that Plaintiff Diana Mey has failed to carry her evidentiary burden to prove any element of Rule 23, even though she bears the burden to prove each. The Court should deny class certification.

The fundamental reason certification fails is that Mey's proposed class is untethered to the facts of this case. The record shows Liberty reached her number only because a consumer mistyped his own—one nearly identical to Mey's—when requesting a home warranty quote online. Like every other person who received calls from Liberty, that consumer expressly consented to contact even if his number was on the DNC registry. And just like every other such person inquiring through Liberty's website, he also waived the right to participate in a class action and agreed to arbitrate claims against Liberty.

Other than a single input error, she has no evidence that Liberty ever called *anyone* on the DNC registry without consent. Yet she asks this Court to certify a class of people with no injury, no claims, and nothing in common with her. Because Plaintiff cannot meet her burden under Rule 23—on predominance, commonality, typicality, adequacy, ascertainability, or superiority—the Court should deny certification.

First, Mey has no way to identify even one putative class member like her with common proof, preventing her from establishing the most important prerequisite to class certification: that common issues predominate over individual issues. Instead, individualized inquiries will be required on a host of dispositive issues: Did they consent? Did they have an established business relationship with Liberty? Did they attempt to revoke that consent? Did they agree to arbitrate? Did they use their number for residential or business purposes? There is no way to resolve *any* of these issues with common proof, and that is dispositive.

That's largely because, as Defendants have consistently affirmed: Liberty does not make unsolicited calls. It only calls consumers who have *first* submitted their contact information and inquired about Liberty's services—giving prior express permission to contact them and creating an established business relationship (EBR). At that point, they also agree to Liberty's or a third party's "Terms of Use" (or both) which generally include a provision requiring they arbitrate disputes. And if a consumer opts out of future contact *after* giving that permission, Liberty removes them from its call list. Thus, the baseline is that all Liberty's calls are legal, and complaints by consumers may not be filed in court. To find any exceptions like Mey's case would require a one-by-one review of call records, hundreds of thousands of interviews with call recipients and Liberty customer service representatives, and so on.

The Court will also need to conduct a highly individualized analysis to determine whether any number is "residential" or used for business purposes, in which case there is no claim. It will take more than merely cross-referencing business number registrations and checking the yellow pages to make this determination, contrary to the baseless and unproven assertions of Mey's "expert witness." June 27, 2025, Expert Report of Christina Peters-Stasiewicz (Class Experts Group, LLC) ("Pl.'s Expert Report") [Doc No. 93-10] ¶ 40. Particularly in today's "gig economy," personal phone numbers are used for business all the time.[1] It would require a fact-intensive examination of who pays the phone bills, the subscriber's income tax returns, and how much the phone is used for business or employment purposes to answer this question. The dozen declarations from the consumers Liberty called, attached to this brief, establish that.

Second, Mey cannot meet her burden to show she is typical or adequate, as she must under

---

[1] *See* https://www.cnn.com/2023/07/24/economy/gig-workers-economy-impact-explained; *Privacy, Surveillance, and Power in the Gig Economy*, avail. at https://dl.acm.org/doi/fullHtml/10.1145/3491102.3502083 (last accessed Oct. 12, 2025).

Rule 23(a). Mey only received calls and texts from Liberty because someone accidentally typed in her phone number. Unlike her other TCPA cases, she's not part of an easily identifiable group of people who received random marketing calls. She's a needle in a haystack. Her claims are also subject to a host of unique defenses, including whether Liberty can invoke the TCPA's and West Virginia's safe-harbor and whether it should've treated her ambiguous email as an opt-out. So, Mey cannot serve as a stand-in for absent class members at trial because she is nothing like those people who consented to calls, had an EBR with Liberty, agreed to arbitration, etc.

Third, Mey limits her class to "residential telephone numbers" that appear in the "Class Records." But she has no reliable and administratively feasible method to identify those numbers. True, Liberty's records show calls made and texts sent, and cross-referencing that with the National DNC Registry is not complicated. Liberty's records *do not show* whether a phone number is a residential, *non*-business line. Mey has no solution to this fatal problem.

Fourth, Mey cannot show that a class action is a superior method of resolving any one-off claims against Liberty that may exist as a result of a one-off error like the one that led to Mey's claims. There are hundreds of thousands of telephone calls and millions of text messages. For none of these is there common proof that can resolve the claims and defenses at issue in this case. The litigation would devolve into thousands of mini-trials. No such case could ever be tried.

The Court should deny class certification.

## FACTUAL BACKGROUND

## I.    A Simple Consumer Typo Landed Mey's Number on Liberty's Call List.

On February 10, 2022, Geoffrey Skadra was in the market for a home warranty. Aff. of Geoffrey Skadra [Doc. 95-5] ¶ 3. Skadra visited Liberty's website and submitted his contact information so that he could get a quote. *Id.*; Decl. of Benjamin Joseph (attached as **Exhibit 1**) ¶ 19, Tab H (LIBERTY000001–9). He entered his name, email address, and home address, along

with what he thought was his phone number. Skadra Aff. ¶ 4. At the time, he owned and intended to use his phone number. *Id.* ¶¶ 3–4. But he mixed-up two numbers, thereby entering the phone number of none other than Diana Mey, self-proclaimed TCPA Consumer Advocate. *Id.* ¶ 5; Dep. Tr. of Diana Mey (Apr. 11, 2024) (excerpts attached as **Exhibit 2**) at 10:9–21.

The information Skadra submitted on Liberty's website was loaded into Liberty's third-party lead management software program, VanillaSoft. Joseph Decl., Tab H at 1. Between February 10, 2022, and March 4, 2022, Liberty salespeople called and texted Skadra at the number he provided, but they never reached a live person. [Doc. 95-6 (call records)]. Instead, sales agents were greeted with a voicemail message masquerading as an answered phone call: "Hello? . . . Hello? . . . Pardon me? . . . What company are you calling with? . . . Leave your message at the beep." *See* Mey Dep. at 38:20–42:20 (confirming voicemail greeting).

On March 4, 2022, Liberty received the following email in its customer service inbox (service@libertyhomeguard.com):

Last month I received multiple telemarketing calls from your agents to my wireless line 304-242-█████. This is a number that has been on the National Do Not Call registry since 2003 and it is my understanding that under the federal TCPA, it is illegal to place an automated call of any kind without the prior express consent of the called party. Furthermore, it is also illegal to place a call to a number on the DNC without my prior express written consent.

Please forward to me on or before March 9, 2022 anything your company has that is evidence that I gave my prior express consent to be called. I want to give your company the opportunity to explain itself before I file a formal complaint.

Diana Mey

Joseph Decl. ¶ 21, Tab I (Mar. 4, 2022, Email). What's important in this email is the information Mey deliberately left out. She does **not** say that she or someone she knows had not given her consent to be contacted by Liberty. *See id.* And she did **not** ask Liberty to remove her from its calling list. *Id.* Nor did she state that the phone calls were unwanted or unsolicited. *Id.* Instead, Mey provided Liberty with her "understanding" of the TCPA, advised Liberty *generally* that it is

"illegal to place a call to a number on the DNC without [her] prior express written consent," and then invited Liberty to contact her with "evidence that I gave my prior consent to be called." *Id.*

Liberty got the email. Dep. Tr. of Benjamin Joseph (Jan. 31, 2024) (excerpts attached as **Exhibit 3**) at 80:4–8. But the vague wording, lack of corroborating details, and a request for information raised serious doubts about its legitimacy and Mey's intentions. *Id.* at 82:7–10. So, Joseph and the customer service team investigated the email. *Id.* at 81:14–82:24. They looked up the referenced number and found that it was connected to Skadra, along with other information— like a valid address, email address, and a matching IP address. That indicated that Skadra's information was legitimate, and that Mey's unsupported demand for documentation was not. *Id.* This was based, in part, on the fact that Mey's name and email were not in VanillaSoft, Liberty's lead system. *Id.* at 86:9–14. Liberty concluded that the email was likely a phishing attempt or a scam and did not respond. *Id.* at 81:14–17, 84:4–6, 88:1–3.

After receiving Mey's ambiguous email, Liberty sent several additional text messages to the phone number, each time addressing the message to "Geoff"—not "Diana"—and each time inviting the recipient of the text messages to "Text 'STOP' to unsubscribe." Joseph Decl. ¶ 25, Tab K (text messages). Mey never did. Nor did she call to try to clear up any confusion. Instead, she waited a month and then sent a second email on April 7, 2022. *Id.* ¶ 27, Tab L. This time, the email included three people, including Joseph and Joel Blaski, and included more detail:

Dear Sirs

Between 2/10/2022 and 2/23/2022 I received 9 unsolicited telemarketing calls on behalf of your company to my voip line 304-242-███ which has been on the federal DNC since 2003. I pay per call/text received to that voip line.

On 3/4/2022 I sent an email to service@libertyhomeguard.com about these unwanted and unwelcome calls but the only response I got was more solicitations in the form of 8 unsolicited text messages to that same number.

Based on the lawsuit that was filed against your company by Charles Gulden in November of 2020, I'm sure you know that the TCPA provides for up to $1,500 in statutory damages for violations.  Here in WV we have a companion statute called the WVCCPA which also gives rise to statutory damages of up to $3,000 per violation.  Courts in my jurisdiction have upheld the proposition that these federal and state damages may be stacked.

Before filing a lawsuit, I am offering to settle my claim against your company for the sum of $76,500.  This figure represents $1,500 per each of the 17 statutory TCPA damages and $3,000 per each of the 17 WV CCPA statutory damages.  You should also be aware that the WV statute contains a provision that could require your company to pay my attorney fees should I prevail in a lawsuit against your company.

Please let me hear from you on or before 5:00 p.m. eastern on 4/14/2022 because after that date, I plan on forwarding the case on to my attorney to prosecute.  You should also be aware that I have recordings of the telemarketing calls.

Yours truly,
Diana Mey

*Id.* Liberty reviewed this email as well and determined that it was a do-not-call ("DNC") request, specifically because of Mey's characterizations of the phone calls and texts as "unsolicited" and "unwanted and unwelcome"—characterizations absent in the prior email. Joseph Dep. at 98:21–99:3 (testifying that the language in the email indicated that the email "need[ed] to be looked at, not as a cybersecurity threat, but as a potential opt-out request"); *id.* at 97:1–8. She also referred to the West Virginia law, which matched the area code of the phone number at issue, and said her telephone was through a VoIP line, which also tracked with her comment about recording the calls. Finally, instead of demanding the personal information and proof of consent like in the prior email, she threatened a lawsuit and made a pre-suit settlement demand. Liberty immediately ceased all contact with the phone number Skadra provided. *Id.* at 97:9–12.

## II.    Liberty's Business Practices Don't Include Cold Calling or Contacting Consumers Who Request Not to Be Contacted.

Liberty's business model doesn't involve cold calling. *See* Joseph Dep. at 43:9–11; Decl. of Joel Blaski (attached as **Exhibit 4**) ¶ 9; Joseph Decl. ¶ 9. Rather, consumers initiate contact

themselves—either by expressing interest in home warranty services through Liberty's marketing

partners or by reaching out to Liberty directly through various channels. Joseph Decl. ¶ 8.

### A.       Some Consumers Engage Directly with Liberty.

Liberty maintains a website where consumers can, among other things, submit an inquiry

into Liberty's services. After getting to one of Liberty's customized landing pages and entering a

zip code, the consumer sees a screen similar to the following:



Joseph Decl. ¶ 10 & Tab A (LIBERTY000011) (blue hyperlinks take consumers to then-current

Privacy Policy and Terms of Use, *see id.* Tabs D & F). Liberty's Terms of Use have remained

substantially the same since 2018 and provide as follows:

**Agreement to be contacted and telephone communications:**

***

You also agree that LHG may obtain, email addresses, mailing addresses and phone
numbers provided by you directly or obtained through other lawful means, and you
agree to be contacted via that information. . . . Calls or text messages to you may
be made by or on behalf of LHG even if your telephone number is registered on
any state or federal "Do Not Call" list. You acknowledge that you may incur a
charge for these calls or text messages by your telephone carrier and if you do that
LHG is not responsible for these charges.

Liberty Discovery Responses (attached as **Exhibit 5**) at 48–49; Joseph Decl. ¶ 13 & Tab E. The

Terms of Use also include an arbitration agreement and class action waiver:

> **Limitation of legal remedies:**
>
> Instead of suing in court, you and we each agree to arbitrate disputes on a bilateral
> (individual) basis. Us and you agree that any dispute, controversy, or claim that
> comes out of your use of this website, it's [sic] content, or LHG services
> (collectively "Claims") which cannot be settled by mutual agreement of the parties
> shall be resolved by one arbitrator through binding arbitration. This agreement to
> arbitrate is intended to be broadly interpreted. It includes claims based in contract,
> tort, statute, fraud, misrepresentation or any other legal theory. The arbitrator's
> decision and award is final and binding, with some exceptions under the Federal
> Arbitration Act, 9 U.S.C. 1, et seq., and judgment on the award may be entered in
> any court with jurisdiction.
>
> **Class action waiver:**
>
> Any claim must be brought in the parties' individual capacity, and not as a plaintiff
> or class member in any purported class, collective, representative, multiple
> plaintiffs, or similar proceeding ("Class Action"). The parties expressly waive any
> ability to maintain any class action in any forum. The arbitrator shall not have
> authority to combine or aggregate similar claims or conduct any class action nor
> make an award to any person or entity not a party to the arbitration. Any claim that
> all or part of this class action waiver is unenforceable, unconscionable, void, or
> voidable may be determined only by a court of competent jurisdiction and not by
> an arbitrator. The parties understand that they would have had a right to litigate
> through a court, to have a judge or jury decide their case and to be party to a class
> or representative action, however, they understand and choose to have any claims
> decided individually, through arbitration.

Liberty Discovery Responses at 51–53; Joseph Decl. ¶¶ 14–15, Tabs E & F. Consumers regularly

use this submission form to signify their desire to be contacted by Liberty and their understanding

that, by submitting their contact information, they are permitting Liberty to contact them. *See e.g.,*

Decl. of Dr. Maria Guevara (attached as **Exhibit 6**) ¶¶ 3–4 (provided contact information on

Liberty's website and "understood that, by doing so, I was giving Liberty and its business partners

permission to contact me about home warranty services"); Decl. of Don Millspaugh (attached as

8

**Exhibit 7**) ¶¶ 3–4 (same); Decl. of Jason Rinsky (attached as **Exhibit 8**) ¶¶ 3–4 (same); Decl. of Jessica Bustamente (attached as **Exhibit 9**) ¶¶ 6–7 (submitted contact information to "get additional information from Liberty," "noticed a disclaimer on the website when I submitted my information," and "understood that by providing my contact information I was giving Liberty permission to contact me via telephone call or text message regarding the services in which I had expressed interest"); *see also* Joseph Decl. ¶ 10, Tab B (listing the URLs of various landing pages consumers may encounter).

### B. Liberty's Marketing Partners Also Get Prior Express Permission and Require Individual Arbitration.

As Defendant and co-CEO Benjamin Joseph testified, a consumer can also submit her information into an online form with one of Liberty's Marketing Partners. Joseph Dep. at 43:23–44:10. Like Liberty, its Marketing Partners also have webpage consent-to-contact language and terms of use provisions governing consent, class action waivers, and mandatory arbitration. *See, e.g.*, Decl. of Zac Carman (attached as **Exhibit 10**) ¶¶ 7–10, Tab A (Website User Flow, the last page of which includes the consent-to-contact language).[2]

### 1. ConsumerAffairs

ConsumerAffairs operates a website that provides links to and runs advertisements from its partnered brands, which includes Liberty. *Id.* ¶¶ 5–6, 13. When a consumer wants to learn more about home warranty services on the ConsumerAffairs website, the consumer answers a series of questions about their home and warranty needs designed to match them with service quotes. Id.

---

[2] Although Liberty can track in VanillaSoft whether a lead comes from one of its Marketing Partners, if a lead comes in with a number already in the system, the software overwrites the original lead source with the most recent source. Joseph Decl. ¶ 39. This overwriting makes it impossible to trace definitively any particular lead as coming from a specific Marketing Partner without asking the consumer directly.

¶ 7, Tab A (Website User Flow). The following language appears on the final screen, below the "See My Match" button:

> By clicking the button See My Match, I direct ConsumerAffairs to share my information and give my express written consent for ConsumerAffairs and/or the BRAND(s) I am matched with to call, text or email me with marketing offers or other messages regarding the products and services about which I have inquired at the phone number I have provided using an automated dialing system, artificial or prerecorded voice or otherwise. I understand that I may receive calls at the phone number provided even if my telephone number is currently listed on any internal, corporate, state, federal or national do-not-call (DNC) list. I understand that my consent is not a condition of purchase. I agree to the Terms of Use and have read the Privacy Policy and California Privacy Notice.

*Id.* The phrase "Terms of Use" is hyperlinked, leading to ConsumerAffairs' Terms of Use. *Id.* This consent language has remained substantially the same since March 2019. *Id.* ¶ 12. In addition, ConsumerAffairs operates a landing page dedicated to Liberty, which is one of ConsumerAffairs' partnered Brands, where consumers go through a similar series of webpages providing information, but they directly request a quote from Liberty. *Id.* ¶ 13, Tab B (Liberty User Flow). Consumer Affairs' Terms of Use include additional consent language and an arbitration agreement. *Id.* ¶ 18, Tab C at 79–80.

### 2. Modernize

Although not as common a lead source for Liberty, Modernize also operates a website that connects consumers with, among other things, home warranty services. Decl. of Gregg Hicks (attached as **Exhibit 11**) ¶ 4–5; Joseph Decl. ¶ 8. Consumers can submit their contact information so that either Modernize or one of its partnered service providers, which at times included Liberty, may reach out regarding their identified needs. Hicks Decl. ¶ 6. When consumers use the website and submit their contact information, they see consent language like the following:

> We respect your privacy and want to make you aware of a few things. By submitting, you authorize Modernize and up to four home warranty companies, to call you on the mobile or landline phone number provided. You understand that some may use automated dialing, prerecorded messages or SMS messages to contact you and that you are in no way required to purchase any products or services from them. It's entirely your choice. Please see our Privacy Notice and our Terms of Use.

*Id.* ¶ 7, Tab B. The "Terms of Use" are hyperlinked to permit a consumer to review them.

## III.    Liberty's Trained Sales Representatives Tend to Over-Designate Opt-Outs.

Liberty uses VanillaSoft to route leads to its sales representatives, who are matched with one lead profile at a time. Blaski Decl. ¶ 6. This system allows the sales representative to review the consumer-submitted information before calling.[3] *Id.* ¶¶ 6–7. When the sales representatives get a person on the phone, they identify themselves, describe Liberty's home warranty services, and ideally close a sale. *Id.* ¶ 8. The sales representatives may follow up with a text message or email, which they send through VanillaSoft. *Id.*

The sales representatives receive training on calling leads and coding the responses from the leads. *Id.* ¶ 10, Tab A; Decl. of Benjamin Joseph in Supp. of MSJ ("Joseph MSJ Decl.") [Doc. 95-4 ¶ 9 & Attachs. A & B (Training Materials)]. This training emphasizes the importance of recording when a consumer asks not to be called. Blaski Decl. ¶ 12; Joseph MSJ Decl. ¶¶ 9–10. For example, if a consumer revokes their consent or opts out of further communications from Liberty, the Liberty sales representatives mark the lead profile with the code: Remove/DNC. Blaski Decl. ¶ 11 & Tab A; Joseph MSJ Decl. ¶ 7. A consumer can revoke consent by telephone or email, or by responding "stop" to Liberty texts messages. Blaski Decl. ¶¶ 11, 21, 23–24; *see also* Joseph Decl., Tab K. Because of the importance placed on honoring DNC requests, many sales representatives err on the side of caution—sometimes coding a lead as REMOVE/DNC even if the

---

[3] Liberty also reaches out to potential customers—again, only those consumers who have made an inquiry—using a texting service within the VanillaSoft platform. Blaski Decl. ¶ 23.

consumer did not actually make a DNC request. Examples of Liberty's sales representatives over-designating leads with the Remove/DNC code include:

- Duplicate lead profiles, *see*, *e.g.*, Blaski Decl. ¶¶ 15, 18, 25 (marking as Remove/DNC phone numbers of leads who were already customers so that they would not "come back up and waste time," without even speaking with the lead); Decl. of Frederick David Chazanoff (attached as **Exhibit 12**) ¶ 15(d) (same); Decl. of Norman Sarfati (attached as **Exhibit 13**) ¶ 18 (same);

- Bad, incorrect, or fake data and wrong numbers, *see*, *e.g.*, Chazanoff Decl. ¶ 15(c) (determining that a lead named "Bob Builder" was fake and marking as Remove/DNC); Sarfati Decl. ¶ 14 (determining a number provided was the wrong number after no talk time and marking as Remove/DNC); Blaski Decl. ¶ 14 (determining a lead had bad info and marking as Remove/DNC);

- When leads state they're not interested at the time or it seems "clear" to the sales representative that "talking to the lead further will not result in a sale," *see*, *e.g.*, Blaski Decl. ¶ 12; Chazanoff Decl. ¶ 12; Sarfati Decl. ¶ 15 (notes indicating lead had gone with another home warranty company); or

- For a host of other reasons, *see*, *e.g.*, Sarfati Decl. ¶ 16 (mistake); *id*. ¶¶ 19–29 (realtor forwarded to different line); Chazanoff Decl. ¶ 15(b) (because lead indicated they would call back and the representative "didn't want another sales agent to bother the prospective customer again if he was really going to call back"); Blaski Decl. ¶ 16 (marked Remove/DNC because the lead was being handled by another sales rep).

Once a lead is coded as Remove/DNC, it is removed from the call list. Blaski Decl. ¶ 6. Once removed, VanillaSoft does not match sales representatives with that lead. *Id.* The only way a salesperson would contact that number is if a consumer submits another inquiry on Liberty's or one of its Marketing Partners' websites, or re-engages with Liberty in some other way. Joseph Decl. ¶ 35; Chazanoff Decl. ¶ 15(b) (outlining an instance where a lead was marked as "Remove/DNC" because the lead stated that they would call Liberty back, and the lead re-engaged by calling Liberty back the same day).

## IV. Consumers Confirmed in Declarations Submitted with This Brief That They Invite Liberty to Contact Them and That They Otherwise Have No Claims for a Variety of Individualized Reasons.

Liberty's customers and potential customers can't be shoved into a one-size-fits-all box. As evidenced by the sample of people who have been contacted by Liberty in response to Mey's motion, consumers' experiences vary significantly in many respects, except one—Liberty never initiated unsolicited contact. Guevara Decl. ¶ 6 ("Liberty never called me before I gave it my phone number."); Millspaugh Decl. ¶ 6 (same); Rinsky Decl. ¶ 6 (same); Bustamente Decl. ¶ 10 ("At no time did I receive communication from Liberty on the Number before I had completed the online inquiry[.]");  Decl. of Robert Chin (attached as **Exhibit 14**) ¶ 7 ("I don't remember receiving any calls from Liberty before I was a Liberty customer. In fact, I sought Liberty out, after researching several options for home warranty services."); Decl. of Marlon Cantave (attached as **Exhibit 15**) ¶ 5 ("I don't remember Liberty ever calling me before I got the Liberty home warranty."); Decl. of Kate King (attached as **Exhibit 16**) ¶ 6 ("I am reasonably confident that I'm the one who initiated contact with Liberty- not the other way around."); Decl. of Anthony Pagonis (attached as **Exhibit 17**) ¶ 8 ("I don't remember receiving calls from Liberty before I purchased the home warranty."); Decl. of Michael Kaufman (attached as **Exhibit 18**) ¶ 6 (I don't remember receiving any calls from Liberty before I had the home warranty or before I called Liberty."); Decl. of Michele Ashfar (attached as **Exhibit 19**) ¶ 6 ("Liberty never called me before I gave it my phone number."); Decl. of Danielle Digirolamo (attached as **Exhibit 20**) ¶ 9 ("Liberty never called the Number before I gave it to them."); Decl. of Karen Solomon (attached as **Exhibit 21**) ¶ 4 ("I have never been contacted by Liberty except in regard to my policy.").

For example, some consumers use phone numbers they've owned for decades, *see* Chin Decl. ¶ 3, while others use phone numbers but are not the named subscriber, *see* Bustamente Decl. ¶ 2; Digirolamo Decl. ¶ 2. Some use their phone numbers for a mix of personal and business uses.

*See* Bustamente Decl. ¶ 3; Kaufman Decl. ¶ 3; Chin Decl. ¶ 4. Some registered their phone number on the National DNC Registry, Bustamente Decl. ¶ 4; Chin Decl. ¶ 9; King Decl. ¶ 11; Pagonis Decl. ¶ 5, while others have never heard of the National DNC Registry, Cantave Decl. ¶ 3. Finally, some consumers reached out to Liberty directly to inquire about home warranty services, *see, e.g.*, Bustamente Decl. ¶¶ 6-7 (via Liberty's website); Solomon Decl. ¶ 3 (by phone). Others inherited the home warranty policy, Kaufman Decl. ¶ 6, and still others acquired a Liberty home warranty policy as part of the closing terms when purchasing their home, Cantave Decl. ¶ 4. From just a sample of consumers, individualized questions abound regarding, for instance, how and whether consent was given or revoked, how and when Liberty contacted the consumers, and how consumers use their numbers.

By contrast, neither Mey nor her expert, Peters-Stasiewicz, has identified a *single* other person who shares Mey's experience. In other words, Mey cannot identify a single person (1) whose number is listed on the National DNC Registry but was accidentally submitted in connection with an otherwise valid inquiry to Liberty, (2) who allegedly revoked consent to communicate, and (3) who was subsequently contacted by Liberty. Mey doesn't explain how to resolve these individualized issues because she can't. Nor can she justify holding herself as a representative of all the class at trial, given that her experience is uniquely and materially different from the experience of *every single person* Mey claims are potential class members.

As explained below, Plaintiff's failures are dispositive of her motion to certify a class.

## LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). As a safeguard, Rule 23 imposes strict requirements for class certification. "Rule 23 does not set

forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

"In seeking class certification under Rule 23, the plaintiff has the burden of demonstrating that the requirements for class-wide adjudication have been met." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 654 (4th Cir. 2019); *Mey v. Principal Law Grp., LLC*, 2025 WL 1842616 (N.D. W. Va. Jan. 7, 2025) (same). "A party seeking class certification must do more than plead compliance . . . [She] must present evidence that the putative class complies with Rule 23." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). Certification is proper only if "the trial court is satisfied, after a rigorous analysis," that plaintiff has carried her burden to meet each of Rule 23's requirements: (1) numerosity; (2) commonality; (3) typicality of the claims and defenses; and (4) adequacy of the plaintiff and her counsel. *Dukes*, 564 U.S. at 349–51; Fed. R. Civ. P. 23(a).

A plaintiff also must show that the class satisfies Rule 23(b). Here, Mey seeks certification under 23(b)(3), which requires her to prove that "common" questions "predominate over" individual ones and that a class action is the "superior" way to adjudicate the case. Fed. R. Civ. P. 23(b)(3); *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Last, a plaintiff must prove that the members of the proposed class are ascertainable. *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC,* 91 F.4th 202, 206 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 2845 (2025) ("[I]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate") (internal quotations and citations omitted); *Krakauer*, 925 F.3d at 654-55 ("Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable."). Without establishing each of these Rule 23 elements now, with evidence, the Court cannot certify a class.

## ARGUMENT

Mey fails to show that her putative class satisfies any of Rule 23's requirements—under either subsection (a) or (b). The burden is hers alone, and it extends even to issues touching Liberty's affirmative defenses. The Fourth Circuit has "stressed" this point repeatedly: "[I]t is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but . . . it *is the plaintiff* who bears the burden of showing that the class *does comply*[.]" *Thorn*, 445 F.3d at 321 (citation omitted). It is therefore not enough for Mey to argue that Liberty failed to prove each affirmative defense as to each class member—including consent, arbitration, and waiver—she must affirmatively demonstrate that those defenses can be resolved on a class-wide basis with common proof. *Id.* The Court must undertake a "rigorous analysis" and "probe behind the pleadings before coming to rest on the certification question." *Dukes*, 564 U.S. at 350–51.

Here, the Court should deny Mey's motion to certify this putative class because (1) individualized issues of law and fact overwhelm the basic common issue identified; (2) Mey is an atypical and inadequate class representative who has nothing in common with the class and cannot represent it at trial; (3) she fails to define an ascertainable class; and (4) a class action is not a superior way to resolve any one-off claims that might exist against Liberty.

## I.    Mey's Proposed Class Is Riddled with Individualized Issues.

The Court should deny Mey's motion to certify the proposed class because she cannot carry her burden to establish the most critical requirement of Rule 23(b)(3)—predominance.[4] Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate

---

[4] "The Fourth Circuit has held that 'in a class action brought under Rule 23(b)(3), the commonality requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" *Vance v. DIRECTV, LLC*, 2022 WL 3044653, at *6 (N.D.W. Va. Aug. 1, 2022) (cleaned up) (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 147 n.4 (4th Cir. 2001)). Predominance is not met. Commonality, although less stringent, fails for similar reasons.

over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). As the Fourth Circuit has explained, predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" in which the named plaintiff testifies about the experiences of the entire class. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) (quotation omitted); *Thorn*, 445 F.3d at 327 (finding affirmative defense defeated predominance)

Mey's proposed class is anything but "cohesive." Her sole asserted issue capable of common resolution—whether Liberty called numbers on the National DNC Registry—does not begin to resolve the factual and legal questions that will dominate this case. Liberty's business practices necessarily invite individual analyses. Mey's own case, which arose from a *typo*, shows why. Liberty's practices also confirm that individualized analysis is required to evaluate whether putative class members: (1) gave Liberty consent; (2) revoked their consent; (3) agreed to arbitration; (4) had an EBR with Liberty; and (5) used their numbers for non-residential purposes.

### A.    The Consent and Opt-Out Request Issues Raised Here Demand Individualized Inquiries.

Courts routinely deny class certification in TCPA class actions where defendants obtain permission to call consumers from various sources, as here. *See, e.g.*, *Davis v. Cap. One, N.A.*, 2023 WL 6964051, at *15 (E.D. Va. Oct. 20, 2023), *aff'd*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025); *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 688 (D. Md. 2017) (finding that "the individualized issues relating to consent and revocation, on which claims will ultimately turn, predominate over any common issues such that 'myriad mini-trials cannot be avoided' on the issues of consent and revocation"); *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 459–60 (M.D. Fla. 2018) (holding that, although the "apparent common issues are few and straightforward," those common issues "neglect[] what is likely the determinative—and most complex, fact-specific—aspect of each case: how that number entered Defendant's records and,

related, the issue of consent," and noting that "[t]his is not a case where a defendant sprayed robocalls across a nonconsenting public"); *E&G, Inc. v. Mount Vernon Mills, Inc.*, 2019 WL 4034951, at *6 (D.S.C. Aug. 22, 2019) (denying class certification, reasoning that, "to answer the question about prior permission, the relationship between Wyndham and each fax recipient, or potential class member, would need to be assessed on an individual basis, and there would need to be an individualized inquiry into any prior communications between them").[5]

And because prior express permission is a complete defense to a DNC claim under Section 227(c), this is a pivotal issue that will dominate the litigation. 47 U.S.C. § 227(a)(4) (defining "telephone solicitation" to exclude calls "to any person with that person's prior express invitation or permission"); 47 C.F.R. § 64.1200(f)(15)(i) (same); *see Krakauer*, 925 F.3d at 649 (explaining that DNC liability turns on "telephone solicitation" and noting exceptions, including where "the recipient invited the call").

Relevant authority confirms as much. In *Davis v. Capital One*—recently affirmed by the Fourth Circuit—the district court denied class certification. It found that "the affirmative defense of consent is likely to be involved with respect to a significant number of the putative class members' claims." 2023 WL 6964051, at *14. Yet, the plaintiff had not shown any "method for efficiently resolving who has provided consent." *Id.* In that case, Capital One obtained, at one point in time, consent to contact the members in the proposed class. *Id.*

Likewise, in *Gene & Gene LLC v. BioPay LLC*, the Fifth Circuit reversed the district court and found that certification was not proper for a TCPA fax claim. 541 F.3d 318 at 329 (5th Cir. 2008). The defendant obtained numbers from various sources, but its records did not provide an accurate recording of whether the recipients consented. *Id.* at 328. The court found that it was the

---

[5] Defendants provide additional supporting citations in the Appendix at p. 35.

plaintiff's burden to demonstrate how "generalized proof concerning the lack of consent" could apply across the class given the disparate sources and lack of records, and without such proof, "myriad mini-trials" on consent were unavoidable." *Id.* at 329. On the other hand, in *Krakauer*, the district court "thoroughly documented when certifying the class, all of the major issues in the case could be shown through aggregate records." *Krakauer*, 925 F.3d at 658.

Here, the facts are aligned with *Davis* and *Gene & Gene*, not *Krakauer*. As in *Davis* and *Gene & Gene*, Liberty contacts only consumers who provide prior express permission. Joseph Dep. at 43:9–11; Joseph Decl. at ¶ 7. Liberty gathers this consent through various channels. Some consumers provide consent to Liberty when they call or email directly. *See*, *e.g.*, Kaufman Decl. ¶ 5; King Decl. ¶ 5; Solomon Decl. ¶ 3. Others consent through a webform submission on a website operated by Liberty or one of its Marketing Partners. *See*, *e.g.*, Guevara Decl. ¶¶ 3-4; Millspaugh Decl. ¶ 3; Rinsky Decl. ¶ 3; Bustamente Decl. ¶ 6. And still others had an EBR with Liberty, which independently authorize calls under the TCPA. *See*, *e.g.*, Joseph Decl. at ¶ 18; Kaufman ¶ 5; *see also Johansen v. Efinancial, LLC*, 2022 WL 168170, at 3 (W.D. Wash. Jan. 18, 2022) ("[A] person can provide prior express permission by submitting a web form with personal information when the web form includes a notice that the person agrees to be contacted"); *Beard v. John Hiester Chevrolet, LLC*, 640 F. Supp. 3d 420, 430 (E.D.N.C. 2022) ("clickwrap" consents are valid).

Regardless of the channel, the undisputed evidence shows Liberty only called consumers who **voluntarily submitted** their information **seeking** to be contacted. Joseph Dep. at 43:9–11. Mey offers no contrary evidence or evidence of "aggregate records" that can easily establish a lack of consent. *Krakauer*, 925 F.3d at 658; *see also Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 577 (S.D. Cal. 2013) (where contact information provided in a variety of ways, consent must be dealt with individually). As the court in *Connelly* concluded, the "diversity" of

19

consent sources "suggests that the issue of consent should be evaluated individually, rather than on a classwide basis." 294 F.R.D. at 578.

Mey's own circumstances demonstrate the individual nature of this issue. Liberty obtained consent to call or text that number from Skadra, but that turned out to be a typo on his part. Mey then suggests her March 4, 2022, email was an opt-out request (which Liberty reasonably interpreted as a phishing attempt). Pl.'s Br. at 4. But that email never asked Liberty to add her to its DNC list; it makes no opt-out request; it doesn't state that any calls or texts are "unwanted," "unsolicited," or "unwelcome"; and she never simply said: "Stop calling me." Joseph Decl., Tab I. Instead, she coyly invited further communication by asking Liberty to send her evidence of her prior express permission, which she presumably knew did not exist. *Id.* ¶¶ 22–24 (stating that Liberty investigated and found that the number was associated with a lead who appeared to have provided valid information).

While this situation is unique to Mey, other class members' consent (or revocation of consent) will each have their own story, too. For every number, the Court or jury would have to determine whether the recipient consented, whether the recipient later opted out or revoked consent, and whether Liberty properly ceased contacting those consumers. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir, 2017) ("Revocation of consent must be clearly made and express a desire not to be called or texted."); *Self-Forbes v. Adv. Call Ctr. Techs., LLC*, 754 F. App'x 520, 522 (9th Cir. 2018) (requiring factual inquiry into whether plaintiff revoked her prior express consent). Even if an individual establishes that he or she did clearly opt out, but Liberty called them anyway—which is ***not*** Mey's proposed class—there remains the individualized question of how and why that happened. Liberty's policy and general practice is to mark a number as "Remove/DNC" when a consumer requests to opt out of future contact. Blaski

20

Decl. ¶¶ 11, 20; Joseph MSJ Decl. ¶¶ 7–8. And then the number no longer appears on the call list for the sales representatives. Blaski Decl. ¶¶ 11, 20. But if, for example, someone later *resubmits* an inquiry on Liberty's or one of its Marketing Partners' websites, then the person has renewed their express permission to be contacted. Joseph Decl. ¶ 39.

Even in the examples Liberty has cited, what may appear as a simple "Remove/DNC" code could mean a host of things, including an actual opt-out request. *See id.* ¶¶ 33–40. But it could also mean that the number was a recognized duplicate (*id.* ¶ 33; Chazanoff Decl. ¶ 15(d); Blaski Decl. ¶¶ 15, 18); that the customer intended to call back shortly (Chazanoff Decl. ¶ 15(b)); that the lead should be in a different sales queue and not in the "direct-to-consumer" team's queue (Chazanoff Decl. ¶¶ 18–25; Sarfati Decl. ¶¶ 17, 19–29); or that the sales representative could tell that the customer's data was bad (Chazanoff Decl. ¶ 15(c) (name listed was "Bob Builder"); *id.* ¶ 15(e) (incorrect lead information); Blaski Decl. ¶ 14.

None of these determinations are simple or susceptible to class-wide treatment. As Liberty has repeatedly explained (Liberty Discovery Resps. at 73–75, 77; Joseph Decl. ¶¶ 43), it took Joseph weeks to go through just one month of data—only to find that many of the "Remove/DNC" codes were not opt-outs but the result of over-designations by the sales representatives, attempts to delete duplicate numbers or unwanted leads, or human error. Joseph Decl. ¶¶ 30–43. To research what occurred in just one month of data, Joseph had to look at each individual lead screen, review contemporaneous emails, if available, or speak with the responsible sales representative. *Id.* ¶¶ 32, 42. There was no way to determine by looking at the Remove/DNC codes alone that a consumer was actually opting out. Joseph Decl. at ¶ 31. To even attempt to reach a reliable conclusion would require witness testimony, significant document review, and credibility assessments for each call recipient and Liberty's sales representatives. Thus, Liberty's sales representatives' coding

21

practices—such as using Remove/DNC for various administrative reasons—*see, e.g.*, Blaski Decl. ¶ 15 (marking lead as Remove/DNC "so as not to have this lead come back up and waste time"); *id.* ¶ 15(a) (marking Remove/DNC by one sales agent because another was handling the sale); Sarfati Decl. ¶ 14 (marking Remove/DNC because wrong number)—underscore that identifying true opt-outs cannot be done on a non-individualized, class-wide basis.[6]

## B.    Arbitration Will Be a Predominant Issue.

Individualized consent issues alone doom predominance. But there's more. Mey also cannot satisfy predominance because most putative class members agreed to arbitrate—a term that she herself never encountered and thus has no basis to challenge (as explained below). Courts deny class certification where such agreements apply to absent class members but not to the named plaintiff. *See Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 986–87 (N.D. Cal. 2019) (collecting cases); *see also Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 279–80 (M.D. Fla. 2019) (quoting *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009)) (holding that resolving individual issues of consent would cause the "common legal claims" to "break[] down into an unmanageable variety of individual legal and factual issues"; finding resolving arbitration applicability "will require significant individual inquiries").

### 1.    Arbitration provisions apply to TCPA claims.

Consumers who submitted inquiries through Liberty's website gave express permission to be contacted and agreed to the site's Terms of Use, which provide, "[A]ny claim must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class[.]" Joseph Decl. ¶ 14, Tabs E, F (Liberty recently updated the language but it still includes a class

---

[6] Additionally, if plaintiff cannot establish that putative class members never revoked their consent, then she also cannot establish that they "suffered an injury fairly traceable to the defendant's misconduct," and thus lack standing, which "poses a powerful problem under Rule 23(b)(3)'s predominance factor." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273–74 (11th Cir. 2019) (finding predominance requirement not met).

litigation waiver). The Terms require arbitration for "any claim, dispute, or controversy . . . arising out of or relating to this agreement or the relationships among the parties." *Id*. ¶ 15, Tabs E, F.

The Fourth Circuit and Supreme Court have long enforced such provisions. *In re Marriott Int'l, Inc.*, 78 F.4th 677, 687–88 (4th Cir. 2023); *Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 136–38 (4th Cir. 2025) (reversing this Court's grant of class certification, in part, due to class action waiver precluding certification for class members); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

In *Maldini*, the Fourth Circuit held that the agreement's waiver of "any disputes arising out of or related to the SPG Program or [the SPG Contract]" was broad enough to include a waiver of the plaintiff's consumer protection claims. 140 F.4th at 130 n.1, 136–37. Clauses covering disputes "arising out of or related to" an agreement are intentionally broad. *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (finding arbitration language expansive and holding that "we must resolve a dispute about the scope of an arbitration agreement in favor of arbitration"); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583 (1960)) (precedent requires a court to ask whether the arbitration agreement is "susceptible of an interpretation that covers the asserted dispute").

Here, Liberty's Terms of Use contain the same broad language the Fourth Circuit enforced in *Maldini* and *Mey v. DIRECTV*: requiring individual arbitration of "any claim, dispute, or controversy, regarding any contract, tort, or statute, or otherwise ("Claim"), arising out of or relating to this agreement or the relationships among the parties[.]" Joseph Decl. ¶ 15 & Tabs E, F.[7] Liberty's marketing partners (including Consumer Affairs and Modernize) use similar language

---

[7] Liberty's current version on its website still broadly covers "[a]ny disputes arising out of or relating to" the Terms of Use or use of Liberty's website. Joseph Decl., Tab F.

in their terms, requiring users to consent to contact, to arbitrate disputes, and to waive any right to class proceedings. *See* Carman Decl. ¶ 21, Tab D at 71–80; Hicks Decl., Tab A.

## 2.    Arbitration issues overwhelm any common question.

Because binding Fourth Circuit and Supreme Court precedent should apply to these arbitration agreements governing the putative class's TCPA claims, Mey cannot establish predominance. *See Maldini*, 140 F.4th at 137; *see also O'Connor v. Uber Techs., Inc*., 904 F.3d 1087, 1094–95 (9th Cir. 2018) (reversing class certification and remanding because district court improperly held arbitration and class waiver were unenforceable); *see also Spotswood v. Hertz Corp*., 2019 WL 498822, at *11 (D. Md. Feb. 7, 2019) (quoting *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013)) ("[W]here certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[] commonality and typicality of the class."); *Tan v. Grubhub, Inc.*, 2016 WL 4721439, at *5 (N.D. Cal. July 19, 2016), *aff'd sub nom. Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021) (denying class certification, in part, because the class action waiver provisions require each putative class member to arbitrate individually).

Individual issues will predominate because the Court must inquire whether the arbitration and class waiver provisions bind each putative class member. Because class members reach Liberty from various channels (direct calls, website submissions, Marketing Partners, email, etc.), this determination must be made on a case-by-case basis. Additionally, each class member may argue a lack of assent to the agreement or unconscionability under applicable state law—questions which also require individual inquiry. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 n.4 (4th Cir. 2000) (quoting *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987) ("state law determines questions 'concerning the validity, revocability, or enforceability of contracts generally.'")). And here, there is not just one class litigation waiver at issue; there are

variations from both Liberty and its Marketing Partners *See*, *e.g.*, Carman Decl. ¶¶ 19–21, Tab D (outlining the changes in the dispute resolution provision). The presence of these multiple, potentially overlapping arbitration and class waiver provisions—none of which bind Mey—destroys predominance and independently requires denial of class certification.

### C.    Additional Individual Issues Plague Mey's Putative Class.

On top of the consent, opt-out, and arbitration issues, the Court will have to assess—for each telephone number—whether the subscriber had an EBR with Liberty and whether the number was residential or business. The question of "willfulness" will likewise add to the individualized issues that predominate this case.

First, a "telephone solicitation" excludes any calls to persons with whom Liberty had an "existing business relationship." 47 C.F.R. § 64.1200(f)(15)(ii). Such a relationship exists when a consumer purchased, transacted, or even inquired about services within the prior 18 months (or 3 months, for inquiries). *Id.* § 64.1200(f)(5). Neither Mey nor her expert proposes any feasible method to identify such consumers. Simply deleting calls made to Liberty's customers, as Mey's expert suggests, Pl.'s Expert Report ¶ 46, ignores the regulation's broader scope (which includes inquiries). Liberty's entire business model centers on responding to consumer inquiries, so identifying and excluding EBR numbers would require a line-by-line, consumer-by-consumer review—another individualized issue that would alone overrun the litigation.

Second, the TCPA's private right of action exists for only "residential telephone subscribers." 47 C.F.R. § 64.1200(c)(2); *see also* 47 C.F.R. § 64.1200(d) (prohibiting calls to "residential telephone subscribers"). Courts commonly apply the multi-factor analysis set out in *Chennette v. Porch.com, Inc.*, to assess whether mixed-use phones are "residential" within the meaning of § 227(c). 50 F.4th 1217, 1225 (9th Cir. 2022). Courts consider not only basic information, like whether the phone was registered as a business number or whether a plaintiff

25

held the number out to the public or advertised it as for business purposes, but also whether the number was part of a family usage plan, to what extent it was used for business transactions or employment, who paid (or reimbursed the plaintiff) for the phone bills, etc. *Id.*

Where, as here, the proposed class includes numbers used—even in part—for business purposes, determining which numbers are "residential" necessarily requires individualized evidence about each subscriber's use. The Fourth Circuit's decision in *Career Counseling*, is controlling: there, the court held that predominance failed because identifying covered recipients would require case-by-case inquiries. 91 F.4th at 211-12 (affirming denial of class certification because plaintiff failed to present how the court could determine, without an individualized inquiry, which recipients had "online fax services" as opposed to "stand-alone fax machines"). In short, resolving each number's residential status requires a fact-intensive inquiry. As a result, predominance fails for this reason as well.

Finally, Mey claims that another "common issue" for the putative class is whether Liberty acted willfully and knowingly. Pl.'s Br. at 6. The TCPA's DNC provisions, 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)–(d), impose treble damages where the defendant "willfully or knowingly" violated the DNC rules—that is, where the caller knew or consciously disregarded that the number was on the DNC Registry or subject to an internal opt-out. *Krakauer*, 925 F.3d at 661–62. In *Krakauer*, common evidence of corporate awareness and systemic disregard of the DNC rules, including prior regulatory warnings and enforcement actions, supported a class-wide finding of willfulness. *Id.* Here, by contrast, there is no evidence of such common conduct. The question of willfulness depends on what each caller knew about a given number—whether a prior DNC request was logged, whether consent was believed to exist, whether consent had been previously revoked, and whether the number was classified as a business line. *See id.* at 662–63.

26

The willfulness inquiry here "breaks down into an unmanageable variety of individual legal and factual issues." *Andrews v. Am. Tel. &Tel. Co*., 95 F.3d 1014, 1023 (11th Cir. 1996), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639 (2008). Class-wide adjudication is therefore inappropriate because those individualized issues of knowledge and intent overwhelm any common ones, defeating predominance under Rule 23(b)(3).

This case exemplifies why Rule 23(b)(3)'s predominance requirement exists. The individual issues make a class trial literally impossible.

## II.    Mey Has No Method of Ascertaining a Viable Class.

Mey also offers no reliable or administratively feasible way to identify the members of her proposed class. To satisfy the threshold ascertainability requirement, there must be a "clear class definition" and an "administratively feasible" method of determining membership. 7A *Fed. Prac. & Proc. Civ*. § 1760 (4th ed.); *Krakauer*, 925 F.3d at 658. As the Fourth Circuit has made clear, "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *EQT Prod. Co.*, 764 F.3d at 358; *Career Counseling, Inc.*, 91 F.4th at 212 (affirming denial of class certification on failure to demonstrate ascertainability where the plaintiff failed to identify a proper method for identifying class members). Two years into this litigation, Mey is still unable to define a viable class with ascertainable members. This is fatal to her putative class.

Mey cannot carry her burden to establish ascertainability in the absence of any evidence that she has even attempted to identify a class, aside from Peter-Stasiewicz's "*ipse dixit* testimony" about her proposed, untested methodology. *Davis*, 2023 WL 6964051, at *8. Mey and her expert, Peters-Stasiewicz, imagine a "comprehensive list of actionable calls/texts and associated phone numbers" that will identify all the putative class members. Pl.'s Br. at 9. But they fail to offer a workable methodology for doing so.

27

First, cross-referencing Liberty's call records with the National DNC Registry does nothing to reveal class membership—it merely identifies millions of lawful, permission-based calls. That simplified approach may have worked in Mey's default-judgment case against Principal Law Group, where all (just over 1,000) calls were admittedly unsolicited. *Principal L. Group*, 2025 WL 1842616, at *4; *see also Mey v. Venture Data LLC*, 2017 WL 10398569, at *6 (N.D.W. Va. June 6, 2017) (certifying identifiable class of cellular phone customers who received an autodialed and unsolicited survey call on three specific dates). This case is far different—shot through with issues that complicate ascertainability.

Second, Mey does not provide a reliable methodology to exclude business-use numbers from the putative class, despite her proposed class definition explicitly excluding non-residential numbers. Liberty often calls individuals seeking home warranty coverage who use their numbers for business purposes. *See* Blaski Decl. ¶¶ 30–32 (providing examples of calls where the customer needed warranty for non-residential purpose); Guevara Decl. ¶¶ 8, 11 (has purchased Liberty home warranties for fourteen investment properties)); Digirolamo Decl. ¶¶ 4–6 (uses her phone number in her capacity as a property manager). Mey offers no objective, common method to distinguish the residential- from business-use numbers.

Mey's expert suggests she will outsource this identification to another company, PacificEast, who can "identify and eliminate telephone numbers subscribed as belonging to business entities." Pl.'s Expert Report ¶ 40. She also suggests that she can check the "yellow pages" and "other business directories" and by excluding business-sounding names. *Id*. But this method is unreliable.[8] No single source answers this question for each phone number; each must

---

[8] Peters-Stasiewicz represents that the methods she proposes to utilize have been used in cases that "were certified through litigation or settlement," and she includes a purported representative list. Pl.'s Expert Report ¶ 43, Ex. D. However, out of the nineteen cases listed, two are duplicates and otherwise cite to the wrong case (*Chinitz v. Intero Real Est. Servs.*, No. 18-cv-6100 (N.D. Cal.), and *Chinitz v. NRT W., Inc.*,

be tested individually. In fact, Mey identifies no non-individualized way to confirm that telephone numbers that are not *registered* as businesses or not listed under a company name are not still being used for business purposes, and vice versa. *See*, *e.g.*, Bustamante Decl. at ¶¶ 2–3 (number registered in company's name but used for both business and personal purposes); Chin Decl. ¶¶ 3–4 (owns phone number but uses it for both business and personal purposes).

Other courts have reached similar conclusions. *See*, *e.g.*, *Wilson*, 329 F.R.D. at 459–60 (denying class certification for lack of ascertainability because whether and how a particular individual consented to receive calls "is likely to dwarf the much simpler question of whether Defendant called a given class member with a prohibited system"); *Ung v. Univ. Acceptance Corp.*, 319 F.R.D. 537, 542 (D. Minn. 2017) (declining to certify class and rejecting plaintiff's argument that "those few persons" who consented to receive communication "could simply be excluded from the class"). Because class membership cannot be determined without individualized investigation, Mey's proposed class fails at the starting line—rendering class ascertainment impossible.

---

No. 18-cv-6100 (N.D. Cal.)); ten cases settled or were dismissed before a judge even made any ruling on the reliability or adequacy of the expert reports proffered by the plaintiffs or the certifiability of the plaintiffs' classes; and the court in one of the cases—*Berman v. Freedom Fin. Network, LLC*—denied class certification for lack of typicality and adequacy. *See* 400 F. Supp. 3d at 984-88. Of the remaining seven cases that were filed in federal court, each of the expert reports (all prepared by Anya Verkhovskaya, not Peters-Stasiewicz), actually performed the analysis of calls and phone numbers to form an opinion about the size of the proposed class. *See e.g.*, Verkhovskaya Report, *Krakauer v. Dish Network, L.L.C.*, No. 1:14-cv-333 (M.D.N.C.) ("*Krakauer* Report") (attached as **Exhibit 22**). Moreover, most of the methods utilized excluded calls that did not connect or had a call time of 0 minutes, but Peters-Stasiewicz proposes no method of excluding such calls here. Finally, and most importantly, in none of the so-called "representative" cases did Verkhovskaya use PacificEast to both determine the numbers on the National DNC Registry and identify business entities "based upon various business telephone listings," such as the yellow pages. *Compare Krakauer* Report at 10–11, *with* Pl.'s Expert Report ¶ 40. Thus, neither Mey nor Peters-Stasiewicz can point to a single case where her "proposal" to use PacificEast for all her analyses—not even an actual methodology tested or utilized—has been accepted by a federal court.

## III.    Mey Is Not a Typical or Adequate Class Representative.

Rule 23(a)(3) requires Mey to prove "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006) (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (commonality and typicality "tend to merge"). "Where unique defenses against a named plaintiff exist, the Court must consider the potential danger that the attention to this individual defense might harm the class." *Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 240 (W.D. Tex. 1999); *see also Wu v. MAMSI Life & Health Ins. Co.*, 269 F.R.D. 554, 563 (D. Md. 2010) ("[W]here a purported class representative is subject to a unique defense that cannot be asserted against other members of the class (other than minor discrepancies), typicality may be lacking."). "Thus, in pursuing their own case, the representative parties 'must simultaneously tend to advance the interests of the absent class members.'" *Harris v. Rainey*, 299 F.R.D. 486, 490 (W.D. Va. 2014) (quoting *Deiter*, 436 F.3d at 466).

Rule 23(a)(4) requires the representative to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Adequacy turns on (1) conflicts between the representative and absent members, and (2) the representative's ability to prosecute the action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, at 625–26 (1997); *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 329 (D.S.C. 1991).

Mey does not meet either typicality or adequacy for several reasons. First, Liberty's contacts with Mey stem from Skadra's typo. That scenario is unlike the circumstances of putative members who submitted their own numbers and consented, or who initiated a business relationship

with Liberty. And Mey's purported opt-out through the March 4, 2022 email, and Liberty's investigation of it, are factual anomalies. As a result, her unique facts and the defenses they raise will dominate Mey's case but is irrelevant to the other putative class members.

Second, many absent members agreed to binding arbitration and class-action waivers via Liberty's or its Marketing Partners' clickwrap Terms of Use; Mey, who disclaims using those sites, did not. Courts hold such contractual differences defeat typicality, which makes sense because a class representative cannot challenge a contract, raising, for example, unconscionability issues, when they never agreed to those terms. *See Fuentes v. DISH Network L.L.C.*, 2021 WL 4916754, at *6 (N.D. Cal. June 24, 2021) ("The existence of an arbitration agreement that may be applicable to the putative class, but not to the class representative, may preclude class certification."); *see also Andrews v. Ring, LLC*, 2020 WL 6253319, at *3-*4 & n.1 (C.D. Cal. Sept. 17, 2020) (finding plaintiff neither typical nor adequate where court determined he was not bound to arbitrate and stating that once it determined the plaintiff was not subject to agreement, the plaintiff "lacked standing to challenge its enforceability"); *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015) ("Avilez's arbitration agreement does not contain a class action waiver and counsel did not dispute that those who signed such waivers have potential defenses that Avilez would be unable to argue on their behalf. To the extent the classes and subclasses include individuals who signed class action waivers, Avilez is not an adequate representative . . . and her claim lacks typicality."); *Spotswood*, 2019 WL 498822, at 11; *Tan*, 2016 WL 4721439, at *3 (where plaintiff opted out of agreement, he was "not typical of the putative class members nor can he adequately represent the interests of those members, who are potentially bound by the arbitration and class action waiver provisions").

Mey cannot litigate class litigation waiver issues on behalf of the class because she never agreed to a class litigation waiver. For example, some absent class members may want to assert state-law-based unconscionability arguments or object to the waiver based on an alleged lack of assent. Mey, who never used any of these websites and never consented to any terms of use, cannot litigate those individualized issues on behalf of others. And, as in *Berman*, Mey "has not offered authority showing that [s]he can properly litigate those issues if [s]he h[er]self never visited [Defendant's] websites." 400 F. Supp. 3d at 988. Those members' interests (enforcing their agreements to obtain a quicker, individualized forum) conflict with Mey's strategy to pursue class litigation. Her relevance is limited to a consumer-input-error class that never agreed to such terms, but that is not the class she is trying to certify here. Because Mey did not consent to binding arbitration or a class waiver, she is both atypical and inadequate as a class representative.

Third, consent/revocation, business-purpose numbers, and established business relationships will be key issues for most of the putative class. On the other hand, Mey's case hinges on her unique situation, including her March 4 email and Liberty's investigation and conclusion with respect to it. Mey's need to litigate her own unique opt-out facts will "usurp" time and energy to the detriment of absent class members. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 646 (S.D. Ohio 2017). Where the named plaintiff will be preoccupied with individualized defenses, typicality fails. *See Thorn*, 445 F.3d at 326–27. Because Mey's case will not address the same defenses or arise from the same business practices as the rest of the putative class, her claims are not typical of the class she seeks to represent, and she is not an adequate class representative. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 (1982); *Bridge v. Credit One Fin.*, 294 F. Supp. 3d 1019, 1034 (D. Nev. 2018) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

1992)) ("[C]lass certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").

At the end of the day, the question is this: would Mey be able to sit in the witness box and testify as to the circumstances of the class members—what it was like to opt in or out, to agree to the various consumer-facing terms, or to use her number for business purposes. The answer is no. She's entirely different from putative class members and cannot speak to the experiences that matter most for resolving the proposed class's legal claims. As such, she cannot carry her burden to prove that she is adequate or typical.

## IV.    Mey's Putative Class Action Is the Superior Method of Resolving Her Dispute.

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy," considering manageability and alternative mechanisms. FED. R. CIV. P. 23(b)(3). Certifying this case would not achieve economies of time, effort or expense because of the numerous individual questions that would need to be answered to reach a fair and just result on the issue of liability. Instead, as a class action, this matter "would burden the Court and the litigants with the arduous task of sifting through each putative class member's claim to determine its merits on a case-by-case basis." *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc*., 274 F.R.D. 229, 238 (S.D. Ill. 2011). "This is unacceptable." *Id*.

First, the FAA requires courts to enforce the parties' agreements to individual arbitration and class waivers. *See Concepcion*, 563 U.S. at 344; *Am. Express Co.*, 570 U.S. at 233–34; *In re Marriott Int'l, Inc.*, 78 F.4th at 687–88. Where many putative members must proceed in individual arbitration, a Rule 23(b)(3) class is not a superior vehicle in court.

Second, this case cannot be tried as a class without thousands of mini-trials on consent, revocation, EBR, residential/business status, and contract formation/assent to website terms. That is the opposite of "fair and efficient." Due process would entitle Liberty to present individualized

33

evidence (including witness testimony) on each consumer's consent and revocation history. *See Shamblin v. Obama for Am*, 2015 WL 1909765, at *7 (M.D. Fla. Apr. 27, 2015) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004)) (finding the superiority requirement was not satisfied where the plaintiff failed to satisfy predominance, and noting that "the predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims.").

Third, the TCPA's statutory damages ($500–$1,500 per call) provide ample incentive for individual actions in small-claims or arbitration, further undermining superiority. *See Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995); *Jeffrey Katz Chiropractic v. Diamond Respiratory Care*, 340 F.R.D. 383, 389 (N.D. Cal. 2021).

Considering Rule 23(b)(3)'s factors—especially manageability—the class device is *inferior*, not *superior*.

## CONCLUSION

As explained above, Mey fails to carry her evidentiary burden to satisfy the elements of Rule 23, even though she bears the burden on each. The Court should deny Plaintiff's motion for class certification.

*[Remainder of Page Intentionally Blank]*

34

## APPENDIX

- *Balthazor v. Cent. Credit Servs., Inc.*, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012) (finding no predominance of common issues where the plaintiff's TCPA claim "would necessarily involve an individual assessment of whether each class member consented to receive telephone calls on their cellular telephone" and rejecting the plaintiff's argument that the defendant had failed to produce any evidence of consent because, although the defendant "will ultimately bear the burden of establishing prior express consent, at the class certification stage, the burden is on the Plaintiff to establish the Rule 23 factors")

- *Brodsky v. HumanaDental Ins. Co.*, 269 F. Supp. 3d 841, 849 (N.D. Ill. 2017), *aff'd*, 910 F.3d 285 (7th Cir. 2018) (finding that "idiosyncratic consent issues defeat . . . predominance")

- *Burk v. Direct Energy, LP*, 2021 WL 4267146, at *4 (S.D. Tex. Sept. 20, 2021) (denying class certification where the defendant presented evidence that some class members consented to be contacted, that the contact information and consent opt-ins were provided from at least 3 different companies and nine different landing pages)

- *Gorss Motels, Inc. v. Safemark Sys., LP*, 2018 WL 1635645, at *6 (M.D. Fla. Apr. 5, 2018) (holding that "the issues of consent cannot be resolved without individualized inquiry [and thus] class certification is inappropriate")

- *Hicks v. Client Servs. Inc.*, 2008 WL 5479111, at *7–*8 (S.D. Fla. Dec. 11, 2008) (noting that "[s]everal courts have held that proof of consent is an essential individual issue under the TCPA that makes class certification inappropriate," holding the same where the plaintiff failed to describe how she intended to "show at trial the lack of express consent by herself and the class members . . . without the trial degenerating into mini-trials on consent of every class member," and finding that the defendants' purported failure to produce evidence of consent was not dispositive)

- *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470 (6th Cir. 2017) (affirming denial of a TCPA class based, in part, on individualized consent issues)

- *Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, No. 8:16-CV-3461-MSS-JSS, 2018 WL 1449581, at *4 (M.D. Fla. Feb. 16, 2018) (finding plaintiffs failed to meet burden of "affirmatively demonstrating numerosity, typicality, predominance, and superiority under Rule 23" because plaintiffs failed to present evidence that any of the proposed class members did not give express permission to be contacted (particularly no "evidence demonstrating putative members' collective lack of consent"), and defendant presented evidence that some recipients did give prior express permission)

- *KHS Corp. v. Singer Fin. Corp.*, No. CV 16-55, 2018 WL 4030699, at *4 (E.D. Pa. Aug. 23, 2018) (collecting cases) ("Individualized issues of consent often preclude class certification of TCPA fax cases.")

35

**Originally filed: October 14, 2025; corrected version filed November 6, 2025**

Respectfully submitted,

*/s/ Grayson N. O'Saile*
Stuart A. McMillan (WVSB #6532)
Grayson N. O'Saile (WVSB #14091)
Bowles Rice LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
Fax: (304) 347-1746
smcmillan@bowlesrice.com
gosaile@bowlesrice.com

*/s/ Trishanda L. Treadwell*
Ryan D. Watstein (*pro hac vice*)
ryan@wtlaw.com
Trishanda L. Treadwell (*pro hac vice*)
ttreadwell@wtlaw.com
WATSTEIN TEREPKA LLP
75 14th St. NE, Suite 2600
Atlanta, Georgia 30309
(404) 905-6400

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

**DIANA MEY,**

      **PLAINTIFF,**

**v.**                                 **CIVIL ACTION NO. 5:23-CV-281**

**LIBERTY HOME GUARD, LLC and
BENJAMIN JOSEPH,**

      **DEFENDANTS,**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies, that on the **6th day of November, 2025**, I filed the foregoing ***CORRECTED* DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO CERTIFY CLASS**, via the Court's CM/ECF system, which will provide notification of such filing to all counsel of record.


                                        */s/ Grayson N. O'Saile*
                                        Grayson N. O'Saile (WVSB #14091)