**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

```
1              IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2                    WHEELING DIVISION

3

   DIANA MEY,
4
             Plaintiff,        CASE NO.:
5                              5:23-cv 281
   vs.
6
   LIBERTY HOME GUARD, LLC,
7
             Defendant.
8
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9

10                    DEPOSITION OF

11                    BENJAMIN JOSEPH

12

13          Wednesday, January 31, 2024

14                   10:24 A.M.

15                  Videoconference

16

17              New York, New York

18

19

20

21   Reported By John Sheffield, Commission No. 01SH6435698

22               Job No. 00045494

23

24

25
```

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

**Page 2**

```
1                  APPEARANCES OF COUNSEL
2
3    On behalf of the Plaintiff, DIANA MEY:
4        RYAN DONOVAN, ESQ.
         HISSAM FORMAN DONOVAN RITCHIE PLLC
5        700 Virginia Street East
         Suite 210
6        Charleston, West Virginia 25301
         681-265-3802
7        rdonovan@hfdrlaw.com
         APPEARED VIA IN-PERSON
8
9    On behalf of the Defendant, LIBERTY HOME GUARD, LLC:
10       GRAYSON O'SAILE, ESQ.
         BOWLES RICE LLP
11       600 Quarrier Street
         Charleston, West Virginia 25301
12       304-347-1169
         gosaile@bowlesrice.com
13       APPEARED VIA VIDEOCONFERENCE
14
15   On behalf of the Witness, BENJAMIN JOSEPH:
16       CHARLES DYMOND FRANK, ESQ.
         RACHARLES INC.
17       3 Elliot Road
         Great Neck, New York 11021
18       516-482-0014
         _____
19       APPEARED IN-PERSON
20
21
22
23
24
25
```

**Page 3**

```
1                  INDEX OF EXAMINATION
2
3    WITNESS:  BENJAMIN JOSEPH
4    EXAMINATION                              PAGE
5    By Mr. Donovan                              4
6
7
8                  INDEX TO EXHIBITS
9
10   NO.          DESCRIPTION               PAGE
11   Exhibit A    Notice of Deposition        22
12   Exhibit B    Defendant Liberty Home Guard
13                Responses to Plaintiff's First
14                Discovery Requests to Liberty
15                Home Guard                   29
16   Exhibit C    Liberty 01-13 (CONFIDENTIAL) 48
                  *Exhibit C retained by counsel*
17
18     (Exhibits A through B were attached to the
19   original transcript.)
20
21
22
23
24
25
```

**Page 4**

```
1                  (On the record at 10:24 A.M.)
2        THE COURT REPORTER:  We are here today for
3    the purposes of recording the deposition of Benjamin
4    Joseph, taken by Defense in the matter of Diana Mey,
5    Plaintiff, v. Liberty Home Guard, LLC, Defendant, in
6    the United States District Court for the Northern
7    District -- District of West Virginia Wheeling
8    Division, Civil Action number 5:23-cv 281.
9        Counsel will now state their appearances for
10   the record.
11       MR. DONOVAN:  Ryan Donovan on behalf of the
12   plaintiff, Diana Mey.
13       MR. O'SAILE:  I'm Grayson O'Saile from
14   Bowles Rice on behalf of the defendant, Liberty Home
15   Guard.
16            DIRECT EXAMINATION
17   BY MR. DONOVAN:
18       Q.  All right.  Mr. Joseph, could you please
19   spell your name for the record?
20       THE COURT REPORTER:  Oh, apologies.  I just
21   have to swear in the --
22       MR. DONOVAN:  Oh, sorry.
23       THE COURT REPORTER:  Sorry about that.  I
24   will now swear in the witness.
25            BENJAMIN JOSEPH,
```

**Page 5**

```
1    having first been duly sworn, testified as follows:
2        THE COURT REPORTER:  Thank you.
3        Counsel, you may now begin.
4        MR. DONOVAN:  All right.  Man, sorry about
5    that.
6    BY MR. DONOVAN:
7        Q.  Mr. Joseph, could you please spell your name
8    for the record?
9        A.  Sure.  B-E-N-J-A-M-I-N.  My last name is J-
10   O-S-E-P-H.
11       Q.  Great.  And I prefer to use first names if
12   you don't mind.  You can call me Ryan.  Do you mind if
13   I call you Ben?
14       A.  Ben's perfect.
15       Q.  Makes that easier.  And you're joined here
16   today by your company's general counsel; is that
17   correct?
18       A.  That's correct.
19       Q.  Mr. Frank?
20       A.  That's correct.
21       MR. DONOVAN:  I'm going to call you Charles
22   if I can?
23       MR. FRANK:  Yes, that's okay.
24       MR. DONOVAN:  We've already covered that off
25   the record.
```

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 6

1     MR. FRANK:  Yeah.

2     MR. DONOVAN:  Great.

3   BY MR. DONOVAN:

4     Q.   And Mister -- Ben, have you ever been

5   deposed before?

6     A.   No.

7     Q.   Okay.  I want to go over just a few ground

8   rules.  You've obviously been sworn.  Your testimony

9   today is under oath just as it would be if we were in a

10  courtroom in Wheeling and there were a judge and a

11  jury, and -- and you understand that, correct?

12    A.   Yes.

13    Q.   You are appearing today as the corporate

14  representative of Liberty Home Guard, correct?

15    A.   Yes.

16    Q.   Okay.  And you understand that means that

17  your answers today are, to the extent that they're

18  within the scope of the Notice, not your answers but

19  the answers of the company?

20    A.   Yes.

21    Q.   Okay.  Just a few things about the

22  deposition.  It is, in some sense, a conversation.

23  We're sitting across a table from one another.  I'm

24  going to ask you some questions.  You're going to give

25  me some answers.  But there are a few things that are a

Page 7

1   little bit different.  In a normal conversation, often

2   we can anticipate the question that's going to be

3   asked, and you may want to jump in early and try to

4   answer it.

5          In this case, because we have a court

6   reporter trying his best to take a clean transcript,

7   I'd like to ask you to try to let me finish the

8   question before answering, even if you know where it's

9   going.  I'll do the same and try not to interrupt your

10  answer.

11         Likewise, in a normal conversation, a lot of

12  times you might respond by shaking your head yes or no,

13  or saying uh-huh or uh-uh, or something like that.  I

14  would understand your answer, but it doesn't show up

15  very clearly on the record sometimes.  So to the extent

16  that you can remember to do so, try to use yes or no

17  affirmative responses.  We'll both forget to do that,

18  and I'll either remind you or the court reporter will

19  remind us, but we'll do our best.

20         From time to time, your counsel, Mr.

21  O'Saile, may interpose an objection to a question that

22  I ask.  The one thing that is different from a

23  courtroom is that there's no judge here today to rule

24  on any of those objections.  So what he will be doing

25  is simply preserving the objection for the record in

Page 8

1   the event that this testimony would ever come before

2   the Court, and the judge would rule on that objection

3   then and decide whether your answer could come in or

4   not.  But for now, most of the time, if he objects,

5   I'll ask you to answer the question anyway, and your

6   answer will simply be subject to that objection.

7          Does that make sense to you?

8     A.   Yes.

9     Q.   Okay.  Now, the one exception to that is if

10  I were to ask a question that somehow invaded the

11  attorney-client privilege, privileged communications

12  between you and Mr. O'Saile or your general counsel.

13  I'll do my best not to do that.  If I ask you a

14  question that I think, you know, could even come close

15  to that, I'll try to specify that I want you to answer

16  without divulging the substance of any communications

17  you may have had with your counsel.

18         But in the event that we can't agree on

19  that, Mr. O'Saile may make an objection based on

20  privilege, and that would be pretty much the only time

21  it would be appropriate for him to instruct you not to

22  answer a question, understood?

23    A.   Yes.

24    Q.   Okay.  And if that comes up, we'll probably

25  go off the record and deal with it, so nothing to worry

Page 9

1   about there.

2          One other thing, I understand you have a --

3   a hard stop today around 3:30?

4     A.   This is the priority.

5     Q.   I appreciate that.  You know, the rules do

6   provide for one deposition of a full day.  I think it's

7   defined as seven hours.  I don't have any intention of

8   going that long today.  I'm going to do my best to move

9   through this as quickly as I can.

10         That said, I do like to try to take a break

11  about once every 45 minutes or an hour or so, just so

12  you can grab something to drink, use the restroom if we

13  need to.  That said, you are entitled to take a break

14  at any time that you want.  All you need to do is ask.

15  You can take a break every 10 minutes if you want.

16  Just keep us here longer.

17    A.   Thank you for that courtesy.

18    Q.   If you do need to take a break, the only

19  thing I would ask is that if there's a question

20  pending, try to give me a response to that question

21  first, fair enough?

22    A.   Fair enough.  I'll do my best.

23    Q.   Okay.  So with that, Ben, can you tell me

24  what position you hold with Liberty?

25    A.   I'm co-CEO.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 10

```
1      Q.  Co-CEO.  Okay.  And who is the other co-CEO?
2      A.  David Moreno.
3      Q.  Okay.
4          MR. DONOVAN:  Are you able to hear, Grayson?
5          MR. O'SAILE:  Yes, I am.
6          MR. DONOVAN:  Okay.
7          MR. O'SAILE:  Yeah.
8          MR. DONOVAN:  Sorry.  I thought I heard you
9   pop up.
10  BY MR. DONOVAN:
11     Q.  How long have you held that position?
12     A.  Six years.  Six-and-a-half years.
13     Q.  Okay.  Prior to becoming co-CEO, did you
14  have any other role in the company?
15     A.  No.
16     Q.  Okay.  Came in right at the top.  How long
17  has Liberty been around?
18     A.  Six-and-a-half years.
19     Q.  Okay.  So you were with Liberty from the
20  start?
21     A.  Correct.
22     Q.  And were you a founder of the company?
23     A.  Yes.
24     Q.  Okay.  And are you an owner of the company?
25     A.  Yes.
```

Page 11

```
1      Q.  Okay.  We'll get into that a little bit more
2   later.  Prior to becoming -- or founding Liberty, did
3   you have any other employment?
4      A.  Yes.
5      Q.  Okay.  Let's sort of start with six-and-a-
6   half years ago and move backwards if we can.  What
7   position did you hold prior to becoming co-CEO of
8   Liberty?
9      A.  I was a student in the full-time MBA program
10  at the Wharton School of Business in the University of
11  Pennsylvania.
12     Q.  Okay.  And how long were you in that
13  program?
14     A.  Two years.
15     Q.  Okay.  Prior to starting at Wharton, were
16  you in the workplace or did you go straight to Wharton
17  from undergraduate?
18     A.  Immediately prior, I was traveling.
19     Q.  Okay.  Traveling?
20     A.  Yes.
21     Q.  Just personal travel?
22     A.  Correct.
23     Q.  Okay.  How long were you doing that?
24     A.  Approximately four months, four to five
25  months.
```

Page 12

```
1      Q.  Okay.
2      A.  I was also doing reserve duty during that
3   time.
4      Q.  Okay.  Reserve duty with the United States
5   military?
6      A.  The Israeli military.
7      Q.  Okay.
8      A.  But we did work alongside United States
9   Special Forces.
10     Q.  Certainly.  Prior to that four months of
11  travel, what were you doing?
12     A.  I was an analyst at Citibank.
13     Q.  Okay.  And how long were you with Citibank?
14     A.  Approximately two years.
15     Q.  Okay.  What position?  You said you were an
16  analyst?
17     A.  Correct.
18     Q.  What specific area?
19     A.  I held two positions as an analyst.  First
20  was within a ops control and reporting group, and the
21  second was with a middle office group.
22     Q.  Okay.  Did you work in any particular
23  industry?
24     A.  In the second role, we covered distressed
25  debt and private equity.
```

Page 13

```
1      Q.  Okay.  And in the first role?
2      A.  The first role was more general operational
3   control, making sure that fraud and anti-money
4   laundering and that kind of stuff wasn't going on.
5      Q.  All right.  Prior to your time at Citibank,
6   did you have any other employment?
7      A.  I was an operator in the Israeli Special
8   Forces.
9      Q.  Okay.  And how long did you do that?
10     A.  About two-and-a-half years.
11     Q.  Okay.  I'm not going to ask you any
12  questions about that.  Prior to your time in the
13  Special Forces, did you have any other employment?
14     A.  I was a full-time undergraduate student.
15     Q.  Okay.  And where did you do your
16  undergraduate work?
17     A.  I was on an academic scholarship at the
18  University of Miami.
19     Q.  Miami, Florida?  Miami, Ohio?
20     A.  Miami, Florida.
21     Q.  Okay.  Gotcha.  All right.  And then does
22  that take us back to high school?
23     A.  Correct.
24     Q.  Okay.  I don't need to go any further than
25  that, although, where are you from originally?
```

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 14

1    A.   I'm from Great Neck, New York.

2    Q.   Okay.  We were saying before we went on the

3  record that I -- I wish you had decided to establish

4  your company in Florida, maybe in Miami.  We could have

5  a little better weather for today, although it's not

6  too bad out there.

7         What did you study at Miami?

8    A.   I studied finance and economics.

9    Q.   Okay.  All right.  I just want to ask you

10  some questions about the company, the big picture

11  question.  You said you founded it about six-and-a-half

12  years ago?

13    A.   Correct.

14    Q.   Okay.  What led you to get involved in this

15  particular industry?

16    A.   It was my partner's idea --

17    Q.   Okay.

18    A.   -- essentially.

19    Q.   Mr. Moreno?

20    A.   Correct.

21    Q.   Okay.  Did he have background in the -- I'm

22  going to call it the home warranty industry.  Is there

23  a different term that you use?

24    A.   No.  He did not have a background in the

25  warranty industry.

Page 15

1    Q.   Okay.  So how is it that -- that he decided

2  to jump into that industry at that time; if you know?

3    A.   He knew people in that industry.

4    Q.   Okay.  When you started Liberty, is it fair

5  to say you were kind of starting it from the ground up,

6  or did you take over any other business that had

7  established clients?

8    A.   We started from the ground up.

9    Q.   Okay.  When did you actually start doing

10  business and -- and selling the warranties and things

11  that you do now?

12    A.   In the summer of 2018.

13    Q.   And at that time, how many employees did the

14  company have?

15    A.   Me and my partner.

16    Q.   Okay.  At that time -- and did you have any

17  contracts?  I mean, were -- were you and your partner

18  actually out there selling the contracts, or was your

19  first order of business sort of building a sales staff

20  to do that?

21    A.   Can you clarify which contracts?

22    Q.   Yeah.  That's a --

23         MR. O'SAILE:  And I'll object here.  I think

24  we're getting a little outside the scope of the topics.

25         MR. DONOVAN:  Oh, that's fine.  I mean, I'm

Page 16

1  just looking for general background --

2         MR. O'SAILE:  No, I understand --

3         MR. DONOVAN:  -- Grayson.

4         MR. O'SAILE:  I understand, but yeah, I get

5  it.

6  BY MR. DONOVAN:

7    Q.   And to the extent, just to clarify this, I

8  mean, you -- you are -- I'm going to introduce the

9  Deposition Notice in a moment.  You know, you -- in

10  terms of you speaking on behalf of the company, as Mr.

11  O'Saile points out, those answers are going to be

12  limited to whatever's within the scope of the

13  deposition notice.

14         If I ask you questions that are outside the

15  scope of the Notice, I'm only asking for your personal

16  knowledge of those things, your personal testimony, and

17  if you don't know the answer, it's fine to say you

18  don't know.

19    A.   So to clarify, any questions that fall

20  outside of the scope of the Notice, I'm answering as an

21  individual?

22    Q.   That's correct.

23    A.   Yeah.

24    Q.   So I'm just trying to get a little bit of

25  basic background.  So I mean, I -- if you want, I can

Page 17

1  just kind of ask you to narrate for me.  That might be

2  a little bit easier.

3         Can you take me through the way the company

4  grew over those first several years?

5    A.   Yes.  So I met my business partner.  We got

6  along well.  I found that we could make good partners.

7  We decided to found a home services business.  It was

8  my partner's idea.  We, for the first year-and-a-half,

9  worked to build the software that we had used to

10  facilitate claim servicing.  We worked to understand

11  the regulatory landscape and make sure that we had all

12  the requisite licenses and were complying.

13         We started selling in the summer of 2018.

14  We sold a few contracts, not more than 30, I believe.

15  We stopped selling because we wanted to operate

16  methodically and make sure that our hypotheses could

17  adequately service the customers, and we wanted to keep

18  the scale minimal.  And we realized that a lot of our

19  hypotheses made sense, such as give people service

20  quickly is one hypothesis that we formed.

21         From there, we said, okay, we should begin

22  to scale, and we brought on in-house legal counsel, and

23  we brought on salespeople, and then build one-by-one

24  because we did every job in the company ourselves.

25    Q.   Okay.  So let's fast-forward to today.  How

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 18

1  many employees does the company have?
2       A.   I'd say approximately 45.
3       Q.   Okay.  And roughly how many active contracts
4  do you have at this time?
5            MR. FRANK:  I would object just because
6  there's -- this is confidential financial information,
7  but it's not public.
8            Grayson, I mean, should he answer that
9  question?
10           MR. O'SAILE:  He can go ahead and answer.
11           THE WITNESS:  We have approximately --
12           MR. O'SAILE:  And just leave it
13  confidential, whatever comes out.
14           MR. DONOVAN:  Sure.  Certainly.
15           THE WITNESS:  We have approximately 35 to
16  40,000 active contracts at this moment.
17           MR. O'SAILE:  May I move to deem that as
18  confidential information and covered in the protective
19  order?
20           MR. DONOVAN:  Yeah.  I mean, why don't we
21  just make things easy and just designate the -- let's
22  just designate the transcript confidential and we can
23  go from there.
24           MR. O'SAILE:  Okay.
25           MR. FRANK:  Okay.

Page 19

1            MR. DONOVAN:  That's fine.
2            MR. FRANK:  That's fair.  Thank you.
3            MR. DONOVAN:  And just for the -- for the
4  clarity of the record, I'm not going to be a -- I'm not
5  going to be hard on you about this, but probably
6  Grayson should be the only one who makes objections.  I
7  mean, I'm happy for you to bring it up.
8            MR. FRANK:  I mean, I could state my name
9  before I make the objection, just so it's clear who's -
10 - who's making that objection?  Is - is that okay?  I'm
11 not planning on objecting.
12           MR. DONOVAN:  Yeah.  No, no, that's fine.
13           MR. FRANK:  Yeah.
14           MR. DONOVAN:  Typically, only one lawyer
15 makes the objections, but I -- I --
16           MR. FRANK:  I --
17           MR. DONOVAN:  I -- I want to make --
18           MR. FRANK:  I'm an atypical person.
19           MR. DONOVAN:  I -- I want to make it easy on
20 everybody.
21           MR. FRANK:  Yeah.
22           MR. DONOVAN:  So -- just don't want you guys
23 tag-teaming me too much.
24           MR. FRANK:  No, that's not the plan.  That's
25 not the plan.

Page 20

1  BY MR. DONOVAN:
2       Q.   Okay.  So 35 to 40,000 active contracts, 45
3  employees, and how many locations are you in now?
4       A.   What do you mean by location?
5       Q.   Okay.  That's a -- yeah, that's a good
6  clarification.  In how many states do you maintain
7  physical offices?
8       A.   One.  In New York.
9       Q.   Just New York.  Okay.  And in how many
10 states are you actively selling contracts?
11      A.   In all 50 states.
12      Q.   Okay.  That is a lot of regulatory framework
13 to keep up with.
14      A.   I'm always busy.
15      Q.   Yeah.  Okay.
16           MR. FRANK:  Excuse me.  I'm going to use the
17 restroom if that's okay.
18           MR. DONOVAN:  Yeah, that's great.  We can
19 take a quick break.
20           THE COURT REPORTER:  Off the record at 10:41
21 a.m.
22           (OFF THE RECORD)
23           THE COURT REPORTER:  Back on the record at
24 10:45 a.m.
25 BY MR. DONOVAN:

Page 21

1       Q.   Okay.  I just want to ask a couple more
2  questions background-wise.  We talked about it while
3  you were out of the room.
4            In terms of annual revenue, what do you guys
5  do?
6            MR. O'SAILE:  And I'll -- I'll place my
7  standing objection here on the record for the
8  financials, and -- and ask that it be confidential, but
9  I think it would be the -- the whole transcript
10 confidential at this point.
11           MR. DONOVAN:  That's correct.
12           THE WITNESS:  I believe it's between 8 and
13 $9,500,000.
14 BY MR. DONOVAN:
15      Q.   Okay.  And are you profitable yet?
16      A.   No.
17      Q.   Okay.
18           THE COURT REPORTER:  Could you repeat that,
19 please?  The number?
20           THE WITNESS:  Eight to $9,500,000.
21           THE COURT REPORTER:  Thank you.
22 BY MR. DONOVAN:
23      Q.   All right.  I'm going to go ahead and hand
24 you a Notice of Rule 30(b)(6) Deposition.  Take a look
25 at it.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 22

```
1          THE COURT REPORTER:  Are you going to want
2  this as an exhibit?
3          MR. DONOVAN:  Sure, we can.
4          THE COURT REPORTER:  Sure.
5          MR. DONOVAN:  I didn't know that you were
6  going to be here, so I don't know if I have --
7          MR. FRANK:  Oh, you can take that.  I have
8  the --
9          MR. DONOVAN:  Oh, yeah.
10          MR. FRANK:  We have the third one.  Sorry.
11  BY MR. DONOVAN:
12      Q.  Take a minute to look at it if you like.
13          MR. O'SAILE:  Now, Mr. Donovan, are you
14  introducing this as an exhibit?
15          MR. DONOVAN:  Yeah.  We're going to mark it
16  as Deposition Exhibit A.
17          (EXHIBIT A MARKED FOR IDENTIFICATION)
18          MR. O'SAILE:  Okay.  I -- now, I don't have
19  copies of these marked deposition exhibits, so I'll
20  make a standing objection to that unless I can see it.
21  But if you'll just -- if you'll just help me out here,
22  if you'll let me know --
23          MR. DONOVAN:  Yeah.
24          MR. O'SAILE:  -- what we're looking at?
25  Because I can't --
```

Page 23

```
1          MR. DONOVAN:  So --
2          MR. O'SAILE:  I don't have copies I can
3  actually look at here on me.
4          MR. DONOVAN:  Right.  So everything we are
5  going to use today has either been produced in
6  discovery or entered on the record, so I'll -- I'll
7  give you -- I'll give you either a Bates number or a --
8  a docket number.  So just for --
9          MR. O'SAILE:  All right.
10          MR. DONOVAN:  -- clarification, this is the
11  30(b)(6) notice that was entered on the docket on
12  December 1st, 2023, Document Number 24.
13          MR. O'SAILE:  Gotcha.  Thank you.
14  BY MR. DONOVAN:
15      Q.  Ben, when I -- when I hand you a document,
16  we'll do it grade school style.  Just put your pencil
17  down and look up when you've had time to review it.
18          MR. FRANK:  That just brought me back to --
19  to the law -- a law school exam.
20          MR. DONOVAN:  Right.
21          MR. FRANK:  I was just finishing -- just
22  finishing my brief and had to put my pen down, but they
23  -- they could pick -- they could pick out the rest of
24  the sentence.  I was just on the C -- the last C of
25  CREAC.
```

Page 24

```
1  BY MR. DONOVAN:
2      Q.  And I'm sorry for the front and back.
3  That's --
4      A.  That's okay.
5      Q.  These guys are environmentalists.  They
6  refuse to let me print.
7      A.  Got to love environmentalists.
8      Q.  All right.  So have you seen this document
9  before?
10      A.  As an individual?
11      Q.  Yes.
12      A.  I believe so.
13      Q.  Okay.  And you understand that these are the
14  topics that the plaintiff has asked Liberty to produce
15  a deponent to answer questions about today, right?
16      A.  Yes.
17      Q.  Okay.  And you are that representative,
18  correct?
19      A.  Correct.
20      Q.  Okay.  Can you tell me what you did to
21  prepare to testify -- without revealing to me, the
22  substance of any communications you may have had with
23  your counsel, can you tell me what you did to prepare
24  to testify on these topics today?
25      A.  I went through our text message software.  I
```

Page 25

```
1  went through our lead management software.  I went
2  through the e-mails that Diana sent to our
3  libertyhomeguard.com domain.  Beyond that, I can get
4  into what -- I'm speaking of -- can I say the
5  corporation or myself?  Just because --
6      Q.  The corporation.
7      A.  So that's out.
8      Q.  Well, okay.  Is the answer different --
9      A.  I --
10      Q.  I mean --
11      A.  Well, just to make sure I had a good night's
12  sleep and some breakfast, so.
13      Q.  Okay, great.
14          MR. FRANK:  Well, if you had breakfast, you
15  are one step ahead of me.  I've only had coffee and
16  nicotine today.
17          THE WITNESS:  I've got the nicotine in a bar
18  if that makes you feel better.  I'm just one bar ahead
19  of you.
20  BY MR. DONOVAN:
21      Q.  So let's -- did -- did you -- did you have
22  the opportunity to speak with anyone else at the
23  company about any of these topics?
24      A.  I spoke with Charles a little bit.
25      Q.  Okay.  And that's your counsel?
```

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 26

1    A.    Yeah.

2    Q.    Okay.  Did you speak with any of the

3  individuals who were involved in making the calls that

4  are at issue in this case?

5    A.    No.

6    Q.    Okay.  Let's just look down through these

7  topics, there aren't very many, one-by-one.

8    A.    Sure.

9    Q.    Topic number 1 is all facts and

10 circumstances known to Liberty concerning the

11 allegations in the complaint.  Do you feel like you're

12 prepared to answer questions about that topic today?

13    A.    Yes.

14    Q.    Okay.  Is there anything else you feel like

15 you need to do to be prepared to answer questions about

16 that topic today?

17    A.    No.

18    Q.    Okay.  Topic number 2 is Liberty's

19 relationship with any parties who participated in any

20 way in the making of the call as detailed within the

21 complaint.  Do you feel like you're prepared to testify

22 about that topic today?

23    A.    Yes.

24    Q.    Okay.  Is there anything else you feel like

25 you need to do to be prepared?

Page 27

1    A.    No.

2    Q.    Okay.  I'm going to ask you the same

3  questions about all these.  Number 3 is Liberty's

4  policies and procedures for compliance with the TCPA's

5  Do Not Call provision.

6         Are you prepared to testify about that topic

7  today?

8    A.    Yes.

9    Q.    Okay.  Number 4 is the factual basis for any

10 defenses asserted by Liberty in its answer to the

11 complaint or its responses to discovery served by Mey.

12         Are you prepared to testify about that topic

13 today?

14    A.    Yes.

15    Q.    Okay.  Number 5, the last topic, is

16 complaints received from consumers and/or regulatory

17 bodies related to any telemarketing conducted by or on

18 behalf of Liberty beginning February 10th, 2020.

19 Through the present, and Liberty's response thereto.

20         Are you prepared to testify about that topic

21 today?

22    A.    Yes.

23    Q.    All right.  Very good.  Just so that we have

24 a -- a -- a factual basis for the questions we're going

25 to talk about next, can you tell me what Liberty's

Page 28

1  understanding is of the complaint filed by Ms. Mey in

2  this case?

3         Another way to say this is -- another way to

4  ask that question is: Do you understand what this case

5  is about?

6         THE WITNESS:  Yes.

7         MR. O'SAILE:  Object to form.

8  BY MR. DONOVAN:

9    Q.    Okay.  And -- and -- and what is that?

10    A.    We contacted a phone number that Diana Mey

11 says she owned and operated at the time and did not

12 want to be contacted.

13    Q.    Okay.  Along those lines, I want to ask you

14 a few questions about how Liberty generates business.

15 Obviously we know that one of the ways Liberty

16 generates business in this case is through

17 Telemarketing; is that correct?

18    A.    We receive inquiries to get more information

19 about our policies, and we reach out to provide that

20 information.

21    Q.    Okay.  And when you reach out to provide

22 that information, is it for the purpose of hopefully

23 obtaining contracts?

24         MR. O'SAILE:  Object to form.

25         THE WITNESS:  I would say there's a higher-

Page 29

1  level purpose.

2  BY MR. DONOVAN:

3    Q.    Okay.

4    A.    It's to create a more informed homeownership

5  consumer base with regards to the product --

6         MR. DONOVAN:  Okay.

7         THE WITNESS:  -- that's being offered.

8  BY MR. DONOVAN:

9    Q.    But when you do follow up with these

10 individuals via telephone, you do present them with the

11 opportunity to purchase a contract, correct?

12    A.    Correct.

13    Q.    Okay.  And I understand that your response

14 to discovery is that these calls that were made to Ms.

15 Mey in this case were made by employees of Liberty,

16 correct?

17    A.    They were made by independent contractors.

18         MR. DONOVAN:  Okay.  All right.  I am going

19 to go ahead and hand you a copy of Liberty Home Guard's

20 Responses to Plaintiff's First Discovery Requests to

21 Liberty Home Guard, and we'll mark this as Deposition

22 Exhibit B.

23         (EXHIBIT B MARKED FOR IDENTIFICATION)

24         THE WITNESS:  Okay.

25 BY MR. DONOVAN:

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 30

1    Q.    Feel free to take a spin through that.
2          THE COURT REPORTER:  Can you repeat the
3    title one more time, please?
4          MR. DONOVAN:  These are Defendant Liberty
5    Home Guard's Responses to Plaintiff's First Discovery
6    Request to Liberty Home Guard.
7          THE COURT REPORTER:  Thank you, sir.
8    BY MR. DONOVAN:
9    Q.    And do you recall providing the information
10   that was used in order to respond to these
11   interrogatories?
12   A.    Yes.
13   Q.    Okay.  I want you to look at Page 4 of
14   these.
15         And, Grayson, do you have this up in front
16   of you?
17         MR. O'SAILE:  I do.
18         MR. DONOVAN:  Okay.
19         MR. O'SAILE:  Yeah.  I'll -- I'll renew my
20   understanding objection, but yeah, I'm -- I'm
21   following.
22         MR. DONOVAN:  Okay.
23   BY MR. DONOVAN:
24   Q.    I want you to look at Interrogatory Number
25   4, which begins on the middle of Page 4 of this

Page 31

1    document, and it asks Liberty to identify all third
2    parties or sub-vendors used by your vendors for the
3    period beginning and including February 10th, 2020,
4    through the present day.
5          Did I read that correctly?
6          MR. O'SAILE:  I'm going to object to this
7    line of questioning here, because this is outside the
8    scope of the Notice.  This is discovery on discovery.
9    It's not a proper 30(b) topic.
10         MR. DONOVAN:  Well, it's -- I think it falls
11   pretty clearly within the ambit of Number 1, which is
12   all facts and circumstances known to Liberty concerning
13   the allegations in the Complaint.
14         MR. O'SAILE:  In the Complaint, yeah.  So we
15   can talk about Complaint, but this is -- this is not
16   that.  These are discovery requests.
17   BY MR. DONOVAN:
18   Q.    All right.  Well, objection is noted.  Thank
19   you.  The -- and I am asking I -- I'm -- I'm not doing
20   this.  I'm -- and maybe you don't understand where my
21   question is going because I'm going to get to the --
22   I'm going to the substance of this.
23         The answer to that question says, at the
24   very bottom, the communications with Plaintiff were
25   initiated by Defendant directly.  Meaning information

Page 32

1    related to any third parties or lenders is irrelevant.
2    But I -- the last part of that is a legal objection,
3    but I -- I want to focus in on this language that says
4    the communications with Plaintiff were initiated by
5    Defendant directly.
6          You follow me there?
7    A.    Yes.
8    Q.    Now I took that answer to mean that the
9    communications were initiated by an employee of Liberty
10   Home Guard.  But am I mistaken in that understanding?
11   A.    Well, I can say with certainty that -- that
12   the vast majority were initiated by an employee that --
13   that are -- that is directly involved with Liberty Home
14   Guard.  It was probably me that initiated the majority
15   of those messages.
16   Q.    Okay.  And just help me understand the --
17   I'm generally confused.  When I asked you a moment ago,
18   if the people who made these calls were employees, I
19   thought your answer was that they were independent
20   contractors?
21   A.    Are you asking about calls or calls and text
22   messages?
23   Q.    Calls and text messages.
24   A.    So then the vast majority of them were
25   triggered by me.

Page 33

1    Q.    Okay.
2    A.    Including the text messages.
3    Q.    You personally, okay.  Those that weren't
4    triggered by you, who -- who were those initiated by?
5    A.    I would like to say that some salespeople
6    are employees.  For the most part, those are independent
7    contractors.  Those I believe were triggered by
8    independent contractors.
9    Q.    Okay.  So we'll get back to those in a
10   minute.
11   A.    Those two or whatever they were.
12   Q.    Sure.  Get back to that in a minute.  I -- I
13   try to only work with one exhibit at a time, but so
14   you've got now Exhibit A in front of you and Exhibit B,
15   you may have to jump back and forth between those.
16         When calls are initiated or texts are
17   initiated by an independent contractor, or for the
18   calls that were initiated by an independent contractor,
19   are those -- is that contractor a separate entity that
20   to whom you outsource some of these calling operations?
21   Or are those individuals who act as independent
22   contractors for Liberty?
23   A.    The latter, individuals.
24   Q.    Okay.  In your overall -- and I -- I hate to
25   use the word telemarketing because I know it has

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 34

1  sometimes a negative conversation or connotation, so I
2  can use another term if you want.
3          But in your overall outbound calling, do you
4  ever engage the services of a third-party marketing
5  company or a third-party call center to make those
6  calls on your behalf?
7      A.  No.
8      Q.  Okay.  So these calls that are made by
9  independent contractors, who are they, generally
10  speaking?
11         MR. O'SAILE:  Object to form.
12         THE WITNESS:  I need you to be a little more
13  specific.
14  BY MR. DONOVAN:
15     Q.  Sure.  I wasn't prepared to ask this because
16  I thought they were all done by employees.  Are these
17  simply individuals with whom you contract on a semi-
18  regular basis to make these calls on your behalf?  Are
19  they employees of another entity who make these calls
20  as an independent contractor?
21     A.  The former.
22     Q.  Okay.  And how many independent contractors
23  do you use to engage in outbound calling on Liberty's
24  behalf?
25     A.  Approximately 12.

Page 35

1      Q.  Okay.  How do you identify these individual
2  contractors to engage in outbound calling on Liberty's
3  behalf?
4      A.  I believe it's almost entirely word of
5  mouth.
6      Q.  Okay.  And so you have some independent
7  contractors who engage in outbound calling and sales.
8  Are they engaged in sales also?
9      A.  Can you restate the question?
10     Q.  Sure.  Another bad question.  Are these
11  individuals who are independent contractors engaged in
12  sales on behalf of company?
13     A.  They're there to help assess the coverage
14  needs of the home and match the policy with the
15  coverage needs and have the person sign up.
16     Q.  Okay.  How do they get paid?
17     A.  Biweekly.
18     Q.  Okay.  Are they paid per call made?  Are
19  they paid by the hour?  Are they paid some percentage
20  of sales that they complete?  That's what I meant.
21     A.  It varies.
22     Q.  Okay.  Are there some people who are paid by
23  the hour?
24     A.  No.
25     Q.  Okay.  Are there some people who are paid by

Page 36

1  call made?
2      A.  No.
3      Q.  Okay.  Are there some people who are paid a
4  percentage of sales that they help complete?
5      A.  Yes.
6      Q.  Okay.  In what other ways are these
7  individuals compensated?
8          MR. O'SAILE:  Object to form.
9          THE WITNESS:  Based on the success of the
10  customer's experience.  The customer stays on, the
11  customer helps sign up other people.  Depends on the
12  circumstances with the contractor.
13  BY MR. DONOVAN:
14     Q.  Okay.  And I assume you have written
15  contracts with these individuals?
16     A.  Yes.
17     Q.  And would those contracts detail the terms
18  on which they're to be paid for the work they perform?
19     A.  We don't have any knowledge of contracts or
20  detail of those terms, no.  Wait, sorry, you -- are you
21  asking about how we pay them or are you asking about
22  the duties that they have to perform?
23     Q.  I'm asking about how you paid them.  Would
24  the contract -- if -- if -- if Bob Smith is an
25  independent contractor making calls for you, would your

Page 37

1  contract with that -- with Smith state how he is to be
2  paid for the work that he does?
3      A.  I do not believe; we do not believe so.
4  We're not aware of it stating how they would be paid.
5      Q.  Are you not the one paying them?
6      A.  We are.
7      Q.  Okay.  Who would know how they're paid?
8      A.  You spoke to the contractor who know how
9  they're paid, which I answered.  It's just not in the
10  contract.
11     Q.  Okay.  Where is that information contained?
12     A.  How they're paid?
13     Q.  Yes.
14     A.  Just on a knowledge basis.
15         MR. O'SAILE:  Objection.  I think we're
16  getting outside the topics here again.  We're -- we're
17  getting back to this financial stuff about contracts,
18  contract details.  There's nowhere in the notes.
19         MR. DONOVAN:  Number 1 is pretty broad and -
20  -
21         MR. O'SAILE:  Well, that is -- that is not
22  how -- that is not how it's interpreted under the
23  language of that.  It's about the allegations and facts
24  in the Complaint.  You're talking about contracts, that
25  doesn't make sense.  It's not related.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 38

```
 1        MR. DONOVAN:  Well, the ways in which the --
 2  well, we can talk about this later.  The fact is no
 3  objection was made to any of the topics.  And so I'm
 4  going to ask the questions and, Grayson, if you believe
 5  that they're outside of the scope of the Notice, then -
 6  - then the company won't be bound by the answer.
 7  BY MR. DONOVAN:
 8        Q.  I'm a little bit confused.  You paid --
 9  Liberty pays these people for the work they do?
10        A.  Yes.
11        Q.  And you said there were a number of ways in
12  which they're paid, correct?
13        A.  Correct.
14        Q.  One of the ways in which they're paid, you
15  said was a percentage of sales that they complete,
16  correct?
17        A.  Yeah.
18        Q.  Okay.  And you said there are some other
19  metrics, customer success, for example?
20        A.  Correct.
21        Q.  Okay.  Is there a document or agreement
22  between Liberty and these independent contractors
23  detailing how they're to be compensated for the work
24  that they do?
25        A.  There's no --
```

Page 39

```
 1        MR. O'SAILE:  Objection.
 2        THE WITNESS:  Sorry, Grayson?
 3        MR. O'SAILE:  I object.  Go -- go ahead.  Go
 4  ahead and answer that.
 5        THE WITNESS:  There is no contractual
 6  agreement that speaks to the specific payment
 7  structure.
 8  BY MR. DONOVAN:
 9        Q.  Is it -- is there a --
10        A.  That we're aware of.
11        Q.  -- is there a verbal agreement that -- that
12  covers how they're being compensated?
13        A.  Yes.
14        MR. O'SAILE:  Object to scope.
15  BY MR. DONOVAN:
16        Q.  Okay.  And who would've knowledge of those
17  verbal agreements?
18        MR. O'SAILE:  Object to scope.
19        THE WITNESS:  We would.  Liberty Home Guard
20  would.
21  BY MR. DONOVAN:
22        Q.  All right.  Who at Liberty would have
23  knowledge of those verbal agreements?
24        MR. O'SAILE:  Object to scope
25        THE WITNESS:  Myself, David.
```

Page 40

```
 1        MR. DONOVAN:  Grayson, mindful of your
 2  objection to the scope, you know, I'm just trying to be
 3  efficient here.  I've got Ben in the deposition chair.
 4  He has knowledge of these things.  I -- I would prefer
 5  for everyone's sake not to have to take more time out
 6  of his, what I'm sure is very busy schedule, to give a
 7  deposition as a fact witness on these issues.  So I'm
 8  going to go ahead and just ask some of these questions
 9  and the more information I --
10        MR. O'SAILE:  Okay.  No, I -- I understand.
11  And yeah, that the -- the point of my objections is
12  that we're not necessarily prepared to jump into those
13  types of topics that are out -- that we see is outside
14  the scope.
15        But if Ben, to the best of his knowledge can
16  answer the question, great.  As long as -- as -- as
17  long as Liberty Home Guard is bound by it.  And then
18  you know, if you want to -- if you want to -- if we
19  want to talk about this, you want some more information
20  or something like that, we can discuss that off the
21  record.
22        MR. DONOVAN:  Understood.
23        THE WITNESS:  Yeah.  I think off the back of
24  what Grayson is saying, you know, Number 1 is broad,
25  but it's speaking to the Complaint itself.  And so
```

Page 41

```
 1  that's what we prepared for is the contents of the
 2  Complaint, the four corners of the Complaint, which
 3  don't speak to the commission structures and things
 4  like that.
 5  BY MR. DONOVAN:
 6        Q.  I understand.
 7        A.  Yeah.
 8        Q.  Just trying to be efficient since we're all
 9  here today.
10        A.  No, we appreciate that.
11        Q.  Do you know the names of the individuals,
12  aside from yourself, who initiated contact with Ms.
13  Mey?
14        A.  I believe so.
15        Q.  And who are those individuals?
16        A.  Jonathan Murphy and Sean Miller.
17        Q.  And Mr. Murphy and Mr. Miller are
18  independent contractors?
19        A.  I believe -- we believe so, yes.
20        Q.  Okay.  And if you can, if you do know, can
21  you tell me how Mr. Murphy and Mr. Miller are
22  compensated for the work that they do on Liberty's
23  behalf as an independent contractor?
24        MR. O'SAILE:  Object to scope.
25        THE WITNESS:  A combination of sales and --
```

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 42

1  and customer success.
2  BY MR. DONOVAN:
3      Q.   Okay.  If you know, understanding this is
4  marginally within the scope at best, are Mr. Murphy and
5  Mr. Miller compensated in any way based on the volume
6  of calls made?
7          MR. O'SAILE:  Object to scope.
8          THE WITNESS:  No, they're not.
9  BY MR. DONOVAN:
10     Q.   All right.  Just to be clear, that was no,
11 they're not; not no, you don't know?
12     A.   No, they are not.
13     Q.   Okay, gotcha.  Aside from the calls that are
14 done by these independent contractors and employees in
15 response to -- strike that.
16         I understand that the call at issue in this
17 case, is -- is -- is Liberty's position the calls were
18 initiated in response to a request for a quote on the
19 Liberty website; is that correct?
20     A.   That is correct.
21     Q.   Okay.  Aside from calls that are made in
22 response to a request for a quote, does Liberty engage
23 in any other outbound telemarketing?
24         MR. O'SAILE:  Objection.  That's outside the
25 scope.  It's not related to any of the facts in this

Page 43

1  case.
2          THE WITNESS:  Can you restate the question?
3  BY MR. DONOVAN:
4      Q.   Sure.  Aside from the calls that are made to
5  individuals who have requested a quote from Liberty,
6  does Liberty engage in any other outbound calling to
7  potential customers?
8          MR. O'SAILE:  Same objection.
9          THE WITNESS:  We only call customers that
10 have submitted a form of inquiry to learn more about
11 our services and products.
12 BY MR. DONOVAN:
13     Q.   Okay.  And in this case it's Liberty's
14 position that that form of inquiry was submitted
15 through the Liberty website, correct?
16     A.   In this case, correct.
17     Q.   Okay.  Do you obtain information about
18 individuals who may be interested in Liberty's products
19 in any other way than inquiries through the website?
20         MR. O'SAILE:  Objection.  Scope.
21         THE WITNESS:  Can you specify the question?
22 BY MR. DONOVAN:
23     Q.   Sure.  Let me just be a little more
24 straightforward.  Do you ever purchase leads from any
25 other company concerning people who have indicated an

Page 44

1  interest in your product and have given their consent
2  to receive marketing about the -- or calls or inquiries
3  about those products?
4          MR. O'SAILE:  Objection.  Scope.
5          THE WITNESS:  We do.  Yes.
6  BY MR. DONOVAN:
7      Q.   Okay.
8      A.   To be clear, they host a website.  We don't
9  host it.  Our brand's on there.  They fill out the
10 form, they send the form over to our a system.
11     Q.   Right.  This is what's commonly known in
12 this industry and others as lead generators, correct?
13         MR. O'SAILE:  Object to scope.  Object to
14 form.
15         THE WITNESS:  Host and post is the -- the
16 correct term.
17 BY MR. DONOVAN:
18     Q.   I didn't hear what you said, I'm sorry.
19     A.   Lead gen covers a wider scope of -- of
20 activity, host and post is the correct term.
21     Q.   Host and post?  Is that a company or a --
22     A.   No.  It's a -- it's a -- it's an industry
23 jargon.
24     Q.   Okay.  That's new to me.  Can you explain to
25 me the distinction between that and lead generation?

Page 45

1      A.   They host their own -- they're doing lead
2  generation, but they're hosting their own pages and
3  posting information with the processes.
4      Q.   Okay.  So there's a third-party company that
5  hosts a website, correct?
6      A.   Correct.
7      Q.   And -- and I -- I'm not -- I really am not
8  trying to trip you up.  I'm just trying to learn how
9  this works.  Third-party company hosts a website and
10 that website would be sort of like a -- and how do
11 people come to that website?
12         MR. O'SAILE:  Object to scope.
13         THE WITNESS:  If you're -- if you're asking
14 in the abstract, it's one answer.  If you're asking
15 specifically in our scenario, they come through various
16 digital advertising means as one example.
17 BY MR. DONOVAN:
18     Q.   Sure.
19     A.   They fill out information on their site.
20 Again, our brands are there, very clearly displayed,
21 then that information posts over to us.
22     Q.   So for example, someone who's looking for a
23 home warranty or an appliance warranty would search for
24 that online, they would come across, through some sort
25 of digital advertising, one of these host and post

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 46

1   websites. They would submit information to that
2   website about who they are and what they're interested
3   in, and they would give their consent to be contacted.
4   And then the host and post company would provide that
5   information to you?
6       A.   Yes.
7       Q.   Roughly, correct?
8       A.   Yes.
9       Q.   Okay. And I assume you pay some fee to the
10  host and post company?
11      MR. O'SAILE: Object to scope.
12      THE WITNESS: There is. Yeah, we -- we are
13  -- we do pay them for -- based on -- yeah.
14  BY MR. DONOVAN:
15      Q.   Do you use more than one host and post
16  company?
17      A.   No.
18      MR. O'SAILE: Object to scope.
19  BY MR. DONOVAN:
20      Q.   Who do you use?
21      MR. O'SAILE: Object to scope.
22      MR. DONOVAN: Hey, Grayson?
23      MR. O'SAILE: Yeah.
24      MR. DONOVAN: If you want -- if you want,
25  you can just have a standing objection to this scope.

Page 47

1       MR. O'SAILE: Sure. Yeah. I'll put a
2   standing objection on it. That's more efficient.
3       THE WITNESS: We use consumeraffairs.com as
4   the -- the only one.
5   BY MR. DONOVAN:
6       Q.   Consumeraffairs.com?
7       A.   Yes.
8       Q.   Okay. Do you pay Consumer Affairs for the
9   lead itself, or do you only pay them when the lead
10  results in a consummated sale?
11      A.   It depends.
12      Q.   Okay. Depends on what?
13      A.   Which time period you're referring to.
14  There are time periods where (indiscernable).
15      Q.   Fair enough. In let's say, August, sorry.
16  I had a timeline from a different case up on my
17  computer and it starts in 1920. Sorry, try again.
18      A.   It's Sears Roebuck was stealing from another
19  market.
20      Q.   Yeah. Not much telemarketing back then.
21  All right. I have the right timeline. So let's say
22  for the time period of February 2022 through April
23  2022, were you paying Consumer Affairs, if you know,
24  per lead or only for consummated sales?
25      A.   I'm not prepared to speak to that because --

Page 48

1       Q.   That's fine. That's reasonably outside the
2   scope. I appreciate that.
3       MR. O'SAILE: John, you have the standing
4   objection reflected, right?
5   BY MR. DONOVAN:
6       Q.   Okay. And just to be clear, since you --
7   you made a good point about time period. Has Consumer
8   Affairs always been the only host and post company you
9   worked with or have you worked with other ones in the
10  past?
11      A.   We have worked with others in the past.
12      Q.   Okay. During that time period of February
13  2022 to April of 2022, were you working with any host
14  and post company other than consumeraffairs.com?
15      A.   I'm not -- we're not able to speak to this.
16  I'm not aware.
17      MR. DONOVAN: I want to hand you another
18  exhibit. And this is marked confidential. It's
19  Liberty 01 through 013. And we'll call this Exhibit C
20  for the deposition.
21      (EXHIBIT C MARKED FOR IDENTIFICATION)
22      THE COURT REPORTER: Are these first two
23  pages supposed to be blank?
24      MR. DONOVAN: This is how we received it
25  from Liberty, so I guess so. Well, let me ask Grayson

Page 49

1   that.
2       Grayson, in your discovery responses, you do
3   refer to at times to information contained on Liberty
4   001 and 002. But the only copy I have is blank on both
5   pages. Is there -- is there an --
6       MR. O'SAILE: That's -- that's on. Does
7   yours start 3?
8       MR. DONOVAN: No. It starts at 001 and 002,
9   but they're blank.
10      MR. O'SAILE: They're blank?
11      MR. DONOVAN: Yeah.
12      MR. O'SAILE: But they're not blank on mine.
13  You want me to send you -- let me -- let me send you
14  what I've got because they shouldn't be blank. I'm
15  surprised. Well, if you want to go off the record a
16  little bit I can --
17      MR. DONOVAN: Yeah. Let's take -- let's
18  take a quick break here.
19      THE COURT REPORTER: Off the record 11:22
20  a.m.
21      (OFF THE RECORD)
22      THE COURT REPORTER: Back on the record
23  11:32 a.m.
24      MR. DONOVAN: Okay. Grayson, thank you for
25  sending me the -- the version of this. I think this is

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 50

1  the first time I've seen pages 1, 2 that weren't whited
2  out.  Do you have -- I -- maybe we should have done
3  this before we went back on the record, but did you
4  send those -- does Ben have those?  Does he have
5  Liberty?
6          MR. O'SAILE:  Yeah.  Let me -- yeah, let me
7  send it to his -- I'll send them to -- I'll send it to
8  Charles that way, or however.
9          MR. DONOVAN:  It -- it may be tough, because
10  we won't be able to mark this as an exhibit, but I only
11  have a few questions about it, so we can just refer to
12  the Bates numbers.
13          THE WITNESS:  Yeah.  I mean, you could --
14  it's all by a factor of two, right?  Or --
15          MR. DONOVAN:  No.  There's -- there's
16  information on these pages --
17          THE WITNESS:  Oh.  Oh, okay.
18          MR. DONOVAN:  -- that I'm seeing for the
19  first time.
20          THE WITNESS:  Got it.  So that's the
21  VanillaSoft screenshot.  And then there's the, I think
22  EZ Texting screenshot?
23          MR. DONOVAN:  Looks like it.
24          THE WITNESS:  Yeah.  Yeah, okay.  I'll wait
25  for you while we wait for the e-mail.

Page 51

1          MR. O'SAILE:  Yeah.  I -- I sent it over to
2  Charles so --
3          MR. FRANK:  I should be getting it.
4          THE WITNESS:  No.  I didn't realize that it
5  had --
6          MR. DONOVAN:  Don't ever bring your computer
7  to a deposition again.
8          THE WITNESS:  Why?
9          MR. DONOVAN:  Because I'm not going to do
10  this to you today, but you should know that if you ever
11  bring your -- can we go off the record for a second?
12          MR. O'SAILE:  Yeah, let's go off the record.
13          (OFF THE RECORD)
14          THE COURT REPORTER:  Back on the record at
15  11:35 a.m.
16  BY MR. DONOVAN:
17      Q.  All right.  We're all doing our best to work
18  through tech issues here.  We're now looking -- both
19  Ben and I are looking at a version of Liberty 00001,
20  that has -- appears to have a screenshot on it.  And
21  also, Liberty 2 appears to have a screenshot.
22          Can you tell me, Ben, what these are
23  screenshots of?
24      A.  On Page 1, it's --
25          You're talking about 0001?

Page 52

1      Q.  Yes, sir.
2      A.  That's VanillaSoft.
3      Q.  Okay.  And VanillaSoft is one of the
4  programs you use to manage communications with
5  potential customers?  Is that a fair characterization?
6      A.  Yes.
7      Q.  Why don't you tell me what VanillaSoft is
8  actually?
9      A.  That -- that -- that's exactly it.
10      Q.  Okay.  Is it a version of what would we call
11  CRM software?
12      A.  I'm sorry, I'm crashing it again.  Give me
13  one second.
14      Q.  Sure.
15      A.  It -- we don't classify that as a CRM.
16      Q.  Okay.  Is this software that you developed?
17      A.  No.
18      Q.  Okay.  You mentioned earlier that when you
19  started the company, you developed some software, and
20  this is not that?
21      A.  No.
22      Q.  Okay.  And -- and what kind of information
23  do you maintain about sales leads within the
24  VanillaSoft program?
25      A.  Beyond what you're seeing on the page?

Page 53

1      Q.  Yes.  Well, actually, let's just walk
2  through what's -- what I do see on the page, and you
3  can tell me if there's anything else.  So I see on the
4  left side, it says Geoff Skadra.
5          That would be the name of the potential
6  customer?
7      A.  Yes.
8      Q.  And then beneath that, there is -- it looks
9  like there's a physical address and an e-mail address,
10  correct?
11      A.  Yes.
12      Q.  I also see a mobile number?
13      A.  Yes.
14      Q.  Okay.  And then beneath that, I see
15  something that says lead status, and it looks like
16  there's a drop-down menu and it says, need to
17  investigate.
18      A.  Correct.
19      Q.  Can you tell me what "need to investigate"
20  means in this context?
21      A.  It's a general category.  It's actually a
22  value that I put in there early on.  Originally, the
23  value was meant to discuss with the source of the lead,
24  or look into the source of the lead, because there were
25  a pattern of leads that there -- there may be a pattern

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 54

1  in the leads that that source is providing that we
2  don't like for one reason or another, such as economics
3  or somebody saying it's not me.
4      Q.  Okay.  So -- so was this lead flag as need
5  to investigate?
6      A.  When -- I believe that tag happened when
7  they removed DNC --
8      Q.  Okay.
9      A.  -- result code --
10     Q.  So that's a tag that would not have been in
11  place until after Ms. Mey reached out to your company
12  about the calls?
13     A.  That tag is associated with the removed DNC
14  result.  It would not have been in place -- in place
15  without that removed DNC result code that took place on
16  April 8th.
17     Q.  Okay.  Just to clarify, I think I
18  understand.  That tag would not have been there when
19  the initial communications to Ms. Mey were sent,
20  correct?
21     A.  That tag would not have been there when the
22  initial -- yes, that's right.
23     Q.  Okay.  All right.  And then looking over to
24  the next frame to the right there, I see Thursday,
25  February 10th.  It looks like there are two text

Page 55

1  messages.  One is at 3:51 p.m., and one is at 5:21 p.m.
2  One's from Jonathan Murphy, and one's from Sean Miller,
3  who are individuals you already identified.
4      They appear to be invitations to someone
5  named Geoff, to see if he'd like to connect with you
6  about your product, correct?
7      A.  Yes.
8      Q.  Okay.  Now is -- is VanillaSoft the program
9  that Mr. Miller and Mr. Murphy would've actually used
10  to send those text messages?
11     A.  Yes.
12     Q.  Okay.  So they generate the message in
13  VanillaSoft, and it's sent out that way.  They're not -
14  - for example, they're not using cell phones or
15  something else to send these texts?
16     A.  I can't speak to what specific device they
17  were using at the time.  VanillaSoft is accessible
18  through the browser, and -- and so, I can't answer --
19     Q.  Understood.
20     A.  -- specifically which device, but they
21  would've used the program to send the text.
22     Q.  Okay.  On the right.  I see something that
23  says script.  Can you tell me what that frame does?
24     A.  So the script titles from VanillaSoft,
25  right, that this is a software that we license not

Page 56

1  specific to us.  That allows us to send this
2  information over to the software that onboards
3  customers, and sets up the policy.
4      Q.  Okay.  And then I see, down at the bottom, a
5  call history log?
6      A.  Yes.
7      Q.  And it looks like it's in reverse
8  chronological order, starting April 8th at the top, and
9  going down to February 10th at the bottom.
10     Am -- am I under -- looking at that
11  correctly?
12     A.  April 8th at the top and February 10th at
13  the bottom.
14     Q.  Okay.  Is it your understanding that that
15  call history represents all of the actual audio
16  telephone calls that were made to Ms. Mey by your
17  company?
18     A.  Okay.  So the ones that have talk time would
19  be confirmed calls --
20     Q.  Uh-huh.
21     A.  -- in this case.  There may be an instance
22  of the salespeople not actually dialing out, and just
23  clicking on the lead to move on to the next one, and
24  copying the previous note prior, because I don't see
25  any talk time.  So these are -- this is how many times

Page 57

1  a salesperson saw this screen and clicked on a
2  disposition for the lead.
3      Q.  Gotcha.  So for example, if I look at the
4  call date and time entry for February 16th, 2022, at
5  2:29 p.m. --
6      A.  Uh-huh.
7      Q.  -- there's a duration, but there's no talk
8  time.  Would that indicate that a call was made, but
9  there was no connection to an actual person who
10  answered on the other end?
11     A.  We're of the opinion that a call probably
12  was not made, and there was no -- and there was no
13  connection.
14     Q.  Okay.  What would the -- what would the
15  duration indicate to?
16     A.  The amount of time that the screen was up
17  for them.
18     Q.  Okay.  I -- why are you of the opinion that
19  no call was made?
20     A.  So if you look at the timing, right, 16
21  seconds for that disposition in question --
22     Q.  Uh-huh.
23     A.  On the remove DNC tag, which I personally
24  did, I had to go in and click the button, and it took
25  me 13 seconds to go in and click.

Q. Right.
A. So for 16 seconds to go dial the number, let it ring, I cannot imagine that that's enough time for --
Q. Okay.
A. -- to respond to -- be dialed.
Q. And then there is a column for result as well, correct?
A. Correct.
Q. Okay. So let's stick with that February 16th call. The result there says, VM N/A full.
A. Uh-huh.
Q. Is it safe to assume that VM refers to voicemail?
A. Yes.
Q. Okay. And then it says result, and then it says, slash full. Is it possible that -- that means they reached a voicemail recording and it was full, so no messages left?
A. The recording was not operable, is essentially what that result code means. The voicemail wasn't operable.
Q. Meaning it was full potentially, or --
A. Yeah, it was potentially full. It was potentially not operable, not -- not applicable.

Q. Okay.
A. Not available.
Q. Gotcha. And then on the comments' column to the right, it's sticking with that same call, February 16th, or same entry on February 16th. I see a comment that says recording.
Do you have any idea what that indicates?
A. No, not really.
Q. Okay. Do -- when you engage in outbound calling, do you record all outbound calls?
A. No, we do not.
Q. Okay. Is there anything on this page that would indicate to you or me the source of this lead?
A. Do you mean such as being -- inquiring on our form on our website?
Q. Yeah. Is there anything that would indicate here whether this was a lead that was obtained, or information that was obtained, as a result of inquiry on the website or from your host and post partner or someone else?
A. No.
Q. Okay. And then one last question, I think, I can't promise, about this page. You indicated that that need to investigate tab, or flag, or whatever we may call it --

A. Tag.
Q. -- was something that was placed after the Do Not Call request on -- whenever that was first received. Is there any way with this software to go back in time and see how this entry would've appeared at a particular day and time?
A. There's no way to see that, unfortunately.
Q. Okay. All right. Let's move on to Page 2. Can you tell me what this is?
A. Just one moment.
Q. It looks like a screenshot maybe from a different program?
A. Yes. This is a manifest of previews. It's a -- manifested previews from EZ Texting.
Q. Okay. And it looks like there are one -- I see 15 entries; is that correct?
A. That's correct.
Q. And do these entries reflect, as far as you understand it, text messages that were sent to Ms. Mey's phone number?
A. This screenshot reflects text messages that were sent to the number under the Geoff Skadra lead, 304-242-4327.
Q. Okay. Is -- does this reflect all of the text messages that would've been sent to that number?

A. From EZ Texting?
Q. From your company?
A. These are what you saw on the prior screen.
Q. Okay. Got it. And just for my understanding, why -- why is it that -- that you would've two different records? Why -- why do you have two different pieces of software that send these messages?
A. This software enables through manual -- manually uploaded, curated, and initiated trigger to send out text messages to a group at once.
Q. Gotcha.
A. Which I manage, I curate entirely since the beginning of the company.
Q. And I understand why you're being careful about talking about it being manual, but you understand Ms. Mey has dismissed any claims regarding the use of automated technology. So you can continue to be careful about that if you want, but that's not an issue in this case.
Okay. So we have basically two kinds of software then if I understand it. The VanillaSoft texts are texts that would've been initiated individually to that number by your independent contractors, Mr. Miller and Mr. Murphy, correct?

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 62

1    A.   Yes.
2    Q.   And then the second software, remind me the
3  name again.
4    A.   EZ Texting.
5    Q.   EZ Texting.  That's when you want to send a
6  group text to everyone in a particular category of
7  lead, I assume.
8    A.   That's right.
9    Q.   And those were initiated by you?
10   A.   Yes.
11   Q.   Okay.  That makes sense to me.  How do you
12 determine when to send these EZ Text messages?
13   A.   Time of day?
14   Q.   No, not time of day.  I -- I -- I mean just
15 in terms of, do you send them -- it doesn't look to me
16 like there's any kind of pattern.  They're not going
17 out every two days or three days.
18        I guess, what is it that prompts you, as the
19 person who's responsible for initiating these texts, to
20 initiate one of these mass texts?
21   A.   Inability to get in contact with people that
22 have inquired with us.
23   Q.   Okay.  So when you sent, is -- is there
24 anything on this EZ Text screenshot that would indicate
25 -- let me back up a second.

Page 63

1        When you send these mass tests, do you
2  typically send them to every number that you have
3  consent for, or do you identify smaller subsets or
4  groups of potential customers to send the text to?
5    A.   Smaller subsets.
6    Q.   Is there anything on this EZ Text
7  screenshot that would indicate what subset of leads you
8  were sending the text to?
9    A.   No.
10   Q.   Okay.  Is there anything that would indicate
11 the number of individuals who received any of these
12 texts?
13   A.   No.
14   Q.   Okay.  Is there anything on here that would
15 indicate the source of the leads to whom -- for -- for
16 whom these mass texts should be sent?
17   A.   Unfortunately not.
18   Q.   Okay.  Is there anything within the software
19 that would allow you to do that, even if it doesn't
20 appear on this printout?
21   A.   No.
22   Q.   Okay.  Is EZ Text software that you
23 developed, or is it some -- something that you --
24 someone you contract with?
25   A.   It's a third party.

Page 64

1    Q.   Okay.  I'm just curious, when you -- you
2  said earlier you developed some software yourself, are
3  you using any of that software anymore?
4    A.   When you say, I'm just curious, is that --
5  are we --
6    Q.   No, we -- we're still on the record, yeah.
7  Okay, sorry.
8    A.   That's off -- can you restate the question?
9    Q.   You indicated in some of the earlier
10 questioning that one of the first things you did when
11 you founded the company was develop some software for
12 use in sales in this contract.
13        Are you still using that software?
14        MR. O'SAILE:  I would object.  You can
15 answer.
16        THE WITNESS:  I would just correct that it
17 wasn't for use in sales.  It was for use for customer
18 experience and -- and servicing.
19 BY MR. DONOVAN:
20   Q.   Gotcha.  So all of your sales software is --
21 is third party?
22   A.   I need you to be more specific.
23   Q.   Okay.  All of the software you're using to
24 communicate with potential leads about sales is
25 developed by a third party.  Let me ask you -- let me -

Page 65

1  - let me -- let me -- let me try to clarify.
2        This VanillaSoft, is that what it's called,
3  the first screenshot?
4    A.   Yes.
5    Q.   That's the third-party software that you
6  license for use in sales?
7    A.   Yes.
8    Q.   Same with EZ Text?
9    A.   Yes.
10   Q.   Are there any other software platforms that
11 you use to communicate with prospective customers?
12   A.   No.
13   Q.   Okay.
14        MR. O'SAILE:  Beyond the scope.
15 BY MR. DONOVAN:
16   Q.   And both of those are third-party produced?
17   A.   Yes.
18   Q.   Okay.  And then I -- I think now we can go
19 to the -- to the version of this exhibit that we marked
20 as Deposition Exhibit C, because it looks like the
21 remaining pages of this 3 through 13 do have text on
22 them.  And it -- it's a -- it's a little bit strangely
23 formatted, because we have 13 pages, but it's -- it --
24 only a couple of lines at the top of each page.  My
25 guess is that maybe this isn't -- well, at least 3

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 66

1  through 9 are like this.
2       My guess is, maybe this was a printout from
3  a spreadsheet, and that's why it's formatted that way;
4  is that correct?
5       A.  That is correct.
6       Q.  Okay.  From where do these pages come?
7       A.  They come from a data table for leads that
8  inquire through our website.
9       Q.  Okay.  So leads come in -- I'm not a
10  tech guy at all.  When leads come in through your
11  website, where do they go?
12       A.  They go to that grid.
13       Q.  Okay.  Automatically populated into this
14  data table?
15       A.  Yeah.
16       Q.  Okay.  And then how do those leads make it
17  from that data table into VanillaSoft, EZ Text?
18       A.  We post it into VanillaSoft.
19       Q.  Okay.  That -- is that an automated process?
20       A.  Yes.
21       Q.  Okay.  So I want to kind of just walk
22  through this -- these pages, if I can.  Let's look at -
23  - do you mind if I skip on the zeros?  Let's just look
24  at Liberty 3.  Looks like this contains some contact
25  information for a lead that came in through your

Page 67

1  website?
2       A.  Yes.
3       Q.  Okay.  I see first name, last name, e-mail.
4  I don't think I need to ask any questions about those.
5  There's a phone number, 304-242-4327.
6       That's your -- that's the -- the number that
7  the text messages at issue in this case went to,
8  correct?
9       A.  Yes.
10       Q.  Okay.  There's a ZIP Code, and it looks like
11  that might all be information that was added, or that
12  was submitted by whomever went on your website and put
13  this information in, correct?
14       A.  That information was submitted by somebody
15  on our website, yes.
16       Q.  Okay.  And then the number of other columns.
17       A.  There is other information that the person
18  on our website submitted as well.  It's not all the
19  information that the person on our website submitted,
20  just to be clear.
21       Q.  No, understood.  So we'll -- we'll keep
22  working through that.  So I see something called
23  Liberty Gate.  Do you know what that refers to?
24       A.  It's what I call my fundamental data table.
25       Q.  Okay.  And then added date; is that

Page 68

1  information that would've been automatically grabbed?
2       A.  Yeah.  I refer to it as a calculated column,
3  meaning that it's -- it's -- it's calculating that
4  value itself, unlike the ZIP Code.
5       Q.  Uh-huh.  And so we've got a date here,
6  February 10th, 2022, 14:45.  Do you know where that --
7  do you know what time zone we're working with on that?
8       A.  Eastern.
9       Q.  Okay.  So Eastern always, regardless of
10  where the lead was submitted?
11       A.  Yes.
12       Q.  And then there's a column for lead
13  source?
14       A.  Yes.
15       Q.  What does that mean?
16       A.  That means what pages were they on before
17  they submitted the lead inquiry.
18       Q.  Okay.  And this -- is this the software that
19  you created that we were talking about earlier?
20       A.  This is -- yeah.
21       Q.  One of them.
22       A.  One -- one of the -- yeah, one of the
23  gadgets.
24       Q.  Okay.  So what does -- what do -- what does
25  58 tell us about the lead source?

Page 69

1       A.  It tells me that this is -- it came -- like,
2  because it's a number, it came on -- it's on our
3  website.  It wasn't a host and post provider.
4       Q.  Okay.  So host and post leads also come into
5  the data table?
6       A.  It's a different data table, but yes, but
7  for redundancy.
8       Q.  Gotcha.  Online purchase: no.  What does
9  that mean?
10       A.  They didn't buy the policy online.
11       Q.  Okay.  Let's see.  Address 1, that was
12  submitted by whomever visited the website?
13       A.  Yes.
14       Q.  Okay.  Same with city and state?
15       A.  Yes.
16       Q.  Okay.  Then there's a Liberty Gate ID.  What
17  does that tell us?
18       A.  It's just an internal -- it's an internal ID
19  for the record.
20       Q.  Does that tell us anything about the
21  timing -- let me -- let me ask this way.  Is there any
22  substantive information that that number tells us, or
23  is it just, sort of a -- a number that's generated to
24  keep track of this?
25       A.  There is not any substantive information

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 70

1  there.

2  Q.  And what is UTM ID?

3  A.  That is telling us, you know, what

4  advertising click, you know, parameters.  It's

5  something I -- I believe -- I believe Google -- it's

6  like Google standard tracking.

7  Q.  Okay.  Does that tell you how the person

8  landed on the --

9  A.  What -- could you be more specific on that

10  question?

11  Q.  Yeah.  Does the UTM ID tell you anything

12  about how the person came to your website?  I don't

13  have a very sophisticated understanding about how this

14  software works, but I understand that, you know,

15  through trackers and cookies and whatnot, you can

16  sometimes know how someone came to your website.

17       Is that what that information is telling us,

18  sir?

19  A.  It gives us an indication that the person

20  came to our website from an external page.

21  Q.  Okay.  But not which external page?  And I'm

22  not asking you if you can tell me right now what page

23  they came from.  I'm just asking if that's information

24  that's available from that column.

25  A.  We may be able to deduce that.

Page 71

1  Q.  Okay.  What about, is it O Click ID in the

2  next column?

3  A.  That's -- it's when they click on our link,

4  because they're coming to our link.  So if they click

5  on a Google ad, or they click on, you know, let's say

6  the sponsored ads at the top's, you would click, this

7  number gets generated so we can track the click.

8  Q.  Okay.  What about O Code?

9  A.  Similar.  There's a lot of redundant click

10  data points in case some fails or breaks or has an

11  issue.

12  Q.  Okay.  Auto camp, and --

13  A.  It's some -- it's sometimes used to track,

14  you know, certain parameters, like what keywords, or

15  the blogs they read --

16  Q.  Okay.

17  A.  -- where a lead would come from.

18  Q.  The Landing URL, what does that tell us?

19  A.  It's the whole thing combined.

20  Q.  Okay.  I see, we're on Liberty 7 now.

21  There's a column for lead channel?

22  A.  Yes.

23  Q.  What does that tell us?  It says exit

24  intent.

25  A.  So I believe that would tell us that they

Page 72

1  clicked on the action -- specific actions button that

2  shows up on the screen.

3  Q.  Okay.  What about Application ID?

4  A.  That's system-generated.  It's to track this

5  -- this record ID.  It's another primary key.

6  Q.  Okay.  How about Device ID?

7  A.  It's meant to track -- originally, it was

8  meant to track, like if it's the same device coming

9  back filling it out, theoretically, you can have, you

10  know, the same device value multiple times.  In this

11  case, it's not -- it's not -- not just in this case.

12  We -- it's not something that, in terms of the

13  information, you can glean from.

14  Q.  Would there be any way to search your data

15  table to identify whether that Device ID had been used

16  to submit other inquiries?  I guess it -- it let me let

17  me back up.

18       Is that Device ID referring to the device

19  that was used by the person who submitted the inquiry

20  on the website?

21  A.  Liberty Home Guard is not aware of an

22  instance where we've been able to successfully

23  attribute the same Device ID using that field.

24  Q.  Okay.  I'm asking hypothetically if you

25  could search your data table to see if that Device ID

Page 73

1  has shown up more than once?

2  A.  Yes.

3  Q.  Okay.  And have you done that in this case?

4  I'm just -- you -- your answer said you're not aware

5  of, that just I -- I want to -- I'm curious about what

6  steps you have done to -- to make that determination,

7  or to try to become aware?

8       MR. O'SAILE:  Object.  Asked and answered.

9       THE WITNESS:  It's a -- it's a field that we

10  don't use often.  I do not believe I searched that

11  Device ID in this case.

12  BY MR. DONOVAN:

13  Q.  Okay.  And then User ID, how -- how does

14  that differ from Device ID?

15  A.  So User ID tells us if we were able to find

16  a match within the time frame on the phone number or e-

17  mail address.  The same phone number or e-mail address

18  is submitted twice.

19  Q.  I see.  Okay.  All right.  We're on Liberty

20  8 now, which is -- it says user agent.  And then it

21  says, desktop Macintosh OS X 10.15.7 Chrome.

22       What does that tell us?

23  A.  It tells us the type of device that was

24  used, the operating system, and the browser, and the

25  browser version.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 74

1    Q.   Okay.  Is that -- how -- again, I'm ignorant
2  of these things.  How can you tell that just from
3  someone submitting a form on the website?
4           MR. O'SAILE:  Objection.  Outside scope.
5           THE WITNESS:  I believe it involves the
6  protocol between the device and how it interacts with
7  the program that is the browser that you're using.
8  BY MR. DONOVAN:
9    Q.   Okay.  Is it generally accurate as far as
10 you're aware?
11          MR. O'SAILE:  Objection.  Outside scope.
12          THE WITNESS:  I'm unsure.  I'm unsure.
13 BY MR. DONOVAN:
14   Q.   Okay.  But at least in -- in terms of what
15 it purports to indicate, would tell us that someone was
16 using a desktop -- oh, a desktop operating system,
17 correct?
18   A.   Yes.
19   Q.   As opposed to, like, a mobile operating
20 system like iOS, right?
21   A.   Yes.
22   Q.   And that -- that was a Macintosh operating
23 system, correct?
24   A.   Yes.
25   Q.   And that the browser that was used was

Page 75

1  Chrome, which is a Google browser, right?
2    A.   Yes.
3    Q.   Okay.  And then the -- last string of
4  digits there, is that an IP address?
5    A.   I do not believe that's an IP address.
6    Q.   Okay.  Do you know what that is?
7    A.   It's not an IP address.  It may be the --
8  the -- the browser version.
9    Q.   Okay.  All right.  Next column says, match
10 ID.  What does that represent?
11   A.   It speaks to what I mentioned earlier about
12 us -- the user ID matching the phone number or the e-
13 mail address.
14   Q.   Okay.  And then it says, primary days 90, or
15 phone primary days 90.  What does that indicate?
16   A.   It's what we call a look-back, how far back
17 in our records it's looking.  The same phone number
18 showed up, but it was 91 days apart, the user ID
19 wouldn't be matched.
20   Q.   Okay.  And the same with e-mail, I assume,
21 except 30 days --
22   A.   Yes.
23   Q.   -- for the e-mail address?  Okay.  Property
24 size "under 5,000 square feet," is that user-submitted?
25   A.   Yes.

Page 76

1    Q.   Same with policy term?
2    A.   Yes.
3    Q.   Okay.  Coverage plan.  That tells us what --
4  what plan, I guess, the person indicated they were
5  interested in?
6    A.   Yes.
7    Q.   Okay.  And then there's a funnel column that
8  says, get quote, checkout.  What does that mean?
9    A.   We have different purchasing -- digital
10 purchasing paths.  So you know, on July 4th, it's
11 Independence Day.  On Memorial Day, it's Memorial Day.
12 So we, you know, during the path that we go on, we can
13 offer -- let's say Black Friday, and we'll offer the
14 holiday as a special funnel with different pricing.
15   Q.   Gotcha.  And then there is a last step
16 visited number.
17          What does that indicate?
18   A.   It indicates that they made it very far in
19 the purchase journey, which does indicate that they
20 were a serious customer looking to buy a policy, they
21 did not just want to get pricing and leave.  They made
22 it past the pricing page.  They made -- they -- they
23 submitted information five times, five separate pieces
24 of information.
25          Then the phone, you have a first of that, or

Page 77

1  first or second of that, of that set of information.
2  Yeah.  Yes.
3    Q.   Do you know how many steps there are in the
4  purchase journey?
5    A.   I believe seven.
6    Q.   Okay.  And then the last column is IP
7  address.  So maybe that clarifies my earlier question.
8  Is that the IP address from the individual who
9  submitted the inquiry?
10   A.   Yes.
11   Q.   Okay.  All right.  Now we're looking at
12 Liberty 10.  This is formatted differently.  Is this
13 from the same data table?
14   A.   No.
15   Q.   Okay.  What is this from?
16   A.   This was my work.  I put it in a spreadsheet
17 to compile all calls and misnomer here.  These are
18 results, dispositions in VanillaSoft, not calls.  Not -
19 - not -- they're not calls, but these are five
20 dispositions in VanillaSoft.  As I mentioned earlier --
21   Q.   Right.
22   A.   -- I can't say these are all calls.  And
23 then the text messages, secondly.
24   Q.   Okay.  And is this -- if I understand your
25 answer correctly, then this is not information that you

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

---

Page 78

1  would regularly create or maintain. This is something
2  that you created for the purposes of this litigation?
3      A.  I synthesized the information.
4      Q.  Gotcha.
5      A.  Yes.
6      Q.  All right. And then we've got Liberty 11.
7  What is this?
8      A.  This is the form that users would fill out
9  to provide us their first name, last name, e-mail,
10  phone number, number of properties they would like to
11  cover, providing their consent to be contacted, and the
12  e-mail and/or phone number to learn about our products,
13  as well as showing them clearly that there's a privacy
14  policy in terms of use in place that they can easily
15  access.
16      Q.  Okay. Do you know what date this screenshot
17  was taken?
18      A.  I see the page. I see on the top left. Is
19  that what you're referring to?
20      Q.  I -- I don't know. I'm just asking. It --
21  it says January 5th, '24. I don't know if that's the
22  date that it was obtained from the website or --
23      A.  I don't -- I -- we're not aware of the date
24  of the screenshot. No.
25      Q.  Okay. As far as your -- is this, as far as

---

Page 79

1  you're aware, what the website looks like as we sit
2  here today?
3      A.  Yes.
4      Q.  Okay. Is this what the website would have
5  looked like from February to April of 2022?
6      A.  It's hard to say. You know, we're -- we
7  were a small company, a new company growing, so we
8  don't keep logs of -- backups and logs of the website
9  and any change that happens.
10      Q.  As far as you're aware, would there have
11  been anything substantively different about the way
12  that this page on the website appeared during the time
13  frame I just mentioned of February to April 2022?
14          MR. O'SAILE:  Object to form.
15          THE WITNESS:  No.
16          MR. DONOVAN:  I just got a marketing text.
17          MR. FRANK:  There you go.
18  BY MR. DONOVAN:
19      Q.  Okay. And then Liberty 12 appears to be an
20  e-mail from Diana Mey on March 4th, 2022; is that
21  correct?
22      A.  Page 12 is -- appears to be an e-mail from
23  Diana Mey on March 4th, 2022.
24      Q.  Okay. And that e-mail was sent from
25  dianamey@comcast.net to address

---

Page 80

1  service@libertyhomeguard.com. Who is
2  service@libertyhomeguard.com?
3      A.  (No audible response)
4      Q.  Let me ask it differently. Who would've
5  received this e-mail in the company?
6      A.  A supervisor, their manager, and the team
7  underneath them, the customer service team that
8  monitors it.
9      Q.  Okay. Now, is there any procedure employed
10  in place at Liberty when you receive an e-mail such as
11  this or a communication such as this indicating that a
12  consumer has received unwanted solicitations from the
13  company?
14      A.  The procedure that we have in place around
15  these types of e-mails is more cybersecurity-related.
16  We run it through a bunch of checks to verify and see
17  if there's any veracity, see if there's any spam or
18  phishing going on. That's the procedure that would've
19  probably kicked him here.
20      Q.  Okay. In terms of dealing with the actual
21  complaint from the consumer that she's received calls
22  that she didn't want to receive or consent to receive,
23  alleged that she didn't consent to receive, do you have
24  any process for dealing with that?
25      A.  Sorry. Can you restate that?

---

Page 81

1      Q.  Yeah. I mean, what -- what this is, what
2  this appears to be is an e-mail from an individual who
3  is now the plaintiff in this case, Diana Mey, stating
4  that she received multiple telemarketing calls to a
5  number that was on the Do Not Call Registry, and that
6  she didn't wish to receive. I mean --
7          MR. FRANK:  I -- I object to -- to the
8  characterization.
9          MR. DONOVAN:  Okay.
10  BY MR. DONOVAN:
11      Q.  Is there any process for dealing with this
12  kind of a -- a complaint to determine whether it's
13  valid?
14      A.  Well, as part of the cybersecurity checks,
15  we'd look to verify the information. And we could not
16  verify that this number was associated with this person
17  or e-mail address. And because we are an emergency
18  service that provides things like climate control, AC
19  systems for first responders in heat waves, or help
20  replace refrigerators with people that have, let's say,
21  diabetic medicine that they need to keep cool, we need
22  to be able to contact customers and keep them in
23  contact.
24          So as such, when we checked this, we were
25  not able to verify any correlation, whereas all the

---

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 82

1  other information submitted with the Geoff Skadra lead
2  form at the time seemed verified.
3      Q.  Okay.  Well, did it -- did it raise any red
4  flags that this person was saying she received calls at
5  this number and her name was not Geoff Skadra?
6          MR. O'SAILE:  Object to form.
7          THE WITNESS:  It -- it raised our
8  cybersecurity check red flag to see if we have a -- a
9  spoofing or a phishing situation with regards to -- and
10  we checked into it.  When we looked into it, it looked
11  like it was a valid number.  And as such, there was not
12  -- there was no specificity in the e-mail.  For all
13  intents and purposes, you know, the red flags it raised
14  were not -- were unable to be verified at the point.
15  BY MR. DONOVAN:
16      Q.  What did you do to check to determine
17  whether this name was associated with this number?
18      A.  So we were able to determine that there was
19  a Geoff Skadra who lived at that address and the IP
20  address corroborated that.  So you know, generally when
21  people are submitting bogus information, it's not so
22  well corroborated, like very much so.  So those were --
23  that was the extent, that I would say the -- the
24  majority of what we used to verify.
25      Q.  Okay.  Did you make any effort to -- to

Page 83

1  determine whether Diana Mey was associated with that
2  telephone number?
3      A.  We tried to get in contact with the
4  telephone number.
5      Q.  Okay.
6      A.  And one more thing I'd like to mention is
7  that every single text message she received had, we
8  believe had a "stop to unsubscribe" link in it because
9  that is program protocol for EZ Texting.  So again, it
10  -- it just didn't make sense to us.  Why e-mail us, why
11  not just opt out directly then and there the easy way.
12      Q.  What kind of database did you look at to
13  determine that there was a Geoff Skadra who was
14  associated with that contact information?
15      A.  Through public record.
16      Q.  Public record, like a website called public
17  record?
18      A.  Like a -- yeah, it was -- it was -- it was
19  we went through the internet and we did our research,
20  did our fact-finding and -- yeah.
21      Q.  Okay.  You don't recall specifically what
22  you looked at?
23      A.  I do not recall.  I could look it up.
24      Q.  Okay.  That's fine.  Who would've been the
25  person actually conducting this investigation?

Page 84

1      A.  Can I use the bathroom?
2      Q.  Absolutely.  Well, actually, sorry, I did
3  ask the question.  Do you mind just finishing --
4      A.  Yeah.  Who conducted this investigation?
5  Well, it would've been the people that monitor service,
6  obviously.  And then I also conducted it as well.
7      Q.  And who are the people that monitor service?
8      A.  It's a team of customer service reps and --
9  and their supervisor at the time.
10      Q.  Okay.
11          MR. DONOVAN:  So you just want to take a
12  break?  Do you want to -- are you going to try to do
13  lunch?
14          MR. FRANK:  I mean, because of the time, we
15  might -- why don't we just go to lunch?  But I don't
16  want to --
17          MR. DONOVAN:  No, that's fine.  I probably
18  have, like, another --
19          THE COURT REPORTER:  Off the record.  It's
20  12:21 p.m.
21          (OFF THE RECORD)
22          THE COURT REPORTER:  On the record at 1:17
23  p.m.
24  BY MR. DONOVAN:
25      Q.  All right.  We're back from a lunch break,

Page 85

1  and I want to jump back into just a couple more
2  questions about the e-mails from Ms. Mey that we were
3  looking at.  I think those are at the tail end of
4  Exhibit 3, starting on page -- or it's marked Liberty
5  12.  And apologize -- apologies if some of this is
6  repetitive, but I want to sort of lay the foundation
7  for where we were.  And we were discussing what you had
8  done in response to receiving this e-mail from Diana
9  Mey on March 4th, 2022.
10          I believe you indicated that your -- your
11  first concern was that this might be some kind of
12  phishing attempt or cybersecurity threat; is that
13  correct?
14      A.  I indicated that was the procedure that was
15  -- that was -- that was triggered.
16      Q.  Okay.  And -- and how did you determine that
17  it was not?
18      A.  We -- we didn't --
19          MR. O'SAILE:  Object to form.
20          THE WITNESS:  I'm sorry.  I didn't hear
21  that.
22          MR. DONOVAN:  Just objecting to the form.
23          THE WITNESS:  We determined that it wasn't
24  credible.  It's sort of an absence of evidence thing.
25  Not enough evidence of -- like, a -- it wasn't

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 86

1  conclusive.  It was just, you know, we could -- we
2  didn't take it any further.
3  BY MR. DONOVAN:
4      Q.  Okay.  What led you to believe that it
5  wasn't credible specifically?
6      A.  That the threat, the cybersecurity threat,
7  wasn't credible.
8      Q.  Okay.
9      A.  Because there was nobody answering the line,
10 and we couldn't get in touch with them.  And we
11 couldn't figure out -- they weren't a customer.  It
12 didn't seem like there was any sort of -- we couldn't
13 tell what they were getting at, so we realized that we
14 would be spinning our wheels unless we had a way to go.
15     Q.  Okay.  Did you make any efforts to determine
16 whether the complaint itself of receiving unwanted
17 solicitations was credible?
18     A.  You say unwanted solicitations.  There's
19 nowhere here to indicate that she -- that there --
20 there was no way to indicate these solicitations were
21 unwanted, based on what I can tell.  There's nothing
22 explicit.
23     Q.  Okay.  I understand that it may not say that
24 explicitly, but you do understand that she was
25 complaining of receiving multiple telemarketing calls

Page 87

1  to a number that was on the National Do Not Call
2  Registry, correct?
3      A.  She's stating that she received -- what I'm
4  reading here is, she's stating she received multiple
5  telemarketing calls from our agents, is what she's
6  stating, to the line that she put forth.  And then she
7  asserts that it's been on the National DNC in this e-
8  mail since 2003.
9          And then she goes into explaining her
10 interpretation of Federal TCPA and the law.  And then
11 she goes on to further explain the law.  And then she
12 goes on to ask us for, you know, company data.  Which
13 again, as long as we, you know, don't take any action,
14 we're protected.  Without this quote, like, without
15 providing any -- if this is a phishing action, which we
16 were at the time operating under, given the vagaries.
17     Q.  So once you determined that it wasn't a
18 phishing action, did you -- well, let me back up.  So
19 when you read this, you don't take the -- you -- you
20 did not interpret this in any way to reflect concerns
21 from Ms. Mey that she was receiving unsolicited
22 telemarketing calls?
23     A.  In the course of running a business, I can't
24 -- I can't -- we can't operate in -- in any way and run
25 every single scenario under the gamut, but the

Page 88

1  determination that we determined was that this is more
2  likely than not, if anything, some sort of phishing
3  attempt.  And -- yeah, I mean, that's -- that was --
4  that was pretty much -- that we weren't able to
5  determine one way or the other, but that's what would -
6  - this was interpreted as.
7      Q.  Okay.  And did you make -- and you didn't
8  make any effort to -- I mean, she did say, before I
9  file a formal complaint.
10         You didn't take that as evidence that she
11 was complaining about receiving unwanted telemarketing
12 calls?
13     A.  Yeah.  In today's day and age, the darndest
14 things will come out in these e-mails to try to elicit
15 information that they can then use to create a -- a
16 data problem or cyber problem.
17     Q.  Well, I understand being careful, but you
18 said -- you testified that you did eventually determine
19 that there was no basis to believe this was a phishing
20 attack, right?
21     A.  Yes.
22     Q.  Okay.  And after you made that
23 determination, did you make any effort to respond to --
24     A.  Hold on.  I just want to correct the no
25 basis.  We came to a threshold of skepticism that Geoff

Page 89

1  Skadra was not behind the phone number any longer.
2  That's the determination that we made.  And once we
3  determined that there's a decoupling of that
4  information, no issue.  And we removed it to be safe.
5      Q.  But you didn't remove it in response to this
6  e-mail?
7      A.  We removed it on April 8th, after the second
8  meeting.
9      Q.  Right.  And in-between this e-mail and April
10 8th, there were a number of additional communications,
11 correct?
12     A.  Yes.
13     Q.  Okay.  So I -- I -- we'll talk about the
14 second e-mail in a minute.  In response to this first
15 e-mail, you did not remove her number or name from the
16 data -- or you did not remove this number or Mr.
17 Skadra's name from your database, correct?
18     A.  Correct.
19     Q.  And you did not respond to Ms. Mey's request
20 that you provide her with evidence of consent, correct?
21     A.  Correct.
22     Q.  Why not?
23     A.  Because we received consent from the person
24 that all their information corroborated.  They're a
25 real person for that record.  Because we had consent,

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 90

1  you know, it was within -- it was within procedure to
2  continue communicating.
3          And because this was not very clear nor
4  explicit, there wasn't any further action.  That the
5  best course of action was not to take any further
6  action in regards to this e-mail.
7      Q.  And was that decision made pursuant to some
8  kind of policy about how you'd handle these issues, or
9  was that made on a case-by-case basis?
10     A.  Well, I spoke earlier with regards to the
11 cybersecurity procedure that would kick in and take any
12 -- anything that's requesting PII from an
13 uncorroborated source has a potential threat.  We can't
14 be too careful in today's day and age.  Outside of
15 that, I'm not sure if that's what you're looking for.
16     Q.  I'm asking if the decision not to remove the
17 number from the database or to do any further
18 investigation based on this e-mail was a decision that
19 was pursuant to any kind of formal policy, or a
20 decision that was made on a case-by-case basis with
21 respect to this particular complaint?
22         MR. O'SAILE:  Object to form.
23         THE WITNESS:  We have a formal policy when
24 it comes to complaints, and -- and how we outbound
25 call.  That this communication did not fall within that

Page 91

1  policy, because there was no explicit ask, and we were
2  unable to verify -- we were unable to verify any
3  association between the phone number and this person.
4  And all indications pointed to this phone number being
5  associated to the person that filled out the form.
6  BY MR. DONOVAN:
7      Q.  Okay.  And I think you mentioned -- and I --
8  I -- I don't want to bring in your counsel's testimony,
9  but we -- we had a discussion off the record that there
10 may have been some documents reflecting efforts that
11 were taken to determine whether this number was
12 affiliated with Diana Mey.
13     A.  What's the question?
14     Q.  I -- I understood you to say earlier, and I
15 had a brief conversation with your counsel off the
16 record that there may be some internal documents that
17 reflect your efforts to determine whether or not this
18 number was actually affiliated with Diana Mey; is that
19 correct?
20         MR. O'SAILE:  Object to form.
21         THE WITNESS:  Yes.  There's a screenshot
22 that we took, yes.
23 BY MR. DONOVAN:
24     Q.  Okay.  And what -- what efforts were
25 undertaken to determine whether or not the number 304-

Page 92

1  242-4327 was a number that belonged to Diana Mey?
2      A.  The efforts that were undertaken were to
3  determine whether that number was a number that
4  belonged to Geoff Skadra, who filled out the lead.
5      Q.  Okay.
6      A.  And based on those efforts, we had feeling -
7  - we had a sense that this number was associated --
8  associated with the Geoff Skadra.
9      Q.  Okay.  And you did that by checking a
10 database?
11     A.  Yeah.  By checking a database, and having a
12 ton of experience with these types of leads.  If
13 somebody's filling out a lead with a -- a person whose
14 phone number, especially a person like Diana Mey, who's
15 well-known for TCPA complaints, they would take special
16 efforts to avoid associating their number, their --
17 their -- their real identity with the phone number.
18         And again, even if it's not Diana Mey, it's
19 just anybody.  Like, they -- they would use John, you
20 know, John Bambadil (phonetic), whatever the case may
21 be.  They wouldn't give a real name with the real IP
22 address that corroborates the address with an address
23 that they're registered in who supposedly got an e-
24 mail.
25     Q.  So you assume that maybe Ms. Mey was -- this

Page 93

1  was a -- a setup by Ms. Mey then?
2      A.  No.  We just assumed that this was a
3  spoofing thing at the time.  At the time, we didn't
4  know anything about Diana Mey.  We just assumed that
5  this was some sort of attempt from, you know, who knew?
6  It could be a bot.  It could have been -- we -- you
7  know, that's one -- that was one working assumption, or
8  would call all the time.
9          Or it could have been somebody that, you
10 know, for a career, tries to gather any little tidbit
11 of information, to then gather more, to then, you know,
12 create a identity theft event, or another sort of, you
13 know, nefarious action on their part.  And we certainly
14 didn't want to be helpful in their endeavor, if that was
15 the case.
16     Q.  Okay.  But wouldn't any of those concerns
17 that you just indicated be enough to raise a red flag
18 that would warrant further investigation as to whether
19 or not this number really was a number that belonged to
20 Diana Mey?
21         MR. O'SAILE:  Object to form.
22         THE WITNESS:  When you consider the fact
23 that there are many avenues for that number to respond
24 directly to us and put this to bed very easily, this
25 seems -- this -- sending this e-mail seemed to be going

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 94

1  through a lot of trouble to accomplish the goal of not
2  being called and called again.  If that was the goal,
3  even though that goal is not stated explicitly in this
4  e-mail.
5  BY MR. DONOVAN:
6      Q.  Okay.  Do you -- did you make any efforts to
7  determine whether or not this number was registered in
8  the National Do Not Call Registry?
9      A.  Yes.
10     Q.  Okay.  What efforts did you take to make
11  that determination?
12     A.  We looked it up.
13     Q.  Do you subscribe to any database that allows
14  you to scrub numbers in your system against the
15  National Do Not Call Database?
16     A.  Yes.
17     Q.  And what service is that?
18     A.  Real Phone Validation.
19     Q.  And did you run a search with Real Phone
20  Validation in this case?
21     A.  Once we determined that this phone number
22  was bogus, there was no need, since we added her -- we
23  added this number automatically to the internal DNC
24  list.  So it would've been overkill at that point.
25     Q.  No, I'm talking about -- that was after the

Page 95

1  second e-mail, a month later.  I'm talking about on
2  March 4th and when you received this, did you make --
3  or soon after March 4th, did you make any effort to
4  determine whether or not the number was registered on
5  the Do Not Call registry?
6      A.  I believe so.  However, we still would've
7  kept it on if we thought that this number was
8  associated with the Geoff Skadra, since he provided
9  consent to be contacted.
10     Q.  Well, wouldn't the database that you used to
11  determine whether a number is registered on the
12  National Do Not Call Registry tell you who, in fact,
13  the holder of that number was and who had registered
14  it?
15     A.  Not that I'm familiar with.
16     Q.  Let's look at Liberty 13, which is an April
17  7th e-mail to -- from Diana Mey begin -- and this --
18  this one appears to be directed directly to you at
19  libertyhomeguard.com.  Someone named Dan, someone named
20  Joel@libertyhomeguard.com.
21         Is Dan your co-CEO?
22     A.  No.
23     Q.  Who is Dan?
24     A.  I don't know.  I don't think that's a real
25  e-mail person.

Page 96

1      Q.  All right.  Who is
2  Joel@libertyhomeguard.com?
3      A.  Joel is a director of marketing.
4      Q.  Okay.
5          THE WITNESS:  Excuse me.  I'm sorry.  Emma,
6  will you grab a glass of water?
7          MS. LIEBENTRITT:  Yeah.
8          THE WITNESS:  Please and thank you.
9  BY MR. DONOVAN:
10     Q.  Now in this e-mail, Diana Mey indicates some
11  -- some of the same information from her first one, and
12  then also provides additional information to our
13  efforts to bring the calls to your attention, and that
14  we're not responding to.  That she's referring, I
15  believe, to the March 4th e-mail we just discussed.
16  She also makes reference to another lawsuit filed
17  against your company, and she makes a demand for
18  settlement prior to filing the lawsuit.
19         Does that accurately summarize the e-mail?
20     A.  There's also new information.
21     Q.  What's the new information?
22     A.  Nine unsolicited calls, VoIP line.  This is
23  a Voice over IP line.  It's a group of -- there's a
24  Voice over IP, it's not an actual cell phone or
25  landline that she uses.

Page 97

1          This is a line that she keeps on the
2  internet.  She cites new dates, February 10th to
3  February 2020 -- February 23rd on 20 -- in 2022.  She
4  also cites that since March 4th, she got eight more
5  unsolicited text messages to that number.  She also --
6  again, yes, the -- and then there's all that legal
7  stuff, which is also new, indicating that, you know,
8  it's not a bot, so.
9      Q.  Okay.  So when you received this e-mail, it
10  appears that you did ultimately remove the number from
11  your database, correct?
12     A.  Yes.
13     Q.  Okay.  And it looks like, I'm going back to
14  the screenshot at Liberty 1 of the VanillaSoft Program,
15  it looks like you did that on April 8th, so the day
16  after you received this e-mail; is that correct?
17         MR. FRANK:  What is --
18         THE WITNESS:  It's just easier to pull it
19  up.
20         MR. FRANK:  Yeah, let's pull it up.
21         THE WITNESS:  Can you repeat the question?
22  BY MR. DONOVAN:
23     Q.  So it looks like after receiving this e-
24  mail, you did put her on an internal Do Not Call list
25  on April 8th, 2022?

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 98

1    A.   Yes.

2       Q.   Okay.  Now you testified that you did not
3    put her on an internal Do Not Call Database after the
4    March 4th e-mail, because there was no explicit request
5    for you to do so?

6       MR. O'SAILE:  Objection.  Mischaracterizes
7    past testimony.

8       THE WITNESS:  Yeah, that's incorrect.  That
9    wasn't the -- the -- the main reason.  The main reason
10   was that this was unverified information, and the
11   information seemed to be very credible based on what we
12   knew at the time.
13   BY MR. DONOVAN:

14      Q.   Is there an explicit request in this e-mail
15   to be put on a Do Not Call Registry?  I should say,
16   anything you would characterize as an explicit request?

17      MR. FRANK:  You have to ask it to him.

18      THE WITNESS:  Okay.  Your question, could
19   you restate it one --
20   BY MR. DONOVAN:

21      Q.   Is there anything in the April 7th e-mail
22   from Ms. Mey that you -- you would characterize as an
23   explicit request to be put on Do Not -- the internal Do
24   Not Call Registry?

25      A.   Yes.

Page 99

1       Q.   What's that?

2       A.   The language, unwanted and unwelcome, versus
3    juxtaposing, I received multiple telemarketing calls.

4       Q.   So you -- you agree though there's not an
5    explicit request?  There's nothing in this e-mail that
6    says, put me on a Do Not Call Registry?

7       MR. O'SAILE:  Objection.  Asked and
8    answered.  Mischaracterizes testimony.

9       THE WITNESS:  At no point in the March 4th
10   e-mail that I can tell does she say that these calls
11   were unwanted or unsolicited.
12   BY MR. DONOVAN:

13      Q.   Okay.  So from that language in the April
14   7th e-mail, that you inferred that she did not want to
15   receive any further calls?

16      A.   From that language in the -- in that e-mail,
17   it helped increase our categorization identification
18   that this needs to be looked at not as a cybersecurity
19   threat, among other data points in this e-mail and
20   other data points in general.  This needs to be looked
21   at, not as a cybersecurity threat, but as a potential
22   opt-out request.

23      Q.   Okay.  Did you, after receiving this e-mail,
24   do any further work to determine whether or not the
25   number was associated with Diana Mey?

Page 100

1       A.   Our goal was to invalidate, prove that it
2    wasn't associated with the Geoff Skadra, not to
3    associate it with Diana Mey.

4       Once we would know that it was not
5    associated with the information, we would then remove
6    it.  Because somebody that didn't give us consent,
7    didn't really abide by our terms of use of privacy
8    policy.  And there was no harm such as, you know,
9    again, providing emergency services and getting in
10   contact with them for service needs.  That would be
11   done by removing it.  And we err on the side of caution
12   when it comes to these matters.

13      Q.   Okay.  So did you do any work to determine
14   whether the number was associated with Diana Mey after
15   receiving this e-mail?

16      MR. O'SAILE:  Objection.  Asked and
17   answered.

18      THE WITNESS:  I guess by virtue of
19   invalidating that it wasn't, you know, it's one --
20   right.  One way not to make a light bulb, right?  So --
21   yes.
22   BY MR. DONOVAN:

23      Q.   Okay.  And what work was that?  What did you
24   do?

25      A.   By invalidating that it wasn't associated

Page 101

1    with Geoff Skadra, it did increase the data picture,
2    that it could be associated with somebody else, right?
3    Because it's associated with Geoff.  It can't be
4    associated with Diana.

5       Q.   Right.  So what does -- so let me ask you
6    the other way.  What did you do -- or did you do any
7    work after receiving this e-mail to determine that the
8    number was not associated with the scammer?

9       A.   I personally went through the VanillaSoft
10   records, that EZ Texting preview that you saw, the
11   Liberty -- the Liberty Gate data table, and I looked
12   over everything again.  And then I reread the e-mail.
13   You know, I saw the dates.  I saw things that made
14   sense.  I saw that this -- you know, I had a sense that
15   this was a VoIP line.  It seems like this information
16   was corroborated.  I saw the explicit request that
17   these were unwanted and unwelcome calls.

18      And I saw that she's paying per call text.
19   So she's alleging that she pays per call text receipt
20   to that VoIP line.  So those reasons -- for those
21   reasons, I determined that we should regard this, not
22   as a phishing or cybersecurity issue, but as a opt-out
23   issue.

24      Q.   All right.  I want to turn for a moment to
25   the answer that Liberty filed in response to Diana

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 102

1   Mey's complaint. And I understand and appreciate that
2   your counsel e-mailed that to you.
3              Do you have that up on your screen?
4              MR. FRANK: You got to check your e-mail,
5   Mister.
6              MR. DONOVAN: Sorry.
7              MR. O'SAILE: I am sorry, Ryan, did you say
8   the answer?
9              MR. DONOVAN: Yes, sir.
10             MR. O'SAILE: Okay. I did not send the
11  answer. If you give me a couple minutes, I'll -- I'll
12  forward that on.
13             MR. FRANK: I don't think so. You want that
14  one. Oh, I got it. And your folder too.
15             THE WITNESS: I got it. You just
16  downloading it? Should be able to see it.
17  BY MR. DONOVAN:
18     Q.  Excuse me.
19     A.  Okay. I have it up.
20     Q.  Okay. I want to go over some things in this
21  Answer. An answer is a formal legal document filed by
22  your attorneys in response to the Complaint. It's a
23  mix of legal points and factual points.
24             I want to go through and talk about some of
25  these things. I'm going to do my best not to ask you

Page 103

1   about any of the legal conclusions, or -- or legal
2   points.
3              I may ask you about some of the factual
4   bases that support those legal points. I'm sure your
5   counsel will object if I get out of line.
6              MR. O'SAILE: I'd like a standing objection
7   now to this, of being outside the scope.
8   BY MR. DONOVAN:
9      Q.  Okay. We do -- I mean, just for the record,
10  the things I intend to ask about are primarily the
11  factual basis for your defenses, which are expressly
12  within the scope of the Deposition Notice. But -- so
13  the first 13 paragraphs are -- or first 12 paragraphs
14  on Pages 1 and 2 are all legal. So we'll skip that.
15  So if you want to go down to Page 3 -- or I'm sorry,
16  Page 2.
17             And you know what? Can we go off the record
18  for a second? I'm sorry.
19             THE COURT REPORTER: Off the record at 1:45.
20             (OFF THE RECORD)
21             THE COURT REPORTER: Back on the record 1:55
22  p.m.
23  BY MR. DONOVAN:
24     Q.  Okay. Thank you for the break. I just want
25  to ask you a few questions about your answer, as I

Page 104

1   said, and I'm -- I'm going to go through some of your
2   denials and ask for the basis for some of that.
3              In Paragraph 16, you deny that Plaintiff has
4   never provided Defendant, nor their agents, with
5   express written consent to call or text, but I'm going
6   to follow up on that later.
7      A.  I didn't quite follow that. If you could
8   restate.
9      Q.  Sure.
10     A.  Paragraph 16?
11     Q.  So in Paragraph 16 of the Complaint --
12     A.  Is that the defendant denies the allegations
13  of Paragraph --
14             MR. FRANK: No, that's the answer.
15             THE WITNESS: Oh, that's the answer. Okay.
16             MR. FRANK: So the complaint -- okay. You
17  got it now.
18  BY MR. DONOVAN:
19     Q.  So in the Answer you deny that Plaintiff
20  provided Defendants with express written consent to
21  call or text. Do you stand by that denial?
22     A.  Yes.
23     Q.  Okay. And we'll follow up more on that
24  later. In Paragraph 17, the plaintiff alleged that
25  beginning February 10th, 2022, and continuing through

Page 105

1   February 23rd, 2022, Defendant and/or their agents
2   initiated at least nine unsolicited telemarketing calls
3   to Plaintiff's wireless number with the express intent
4   of generating business for Liberty.
5              In your answer, you admit the defendant has
6   called Plaintiff's VoIP number sometime between
7   February 10th and February 23rd, 2022, but deny the
8   remaining allegations.
9              What is the factual basis for denying the
10  remaining allegation in Paragraph 17?
11             MR. O'SAILE: Object to form.
12             THE WITNESS: Primarily, it's, I believe,
13  based on the numeric value of nine calls.
14  BY MR. DONOVAN:
15     Q.  Okay. And what is the basis for denying the
16  nine calls?
17     A.  The dispositions that we see in the
18  VanillaSoft system.
19     Q.  Okay. And I think this may be an issue of
20  we're sort of a mix of legal and factual issue here
21  because the TCPA defines a call to include a text
22  message, so if that -- if -- if I represent to you that
23  that paragraph, the word "calls" in that paragraph, is
24  intended to be inclusive of text messages, do you
25  continue to deny that there were at least nine calls or

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

| Page 106 | Page 108 |
|---|---|

Page 106

1   text messages in that period?
2           MR. O'SAILE:  Object to form.
3           MR. FRANK:  I also object to the form.  You
4   can answer it.
5           THE WITNESS:  Yes, I still deny.
6   BY MR. DONOVAN:
7       Q.   Okay.  And on what basis do you deny that?
8           MR. O'SAILE:  Object to form.
9           THE WITNESS:  Some of these calls -- first
10  of all, the number.  Second of all, some of these calls
11  were to verify -- verify the information even -- yes,
12  it is before that March 4th e-mail but part of it is
13  just to -- it's not to -- it's not always to solicit
14  and -- and -- and market and to sell.  It's just to
15  gather more information of what's going on that -- and
16  we also deny that they were unsolicited.  You know, she
17  provided consent, most importantly.
18  BY MR. DONOVAN:
19      Q.   Okay.  Which of those calls do you purport
20  were not made for telemarketing purposes, but to gather
21  additional information or for some other purpose?
22      A.   I am not able to speak to specifically
23  which.  I'm unaware of which specifically.  I just know
24  it's procedurally in general, those goals, the goals
25  are not all the goals put forward in Number 17.

Page 107

1       Q.   Okay.  In Paragraph 24, the plaintiff
2   alleges that she contacted the defendant via their
3   customer service e-mail address as listed on the
4   defendant's website.  She, in that e-mail, notified
5   Defendant that the number is listed on the national Do
6   Not Call Registry, that she believed the calls were
7   illegal, and requested Defendant send her any evidence
8   substantiating any claim that the calls she received
9   were not illegal.  You admitted only that she sent an
10  e-mail with certain accusations.
11          Is there anything else in Paragraph 24?
12  What in Paragraph 24 do you specifically deny?
13          MR. O'SAILE:  Object to form.  Objection.
14  Asked and answered.
15          THE WITNESS:  So in -- in -- based on what I
16  can read, she's giving us guidance on the law.  She
17  was, in her e-mail.  She wasn't saying that -- in her
18  e-mail, that the calls were in and of themselves
19  illegal.  She was just saying that it is illegal to
20  place an automated call of any kind without prior
21  express written consent of the called party.  And it is
22  also legal to place a call to a number on the DNC
23  without prior express written consent, so that was one
24  basis for denial.
25  BY MR. DONOVAN:

Page 108

1       Q.   So do you deny that Mey requested that the
2   defendants at Liberty send her any evidence
3   substantiating any claim that the calls she received
4   were not illegal?
5       A.   Can you repeat that, please?
6       Q.   Do you deny the allegation in Paragraph 24
7   that Mey believed the calls were illegal and requested
8   -- actually, strike that.
9           Do you deny the allegation in Paragraph 24
10  that Mey requested Liberty send her any evidence to
11  substantiate the claim that the calls she received were
12  not illegal?
13      A.   She asked for evidence that she gave her
14  prior express written consent to be called.  There is
15  nothing about legality in that request.
16      Q.   In Paragraph 26, Plaintiff never provided
17  her consent or requested these -- alleged that she
18  never provided her consent or requested these calls or
19  text messages.
20          Do you still deny that?
21      A.   Plaintiff never provided her consent or
22  requested these calls or text messages.  Yes, we still
23  deny that.
24      Q.   And we'll get into that in greater depth in
25  a moment, but I do just want to be clear.  I'm not

Page 109

1   asking whether you deny that someone provided their
2   consent, but are you denying, as we sit here today and
3   having been able to do further investigation that --
4   since you filed your answer, that Ms. Mey provided that
5   consent?
6       A.   Yes.
7           MR. O'SAILE:  Object to form.  Out of scope.
8   Asked and answered.
9   BY MR. DONOVAN:
10      Q.   In Paragraph 29, Plaintiff alleges that she
11  had never given consent to Defendants or any of their
12  agents, express written consent -- or never given
13  Defendants or any of their agents express written
14  consent to call her, nor does she have an established
15  business relationship with any of them, and you deny
16  that allegation, but -- we've covered the express
17  written consent.
18          But I -- do you deny also that Ms. Mey never
19  had any established business relationship with Liberty?
20          MR. O'SAILE:  Objection.  Scope.
21          MR. FRANK:  Paragraph 29, right?
22          MR. DONOVAN:  Yes.
23          THE WITNESS:  You're asking if she gave any
24  of our agents --
25  BY MR. DONOVAN:

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 110

1      Q.  No.  I'm -- I'm asking about the second
2   clause in --
3      A.  Yeah.
4      Q.  -- specifically, 29, in which Mey alleges
5   that she did not have an established business
6   relationship with Liberty.
7          Do you still deny that allegation?
8          MR. O'SAILE:  Object to form.  And object to
9   characterization.
10         THE WITNESS:  Yeah.  Liberty -- are you --
11  are you referring to our agents or are you referring to
12  Liberty?  Any of our agents or are you referring to
13  Liberty?
14  BY MR. DONOVAN:
15     Q.  With Defendants.  I'm asking if you deny on
16  this allegation that she did not have an established
17  business relationship with Liberty or any of its
18  agents?
19         MR. O'SAILE:  Same objection.
20         THE WITNESS:  Yeah.  There's a lot -- sorry.
21  There's a lot of negatives in there.  I'm trying to
22  just track.  Do I deny that she did not have any
23  business relationships with any of Liberty's agents?
24  BY MR. DONOVAN:
25     Q.  Mey -- okay, let's get rid of the negatives.

Page 111

1      A.  Okay.
2      Q.  Is it your position that Ms. Mey had an
3   established business relationship with Liberty or any
4   of its agents?
5          MR. O'SAILE:  Object to form.
6          THE WITNESS:  Or any of its -- yeah.  Yes.
7   BY MR. DONOVAN:
8      Q.  Okay.  And what is the basis for that
9   established business relationship?
10     A.  Filling out the form online and giving
11  consent.
12     Q.  Anything else?
13     A.  No.  Nothing else that comes to mind as of
14  now.
15     Q.  All right.
16         THE WITNESS:  Emma, can I get another glass,
17  please?
18  BY MR. DONOVAN:
19     Q.  Now there I want to go down to Page 6 of Liberty's
20  answer.  There's a heading called Affirmative and
21  Additional Defenses.
22     A.  Okay, Page 6?
23     Q.  And here the numbered paragraphs restart at
24  1, and again, you know, the existence of Affirmative
25  Defenses can be a legal issue and I'm not asking you

Page 112

1   about any of those legal conclusions, but I do want to
2   ask you about the factual bases for the Affirmative
3   Defenses asserted herein.
4          Affirmative Defense number 2 states that
5   Plaintiff lacks standing to assert some or all of her
6   claims against Defendant.
7          Can you please tell me what facts you
8   believe support the defense that Ms. Mey lacks standing
9   to assert her claims?
10         MR. O'SAILE:  Objection to form.  Objection.
11  It is also asking for -- I think this comes down really
12  just a straight-up legal conclusion.  You're asking him
13  to be an attorney in this instance.  I don't think you
14  can do that.
15         MR. DONOVAN:  I'm only asking him about the
16  facts.  That would be good.  You have a standing
17  objection.
18         MR. O'SAILE:  This is not related to
19  standing, Ryan.  This is really a legal issue.
20         MR. DONOVAN:  Well, it's -- it's not.  It's
21  properly noted in the 30(b) notice and I -- in -- in
22  order for him to assert that legal defense, there must
23  be facts that support it and those facts are the
24  province of the witness.
25         THE WITNESS:  I'm unclear on the standing

Page 113

1   language, but our position is that consent was given.
2   BY MR. DONOVAN:
3      Q.  Okay.  In Paragraph 4, you state that
4   Plaintiff's claims are barred in whole or in part
5   because Plaintiff failed to mitigate her damages.
6          Can you tell me what facts support your
7   assertion that she failed to mitigate her damages?
8          MR. O'SAILE:  Same objection.
9          THE WITNESS:  It's common knowledge that you
10  can reply with, stop, or answer a phone call and say,
11  stop calling me, to be taken off of a legitimate
12  company's list to be called.  In addition, we
13  explicitly do include that language in all of those EZ
14  Texting messages as a matter of procedure and protocol
15  and standard.
16         That would've been the most easy, explicit,
17  straightforward way to stop receiving any sort of
18  communication from us.  There's no issue of
19  verification because it's coming straight from the
20  number, sort of asked and answered in -- in
21  communication sort of way.
22  BY MR. DONOVAN:
23     Q.  Any other facts that support that defense?
24     A.  Timing.  There was a period of time that
25  went by before Ms. Mey reached out in any form that I

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 114

1  can tell.  The first correspondence, I believe, is this
2  e-mail from her to us.  There was no -- there was no
3  voicemail recording.
4        You know, there was no -- it didn't seem
5  like there was much effort to actually be preventative
6  and preempt the different issues that she's complaining
7  about here.
8     Q.   So given those two assertions, is it
9  Liberty's position that a -- an individual whose number
10 is listed on the Do Not Call Registry, nonetheless must
11 take additional steps to stop unwanted telemarketing if
12 she receives them?
13       MR. O'SAILE:  Objection to the
14 mischaracterization of the prior testimony.
15       THE WITNESS:  It's our position that once
16 they provide consent, we can contact them for a limited
17 period within our procedural guidelines and as -- as
18 per our policy.
19 BY MR. DONOVAN:
20    Q.   In Number 8, you assert that Defendant's
21 conduct, if found violative of the TCPA, was not
22 willful or knowing.  Can you tell me what facts support
23 that affirmative defense?
24    A.   We have a policy in place.  I, as the leader
25 of the firm, took direct action here.  In no way,

Page 115

1  shape, or form would we willfully or knowingly violate
2  the law or executive orders or any sort of compliance
3  guidelines, and that's been one of those pieces I
4  mentioned to you in the background from the onset,
5  getting into the space.
6     Q.   Does that Affirmative Defense apply also --
7  do you intend that Affirmative Defense to apply also to
8  the calls and text messages -- calls and/or text
9  messages that were received after Ms. Mey's March 4th
10 e-mail to your company?
11       MR. O'SAILE:  Object to form.
12       THE WITNESS:  Yeah, and is that in the
13 answer?
14 BY MR. DONOVAN:
15    Q.   I'm asking I'm -- I'm asking whether you
16 also maintain that the calls that were -- or the texts
17 that were sent after her March 4th e-mail were not
18 willful or knowing?
19       MR. O'SAILE:  Objection.  Form.
20       THE WITNESS:  The calls after the March 4th
21 e-mail were not willful or knowing, knowingly violative
22 of the TCPA.
23 BY MR. DONOVAN:
24    Q.   And what is the basis for that assertion,
25 the factual basis?

Page 116

1     A.   We thought that phone number was associated,
2  owned and operated by somebody that wanted to learn
3  more about our products and services, and at no point
4  did anybody -- no -- no point in March 4th -- in that
5  March 4th communication, did we determine or see any
6  sort of explicit request not to be contacted again.
7     Q.   So from February to March, you sent numerous
8  calls and text messages to that number, correct?
9     A.   We sent more than one.
10    Q.   Were any -- at -- at any point did the
11 recipient of those calls or messages respond or
12 indicate any kind of an interest in your products at
13 all?
14    A.   As far as was Liberty aware, no.
15    Q.   In Paragraph 10, you assert that, Plaintiff
16 knew of the purported acts or omissions she ascribes to
17 Defendant in this action and was fully aware of her
18 rights against Defendant in this action, if any, but
19 she nevertheless inexcusably and unreasonably delayed
20 in asserting those rights, if any, to the prejudice of
21 Defendant.  For this and additional reasons,
22 Plaintiff's claims are barred by the doctrine of laches
23 and or unclean hands.
24       Did I read that correctly?
25    A.   I believe so.  I'm going to reread it now.

Page 117

1  Plaintiff knew of the purported acts or omissions she
2  ascribes to Defendant in this action and was fully
3  aware of her rights against Defendant in this action,
4  if any, but she nevertheless inexcusably and
5  unreasonably delayed in asserting those rights, if any,
6  to the prejudice of Defendant.
7        For this and additional reasons, Plaintiff's
8  claims are barred by the doctrine of laches -- laches
9  and/or unclean hands.
10    Q.   And I'm not going to -- I mean, again,
11 laches --
12    A.   -- don't beat me up on the --
13    Q.   -- latches is a legal defense.  I don't want
14 to get into that.  I want to, again, stick to the
15 facts.  You state that her delay -- well, first of all,
16 are you aware -- do you know of something called
17 Statute of Limitations Act?
18       MR. O'SAILE:  Objection.  Now we're asking
19 really for legal conclusions and advice.
20       MR. DONOVAN:  I'm just asking if he knows
21 what it is so I can help come up with a better
22 question.
23       THE WITNESS:  Not at the level I'm
24 uncomfortable to say affirmative.
25 BY MR. DONOVAN:

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
Benjamin Joseph on 01/31/2024

Page 118

1    Q.   Okay.  You assert however that the delay in
2  asserting Ms. Mey's rights, if any, were to the
3  prejudice of Defendant.  Can you explain to me what the
4  facts are that support the claim that you were
5  prejudiced by Ms. Mey's purported delay?
6       A.   So prejudice means, you know, affected.  At
7  any point, if she was the owner/operator of that
8  number, with a few keystrokes she could have opted out.
9  If she just wrote the word S-T-O-P and accept the whole
10  thing would've stopped and triggered and that
11  instruction was provided explicitly in a very short and
12  clear message to her.  So that is one, I think, primary
13  example that it was unreasonable in her delaying the
14  ability to not be communicated to by us if she did, in
15  fact, own and operate and control that number.
16       Q.   So in Paragraph 11, you assert the plaintiff
17  has acted in bad faith in its dealings with or conduct
18  towards Defendant.
19          Can you tell me what facts support that
20  assertion Ms. Mey is acting in bad faith?
21          MR. FRANK:  Objection.
22          MR. O'SAILE:  Objection to the extent that
23  this calls for legal analysis or conclusion.
24          THE WITNESS:  Well, my aforementioned
25  answer, I think is related.  I am sorry, Mr. Donovan.

Page 119

1  Thank you.  That's my answer.
2  BY MR. DONOVAN:
3       Q.   Nothing else?
4       A.   Yes.  Nothing else comes to mind.
5       Q.   Okay.  I think we're done with the answer
6  and complaint.
7       A.   Okay.
8       Q.   I want to talk specifically about the issue
9  of purported consent.  Is it fair to characterize your
10  testimony today on several occasions as stating that
11  your primary defense against Ms. Mey's complaint is
12  that she provided consent to receive the calls at
13  issue?
14          MR. O'SAILE:  Objection.  Mischaracterizes
15  prior testimony.
16          THE WITNESS:  That the primary -- you're
17  asking whether the primary defense is whether she
18  provided consent?  Yes.  Consent was provided.
19  BY MR. DONOVAN:
20       Q.   I understand that.  I'm giving you a chance
21  to characterize -- and you can characterize something
22  else as your best defense, if you want.  But I mean,
23  just as two people sitting here talking about this case
24  for the last four hours, it seems to me that that's
25  what you're relying on.

Page 120

1              Is that accurate or not?
2       A.   Consent was --
3          MR. O'SAILE:  Objection to form.
4          THE WITNESS:  -- consent was provided.  The
5  -- there was no explicit opt out request provided on
6  that March 4th initial and only communication from her
7  at the time.  And for the same reason that we believe
8  that it was prejudicial.  As I mentioned earlier, the
9  delays, it also indicated to us that the assertions
10  made in that e-mail were not verified -- were not
11  accurate because it just didn't make logical sense.
12  BY MR. DONOVAN:
13       Q.   Okay.  Let me ask you this way: Do you deny
14  that Liberty initiated the calls and texts, indicated
15  in your own record, to the phone number 304-242-4327?
16       A.   We do not initiate.  That number was
17  provided to us.
18       Q.   Did you -- did you deny that you initiated
19  the calls and texts to that number?
20       A.   We were not called and texted by that number
21  prior to the submission of that form.
22       Q.   I know I'm -- I'm not trying to trick you.
23  I'm just trying to go through this step by step.  You
24  don't -- I think this is pretty clear.  You don't deny,
25  and in fact, your own records show that you initiated a

Page 121

1  number of calls and texts to the phone number 304-242-
2  4327.  I -- I'm just trying to make clear that -- that
3  you're not relying on the defense that you didn't
4  actually make these calls.
5          MR. O'SAILE:  You -- just answer the
6  question.
7          THE WITNESS:  Yeah.  But my -- my just to
8  clarify, the word "initiated", if you are looking at
9  the series of communications and contacts, we did not
10  initiate --
11  BY MR. DONOVAN:
12       Q.   Okay.
13       A.   -- each specific instance, yes.  We -- or
14  our independent contractors took an action that
15  initiated a call or a text to the phone.
16       Q.   I'm using the word "initiate" because that's
17  the word from -- that's the language from the statute.
18  So let me just be, you know, speak more plainly.
19          You don't deny that you made these calls and
20  texts to that phone number, correct?
21          MR. O'SAILE:  Objection.  Asked and
22  answered.
23          THE WITNESS:  Correct.
24  BY MR. DONOVAN:
25       Q.   Okay.  Just getting on making sure that's

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 122

1  not in dispute in this case.  You also don't deny at
2  this point, I think, that -- that phone number 304-242-
3  4327 belongs to Ms. Mey?
4        MR. O'SAILE:  Objection to form.
5  Mischaracterizes client testimony.
6  BY MR. DONOVAN:
7        Q.  Okay.  Let me just ask you this way:  Do you
8  deny that the phone number 304-242-4327 belongs to Ms.
9  Mey?
10       A.  I'm assuming she went through this trouble
11  to hire me and do this court case all over this phone
12  number, I think it would be unreasonable to deny that
13  allegation.
14       Q.  Okay.  Do you -- you -- do you deny that the
15  phone number 304-242-4327 is and was at all relevant
16  times listed on the National Do Not Call Registry?
17       A.  I do not deny that.
18       Q.  Okay.  So I'm just trying to work through
19  all the potential defenses you might have in this case.
20  So having eliminated all those potential issues, it
21  strikes me that the primary defense in this case is
22  your assertion that you obtained consent to call that
23  number, correct?
24       MR. O'SAILE:  Objection.  Form.
25       THE WITNESS:  We obtained consent to call

Page 123

1  that number, yes.
2  BY MR. DONOVAN:
3        Q.  Okay.  It's really not a trick.  Some -- one
4  -- some of the things that we're trying to do in -- in
5  a deposition like this is narrow the scope of
6  everything we're dealing with going forward.  That's
7  all I'm trying to do.
8        If you could turn with me to Exhibit B, I
9  believe, which is the Home Guard's Response -- Liberty
10  Home Guard's Response to Plaintiff's First Discovery
11  Request?
12       A.  Here you go.
13       MR. FRANK:  Do you have a copy?
14       THE WITNESS:  Yes.
15       MR. FRANK:  I can't give you the --
16       MR. DONOVAN:  Here -- here.
17       THE WITNESS:  Thank you.  Okay.  I have it.
18  BY MR. DONOVAN:
19       Q.  And turn to Page 5, please.
20       A.  Okay.
21       Q.  Okay.  Interrogatory --
22       MR. O'SAILE:  I'll object.  I'll make the
23  same objection again to the extent this is outside the
24  scope.
25       MR. DONOVAN:  Okay.  Well, with this -- the

Page 124

1  question is going directly to the issue of consent,
2  which is within -- which is within the scope.
3        MR. O'SAILE:  Okay.
4  BY MR. DONOVAN:
5        Q.  This Interrogatory Number 7 says, if you
6  contend that Plaintiff provided consent to receive
7  solicitation, telephone calls, and/or text messages,
8  state all facts in support of that contention and
9  identify the dates on which the means by which you
10  contend consent.  I'm sorry, and identify the dates on
11  -- on which and the means by which you contend consent
12  was obtained.
13       I would ask if I read that correctly, but I
14  didn't.
15       A.  That's hard.  There's a lot of background
16  noise.  Yeah.  There's a lot of background noise in the
17  --
18       Q.  But -- but are we looking at the same thing?
19       A.  Yeah.  You're talking about Number 7, right?
20       Q.  Yes.
21       A.  I got it.
22       Q.  And in response, your counsel interposed an
23  objection, which I -- I don't want to address, that's a
24  legal matter.  But there is a -- a sentence after that
25  begins with, notwithstanding and without waiving such

Page 125

1  objection, upon information and belief, Plaintiff
2  provided consent to be contacted by requesting a quote
3  from Defendant.
4        A.  I'm -- I'm sorry.  It's hard to follow.
5  There's a lot of background noise that --
6        Q.  I -- I know, I'm sorry --
7        A.  -- it's distracting.  Okay.  This -- what's
8  the question?
9        Q.  The first sentence after the objection
10  begins with, notwithstanding and without waiving such
11  objection.  Upon information and belief, Plaintiff
12  provided consent to be contacted by requesting a quote
13  from Defendant.
14       Did I read that correctly?
15       A.  Not with -- yes.
16       Q.  Okay.  Is it Liberty's -- is it still
17  Liberty's position as we sit here today that the
18  plaintiff, Diana Mey, requested a quote from Liberty
19  Home Guard?
20       A.  Yes.
21       Q.  Okay.  On what basis -- on what facts do you
22  rest that assertion, that Diana Mey requested a quote
23  from Liberty Home Guard?
24       A.  The IP address, pattern of behavior, not
25  straightforwardly unsubscribing, the vague March 4th e-

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 126

1  mail, and the -- yeah, on that basis.
2      Q.   So the -- let's start with the IP address.
3  What about the IP address makes you believe that it was
4  Diana Mey who made that request for a quote?
5      A.   It's quite close.  Relatively, you know, we
6  cover all 50 states and of course people from
7  international locations can submit bogus leads, which
8  is more often the case.  So it's quite -- it would be
9  quite a coincidence for them -- for the IP address to
10  be so close --
11      Q.   You mean --
12      A.   -- to this where --
13      Q.   Okay.
14      A.   -- where she resides, the --
15      Q.   Do you have any evidence at all that that IP
16  address was ever used by Diana Mey?
17      A.   There are certain indications that it may
18  have been.
19      Q.   And what are those indications?
20      A.   Geoff Skadra, I believe, had some sort of
21  affiliation and presence in Wheeling, West Virginia.
22      Q.   Okay.  How does that get you to Diana Mey?
23      A.   Is she not from Wheeling, West Virginia?
24      Q.   She is, but so is Geoff Skadra, so I don't
25  understand how that would indicate that -- more

Page 127

1  strongly that it was Diana Mey and not Geoff Skadra?
2      A.   There's an association between the two of
3  them.
4      Q.   Okay.  What about the -- I hate to keep
5  bouncing back and forth between exhibits here, but
6  Exhibit C has the information from the data table on
7  it.
8          Are you able to ask your team from
9  everything in that data where the person who made this
10  request was physically located?  I think that's what
11  you're saying, right?  I just want to make sure I
12  understand.
13          MR. O'SAILE:  I'm sorry.  What document are
14  we looking at?
15          MR. DONOVAN:  Exhibit C.
16  BY MR. DONOVAN:
17      Q.   I'm just asking, and I'm not looking at any
18  page.  I'm asking if there's anything in there, because
19  I -- I -- I think I understood your answer to the text
20  question for you to be saying that there was something
21  that suggested that -- that this request was physically
22  made from somewhere near Diana Mey, right?
23      A.   The address input corroborated the VPN --
24  sorry.  Corroborated the IP address -- so yeah, there -
25  - yes.

Page 128

1      Q.   Oh, yeah.  So I -- I honestly don't -- I'm
2  not playing dumb here.  I honestly don't understand how
3  IP addresses work.
4      A.   Okay.
5      Q.   Does an IP address give you some
6  geographical information about where?
7      A.   About the access point to the internet --
8      Q.   Okay.
9      A.   -- however, there are services that allow
10  you to mask it like a VPN.
11      Q.   Okay.
12      A.   There's a way to determine whether it's a
13  VPN or not.
14      Q.   Okay.  I do know a little bit about VPNs.
15  Typically, when you use a VPN, I mean, the person could
16  pick anything, right?  Could pick any IP address from
17  anywhere in the world?
18          MR. O'SAILE:  Object to form.
19          THE WITNESS:  Not exactly.
20  BY MR. DONOVAN:
21      Q.   Okay.
22      A.   It's -- there are -- let's just -- we got
23  some numbers here.  Could be a million IP addresses in
24  the United States, which aren't all, but however many
25  household there or whatever.  There are probably, of

Page 129

1  those, a thousand VPNs, so it's not any location.
2  Yeah.
3      Q.   Is an IP address specific to a -- to a
4  location or a device?  That's what I'm confused --
5      A.   A location.
6      Q.   A location.  Okay.  So using this IP
7  address, unless someone use the VPN and somehow
8  specifically chose one to be in Bridgeport, Ohio, then
9  that IP address, what you're saying indicates that this
10  inquiry was made from somewhere near Bridgeport, Ohio?
11      A.   Yeah.  And additionally, we don't restrict
12  address inputs.  So it's just weird that they would've
13  put in an address that's in that same location with the
14  IP.  It wouldn't -- it wouldn't make sense for him to
15  be using everything --
16      Q.   Okay.  So the person -- I mean, so the
17  person who made that program or website was likely
18  physically in Bridgeport, Ohio, or nearby when the
19  request was made?
20      A.   Or the surrounding areas, yes.
21      Q.   Okay.  And you're including that, correctly
22  -- including that Wheeling was near Bridgeport, Ohio?
23      A.   Yes.  And looking into, you know, they just
24  linked in, you can see that Geoff Skadra had a --
25  submit a presence in Wheeling, West Virginia.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 130

1     Q.   Okay.  Have you ever spoken to Geoff Skadra
2   about this case?
3     A.   I have not.
4     Q.   Okay.  Has anyone at Liberty spoken to
5   Skadra about this case?
6     A.   No.  I have not -- we have not.
7     Q.   So -- I mean, could a person in Arizona have
8   submitted this request and it would look like they were
9   in Bridgeport, Ohio --
10         MR. O'SAILE:  Objection.  Form.
11         THE WITNESS:  Unlikely.  I'm not aware of
12   any data centers to allow for VPN masking, or an IP
13   address like that in Bridgeport, Ohio, and they
14   couldn't find anything else on that IP address against
15   any data centers.  So this looks like it was the
16   Verizon Fios, like regular sort of internet residential
17   service.
18   BY MR. DONOVAN:
19         Q.   How confident are you that the person who
20   made this request was in or around Bridgeport, Ohio,
21   and that -- it sounds like very --
22         MR. O'SAILE:  Object to form.
23         THE WITNESS:  I am very motivated to find
24   out who factually ultimately did send it and surpassed
25   definitively.  But I -- I'm very motivated to know for

Page 131

1   certain what we did.
2   BY MR. DONOVAN:
3         Q.   That wasn't my question.  My question was:
4   How confident are you that the person who uploaded this
5   request was --
6         MR. O'SAILE:  Objection.  Asked and
7   answered.
8   BY MR. DONOVAN:
9         Q.   -- physically in or around Bridgeport, Ohio,
10   is done, and not someone else somewhere far off using
11   the VPN?
12         A.   So my answer to that motivation was sort of
13   an estimate and I'll explain why.  I don't really deal
14   on speculation.  I'm confident enough to spend my time
15   and effort to work through this to figure this out.
16         So to that level of confidence where I take
17   it seriously, and I think we have a -- real threat of
18   information and something to investigate here.
19         Q.   And explain to me, you gave an answer a
20   couple of questions ago that I didn't quite understand
21   about -- you had searched and there wasn't an available
22   VPN that would get you to Bridgeport, Ohio, or
23   something like -- can you explain that to me in a
24   little greater detail?
25         A.   Yeah.  So you know, there would be X-VPN,

Page 132

1   right?  Some -- I mean, you got service will have 12
2   data centers in -- or servers where, we'll call them,
3   12 nodes in the United States, right?  So there'll be
4   thousands in New York, New York, Edison, New Jersey.  I
5   couldn't find one that was located in Bridgeport, Ohio.
6         Q.   Okay.  And that's what gives you such great
7   confidence that the person who uploaded this was
8   actually in Bridgeport, Ohio, when it was uploaded?
9         A.   It gives me confidence that there is a --
10   there is an interesting pattern here that warrants
11   further investigation.  I can't say, you know, being
12   purely speculative, maybe somebody that e-mailed this
13   and lead to this, found out a technical way to mask and
14   proxy in and put in all this information.  But it is --
15   I am confident that somebody knew what they were doing
16   here.
17         Q.   So there's other information that we talked
18   about earlier that gives us some indication as to who
19   and how this request for a quote was uploaded.  For
20   example, the -- the records indicated him using a
21   desktop Macintosh computer, correct?
22         A.   That's what the record does indicate.
23   However, that -- sometimes -- can be imprecise.
24         Q.   Okay.  So you're less comfortable relying on
25   that -- in the IP data?

Page 133

1         A.   Yes.
2         Q.   Okay.  If Diana Mey could prove to your
3   satisfaction that for the entire month, the entire
4   winter of 2022, specifically during the time that this
5   was happening, that she was not in Ohio at all, but was
6   wintering in Florida, at a home in Florida, will that
7   change your opinion as to the likelihood that she was
8   the one who input this request for a quote?
9         MR. O'SAILE:  Object to form.
10         THE WITNESS:  I would not ignore that data.
11   If it would change my opinion, it would depend on the
12   facts and circumstances how she would prove that fact.
13   BY MR. DONOVAN:
14         Q.   Okay.  Explain to me what you mean, the
15   facts and circumstances and how she would prove that?
16         MR. O'SAILE:  Object to form.
17         THE WITNESS:  Well, first off, I guess the
18   burden would -- would be on her, but the circumstances
19   such as whether there is anybody -- were there anybody
20   else in her house?  Did she speak to anybody else?
21   What were her communication logs like during that
22   period to the area?  Does she have access to a proxy
23   where she can get into her internet and have her IP?
24   Does she log in through that because of security and
25   firewall?

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

**Page 134**

1    I understand that, you know, she has a
2 business of her own and I'm sure she has a lot going on
3 there.  So yeah, there's just a lot of detail that kind
4 of flow over.  It'd really depend on the -- the
5 specifics.
6 BY MR. DONOVAN:
7    Q.   I -- I'm confused.  The subject has told me
8 it will be very difficult and require a lot of
9 technical sophistication to be able to make it appear
10 as if you were in Bridgeport, Ohio, like working a
11 request when you're actually not?
12    A.   Yes.  But what benefit would a random person
13 gain?  Whereas here, I think it's pretty clear.
14    Q.   What is pretty clear?
15    A.   That to our detriment, she did not opt out
16 through the easy straightforward way and allowed us to
17 continue to contact that phone number and then file
18 this case against us.
19    Q.   I want to just get straight to the meat of
20 this because I don't want to get out of here.  Is it
21 your position that Diana Mey, and I'll represent to you
22 that she was in Florida and we'll be able to prove that
23 to your satisfaction.
24       Is it your position in light of that
25 information that Diana Mey somehow exercised a degree

**Page 135**

1 of technical sophistication that it would've taken to
2 submit a false -- or to submit a lead or request for
3 quote rather, to your company, in a way that would
4 appear as if it had come from Bridgeport, Ohio?
5       MR. O'SAILE:  Object to form.  Calls for
6 speculation.
7 BY MR. DONOVAN:
8    Q.   Simply for the --
9       MR. DONOVAN:  I'm not finished with my
10 question yet.
11 BY MR. DONOVAN:
12    Q.   -- simply for --
13       MR. O'SAILE:  Okay.
14 BY MR. DONOVAN:
15    Q.   -- simply for the purpose of enticing your
16 company into making telemarketing solicitations there?
17    A.   No.  That's not my position.
18    Q.   Okay.  Well, what -- well, I -- I feel like
19 that's what's being suggested.  So I just want to be
20 clear.  I mean, if what other explanation is there, if
21 it's your position that it was in fact Diana Mey and
22 not someone else who submitted this quote and Diana Mey
23 was in Florida.
24       What's your theory as to how she did this
25 and why?

**Page 136**

1    A.   Our position --
2       MR. O'SAILE:  Object to form.
3       THE WITNESS:  The position is that we're
4 taking in this matter extremely seriously.  We are
5 evaluating all possible scenarios and one likely
6 scenario due to the derived financial benefit.  The --
7 the -- the sought after derived financial benefit here
8 is that this was intentionally done by Diana Mey.
9 BY MR. DONOVAN:
10    Q.   Okay.  That's one theory you're saying,
11 correct?  How strong, I mean, but I -- but at the same
12 time I asked you if that was your assertion and you
13 said, not yet.  So I'm just kind of asking you to, you
14 know --
15    A.   Well, you asked me if she filed it with the
16 proxy and did all this type of stuff --
17    Q.   Well, I -- I -- I'm just trying to figure
18 out, you know, in a few months, we're going to
19 potentially be in trial in front of a jury in the
20 Northern District of West Virginia, and we're going to
21 put all this on the table and I -- so I'm trying to
22 figure out what you're going to say at that trial as to
23 where this consent came from.
24       And I -- I want to know if it's going to be
25 your assertion that Ms. Mey did this intentionally in

**Page 137**

1 order to generate a TCPA claim.  And if that is your
2 assertion, I want to know what evidence supports it.
3       MR. O'SAILE:  Object to form.
4       THE WITNESS:  I'm going to --
5       MR. O'SAILE:  I don't know if there's a
6 question there.
7       THE WITNESS:  I'm not an attorney, but
8 between now and then I would assume that we would also
9 get some more information out of Ms. Mey and Mr.
10 Skadra.  It's all speculative.
11       MR. DONOVAN:  You want to take five minutes
12 and then --
13       MR. FRANK:  Sure.
14       MR. DONOVAN:  -- I think that'll be the next
15 -- next and last section.
16       MR. FRANK:  Okay.
17       MR. DONOVAN:  Yeah.
18       MR. FRANK:  How much longer are you thinking
19 it's going?
20       MR. DONOVAN:  45 minutes.
21       MR. FRANK:  Okay.
22       MR. DONOVAN:  Not even an hour.
23       MR. FRANK:  Okay.
24       MR. DONOVAN:  Not even that long.
25       MR. FRANK:  Thank you so much.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 138

1    THE WITNESS:  Thank you, Ryan.
2    (OFF THE RECORD)
3    THE COURT REPORTER:  Back on the record at
4  2:54 p.m.
5  BY MR. DONOVAN:
6    Q.  Have you ever had issues -- Liberty,
7  obviously not you, with bad leads -- receiving bad
8  leads before?
9    A.  Can you define a bad lead?
10    Q.  Yeah.  Well, I'm -- I'm intentionally
11  defining it broadly to cover, you know, a -- a broad
12  range of things.  But have you ever had problems with
13  leads you obtained either through your website or
14  through one of the host and post vendors that you use?
15    A.  Yeah.  I mean, we're in business, my -- my
16  job is to put out problems and deal with problems, but
17  yeah, of course.  You know, we -- that's why I have
18  that tag that we need to investigate so I can
19  investigate to see if there's a problem.  There were no
20  problems.
21    Q.  So what kind of problems have you
22  encountered before?
23    A.  A lot of leads where, you know, pattern of
24  leads where -- let's say that they call the numbers,
25  did not connect, there was no like a -- like the --

Page 139

1  when you call the number, dut, dut, dut, so you get to
2  a non-working number, stuff like that.
3    People saying, hey, yeah, I'm -- I'm -- I'm
4  Jim Smith, but I never submitted a quote.  I never -- I
5  never requested a quote or -- I would say most
6  prevalent is like, oh, I thought you guys were an
7  insurance company.  You guys do home insurance, stuff
8  like that.
9    So it's -- we're looking for people that
10  genuinely want our product and interested in our
11  product, and have some level of information that when a
12  homeowner -- do -- do what we did.
13    Q.  Now with the -- the second of the
14  three examples you gave there, the person who says, I
15  wasn't going to submit to this meeting.  How frequently
16  do you encounter that?
17    A.  I would say a lot less so in the past couple
18  of years, three years.  As we progress we get better
19  and we do better enriching and, you know, verification
20  of the data and better processes.  And in general,
21  like, they just opt out.  They don't even, like, they
22  just reply, stop, to the -- to the text messages --
23    Q.  Yeah.
24    A.  -- and that's it.  They're out.
25    Q.  Are you familiar -- let me ask you this:

Page 140

1  Given that outbound calling plays a significant role in
2  your market, do you participate in any kind of
3  organizations of entities such as yours and others that
4  are engaged in outbound calling in order to generate
5  sales?
6    A.  Without confirming that it's a significant
7  part of your statement, we're not -- no, we're -- we're
8  very much self-contained and self-focused and, you
9  know, we're trying to really just do a really, really
10  good job with our model.  We don't really look to the
11  field or look to, yeah, look to other organizations
12  that do the same.  Yeah.
13    Q.  So you don't participate in any kind of
14  trade groups or anything like that that are engaged in
15  telemarketing?
16    A.  No.
17    Q.  Other organizations that --
18    A.  No.
19    Q.  -- are engaged in telemarketing?  Okay.
20  Have you gone to any, or has anyone in your
21  organization gone to any training, sort of best
22  practices and problems and things that may arise when
23  you're engaged in outbound telemarketing?
24    A.  I've done research.  I've -- you know, like
25  I mentioned to you earlier in the background, the first

Page 141

1  person we brought on was in-house counsel to help us
2  make sure that we were always operating compliantly
3  and, yeah, so from that -- from that domain, yes.
4    Q.  So for example, when you're -- who designed
5  your website?
6    A.  Sorry.
7    Q.  Is -- is your website designed in-house?
8    A.  In terms of the aesthetic?
9    Q.  Yeah.
10    A.  Yeah.
11    Q.  And in terms of the content?
12    A.  Yeah.  So David, my co-founder, my -- my
13  partner is the primary responsible person for the --
14  for the design and the aesthetic.
15    Q.  So are you familiar with the idea that --
16  you're familiar -- you said you had some familiarity
17  with the federal regulations concerning outbound
18  telemarketing of a company?
19    A.  I'm not -- I'm not totally ignorant to them.
20    Q.  Yeah.
21    A.  The answer.
22    Q.  So I'm looking at Liberty 11 in Exhibit C,
23  for example.
24    This is a screenshot of the website in which
25  -- on which a person could submit a request for a

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 142

1  quote.
2      A.   Yes.
3      Q.   Was that designed in-house at Liberty?
4      A.   It was finalized in-house.
5      Q.   Okay.
6      A.   I can't speak to whether we hired or if we
7  had a contractor design it.
8      Q.   In producing this, did you consult with
9  anyone or make any effort to determine whether this
10  form met all the requirements that are necessary for
11  express written consent under the TCPA?
12      A.   Yes.
13      Q.   Okay.  Does this -- does this form anywhere
14  mention the words marketing or promotion?
15      A.   Are you asking if it has -- if it literally
16  has the words marketing or promotion in --
17      Q.   Yep.
18      A.   -- this page that is printed in front of me
19  right now?
20      Q.   Yes.
21      A.   I'm just trying to be thorough here to make
22  sure I don't miss any detail.  It makes mention of
23  products.  It makes mention of our privacy policy in
24  terms of use with link outs, but nowhere on this page
25  in front of me do I see the actual words marketing or

Page 143

1  promotion.
2      Q.   Does it mention anything about that -- that
3  call -- that text or SMS messages will be sent?
4      A.   Via the words contact, yes.
5      Q.   Okay.  Does it expressly say that text or
6  SMS is going to be sent?
7      A.   The words text or SMS are not on this page.
8      Q.   Does it -- does it include a statement that
9  consent does not -- consent to receive communications
10  or contact as it says there is not required as a
11  condition of purchase?
12      A.   Say that again?
13      Q.   Does it receive an express statement that
14  consent to receive these communications is not required
15  as a condition of purchase?
16      A.   That consent to receive these communications
17  is not required as a condition of purchase.  Sorry.
18  For some reason, I'm having trouble following that.
19      Q.   And you might have guessed I'm asking you
20  these things because these are all things that are
21  required in order to -- are required by the FCC in
22  order to obtain valid express written consent.
23      A.   I believe the privacy policy in terms of use
24  that are very clearly linked to that report here speak
25  to all of them.

Page 144

1      Q.   Do you believe that's in the privacy policy?
2      A.   And/or in terms of use.
3      Q.   Have you ever consulted with any firm or
4  company who's provided you with any sort of TCPA
5  compliance audit or review?
6          MR. O'SAILE:  Objection.  I think we're
7  getting a little bit close to attorney-client
8  privilege.
9          MR. DONOVAN:  I'm not asking --
10          MR. O'SAILE:  I think you're not asking
11  about content, but if we start getting into content, I
12  think we're getting a little close there.
13  BY MR. DONOVAN:
14      Q.   I don't want to know about communication,
15  although frankly, most of these firms that do this are
16  not lawyers.  But have -- just have you ever consulted
17  with any firm or agency at all to provide any kind of
18  TCPA compliance auditing or consulting services?
19      A.   Yes.
20      Q.   Who is that?
21      A.   I believe there were two.  The one I can't
22  recall.  The other one -- just give me a sec.  SW Law,
23  I think.  May I look it up?
24      Q.   Sure.
25      A.   Yes.  SW Law is correct.

Page 145

1      Q.   Can you say -- I -- I'm not --
2      A.   SW Law.
3      Q.   Is that a law firm?
4      A.   Correct.
5      Q.   Okay.  You said there was one other?
6      A.   I can't recall the other one, but this was
7  the -- primary audit.
8      Q.   Would there be any records stating the other
9  one that you can look at when we're not here and get
10  back to us on?
11      A.   Let me rephrase that answer.  I believe
12  there may have been.  I'm not sure whether there was or
13  there wasn't.
14      Q.   Okay.  But SW Law, again without getting
15  into the substance of the communication, when did you
16  consult with them?
17      A.   I believe it was 2021.  And then again in --
18  2023.  It is -- it's -- it's a range of time to do
19  consulting with them, working through it.
20      Q.   Okay.  Do you have any kind of a regular
21  audit or arrangement with them set up that things will
22  be done on a periodic basis, or you just go to them as
23  needed?
24      A.   It is more as we have the bandwidth, but we
25  try to do it once a year.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

---

**Page 146**

1     Q.   Okay.  And what kind of services
2  specifically do they provide to you?
3     A.   Audit of TCPA compliance.
4     Q.   Okay.  What does that audit entail?
5        MR. FRANK:  Objection.  It's --
6        MR. O'SAILE:  Tack on.
7        MR. FRANK:  Grayson, this is going to
8  communications now.
9        MR. DONOVAN:  No.
10        MR. O'SAILE:  Yes, it is.  I'm going to say
11  it's attorney-client privilege.  I'm going to instruct
12  him not to answer.  We're getting too close to that.
13        MR. DONOVAN:  Okay.  I want to be real clear
14  about this because this is not correct and we're going
15  to have to revisit this.  I'm not asking him about any
16  communications and -- and -- and I'm also not asking
17  him about the provision of legal services because the
18  TCA -- TCPA audit is not the provision of legal
19  services.  I'm just asking him what the audit and
20  review entails.  I --
21        MR. O'SAILE:  I understand that you're
22  saying that the work of a law firm in analyzing legal
23  compliance is not legal services.  That is legal
24  services.  If we're going to go into the details of
25  these services, that is attorney-client privilege.

---

**Page 147**

1        MR. DONOVAN:  Communications are privileged
2  and communications are the only things that are
3  privileged.  Provision of services and acts is not
4  privileged, but if you're going to instruct him not to
5  answer, I'm not going to waste any time with it today.
6  We'll just take it up with the Court and revisit it
7  later.
8        MR. O'SAILE:  That's fine.
9        MR. FRANK:  You're not asking --
10        MR. O'SAILE:  That's not -- that's not --
11        MR. FRANK:  Because you're -- you're not
12  asking about the provision, you're asking specifically
13  what services were provided.  This is that -- that's
14  going to a communication.
15  BY MR. DONOVAN:
16     Q.   Okay.  Let me ask you some questions.  You
17  can maintain your objection if you want.
18        Did this company review outbound
19  telemarketing scripts?
20     A.   What do you mean by a telemarketing script
21  in that question?
22     Q.   Well, I believe that on Liberty 1, one of
23  the frames -- one of the frames refers -- one of the
24  frames there is right under the tab is scripts, and
25  typically companies provide people who are making calls

---

**Page 148**

1  on their behalf with some kind of script or at least
2  outline of the way that they want them to communicate
3  with consumers on their behalf.
4        Do you -- do you provide your callers with
5  something like that?
6     A.   No.
7        MR. O'SAILE:  I -- I -- I'm going to object
8  again.  This is attorney-client privilege.  You're
9  asking whether anything -- whether -- what
10  communications this is -- this law firm has provided to
11  them in provision of service?  I -- I think that -- I
12  mean, that would be a communication right there.
13        MR. DONOVAN:  I literally -- I literally
14  just asked him if he provided a script to a third party
15  who --
16        MR. O'SAILE:  That's attorney-client
17  privilege.
18        MR. DONOVAN:  No.  A communication that
19  involves a third party by definition, cannot be
20  attorney-client privilege.  You know that.
21        MR. O'SAILE:  No.  You're asking at the time
22  when they send -- they -- you're asking about what did
23  they send them.  That's a communication.  That's
24  attorney-client privilege.
25        MR. DONOVAN:  No.  I'm asking if --

---

**Page 149**

1        MR. O'SAILE:  Maybe I'm -- maybe I'm
2  misunderstanding where you're going with this, but I --
3  but it sounds a lot like you're asking about what did
4  they give you, what did they --
5        MR. DONOVAN:  You've also -- you've also --
6        MR. O'SAILE:  -- what did they provide to
7  you and those are all attorney-client privilege.
8        MR. DONOVAN:  You've also put your TCPA
9  compliance at issue in this case.  But I mean, look,
10  I'll get to it one way or another.  It'd be easier to
11  do it today, but we don't have to.
12  BY MR. DONOVAN:
13     Q.   Did SW Law play a role in producing the
14  telemarketing policies and procedures for Liberty Home
15  Guard that you produced at Liberty 14 through Liberty
16  22?
17     A.   They reviewed policies and procedures.
18     Q.   Okay.  This -- these specific policies and
19  procedures.
20     A.   Correct.
21     Q.   That you produced?
22     A.   Correct.
23     Q.   You are aware that Ms. Mey has also asserted
24  her claims under the West Virginia Consumer Credit and
25  Protection Act in this case?

---

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 150

1    A.   Yes.
2         Q.   Okay.  Has your company ever taken any
3    specific steps to ensure that its policies and
4    procedures are in compliance with the requirements of
5    the West Virginia Consumer Credit and Protection Act?
6         A.   Yes.
7         Q.   Okay.  In what way have you done so?
8         A.   We've expended considerable resources
9    retaining in-house legal compliance.
10        Q.   Okay.  Have you ever retained a attorney
11   licensed in the state of West Virginia to -- to review
12   your policies as to their compliance with the WVCCPA?
13        A.   Yes.  They're licensed in West Virginia?
14        Q.   Uh-huh.
15        A.   Licensed to do what?
16        Q.   Practice law.
17        A.   I'm not aware what -- in which states the
18   attorneys that we've hired for reviews are as far as --
19   in the context of that question.
20        Q.   Would you have any corporate documents,
21   evidence in any way, any of the efforts you've
22   undertaken to inform yourself of and ensure compliance
23   with the West Virginia Consumer Credit Protection Act?
24        A.   Not that I'm aware of.
25        Q.   And when you referred to the in-house

Page 151

1    counsel that performed your work, are you referring to
2    Charles who's here for us today?
3         A.   Yes.
4         Q.   Okay.  Are you familiar with the problem in
5    the telemarket industry known as lead generations
6    fraud?
7         A.   No, I'm not.
8         Q.   Okay.  So I take it if you're not familiar
9    with the problem, you also haven't taken any
10   affirmative steps to protect yourself from something --
11             MR. O'SAILE:  Objection to form.
12   BY MR. DONOVAN:
13        Q.   -- lead generations fraud.
14        A.   I'm not familiar with the term.
15        Q.   Okay.  And the term refers generally to a
16   number of different, I'll call them scams for lack of a
17   better term, in which lead generators scrape
18   information from the internet and submit it, sell it to
19   -- not -- not usually directly to companies like yours,
20   frankly, but they usually filter that leads through or
21   someone else like a host and post site.
22             Are you familiar with that concept at all?
23        A.   Yes.
24        Q.   Okay.  So having established that, have you
25   taken any steps to protect yourself from lead

Page 152

1    generations fraud?
2         A.   Yes.
3         Q.   What steps?
4         A.   We implement CAPTCHA.  We provide -- the
5    CAPTCHA's the -- a big one.  We monitor our website
6    traffic very carefully.  We have an in-house IT team
7    which is responsible for maintaining our servers and
8    redundancies.  If we see evidence that, as I mentioned
9    earlier, progress bad leads and have incomplete
10   information that is being submitted to us being
11   suspicious and requiring them to investigate, then I
12   will, personally, as the leader of the firm, take it so
13   serious that I will take it and look for patterns.
14        Q.   Roughly how many inquiries on your website
15   have you received in a year, request for quotes?
16        A.   In a year you said?
17        Q.   Uh-huh.
18        A.   I'd rather not speculate.  I'd rather -- I -
19   - I -- I am not -- I don't have a handle on exactly on
20   how many.
21        Q.   Is it more like hundreds or more like
22   thousands?
23        A.   In a year?
24        Q.   Uh-huh.
25        A.   It's in the thousands.

Page 153

1         Q.   Okay.  Is it more or less than 10,000?
2         A.   More than 10,000.
3         Q.   Okay.  So when you detect a problem with one
4    of those 10,000 leads, it's you, the CEO of the
5    company, who conducts the investigation?
6         A.   Yes.
7         Q.   How in the world do you have time for that?
8         A.   I don't sleep.
9              MR. DONOVAN:  Fair enough.  I'll strike that
10   off the record.
11             THE WITNESS:  It's a true story.
12   BY MR. DONOVAN:
13        Q.   You mentioned CAPTCHAs.  What's the purpose
14   of the CAPTCHA?
15        A.   If any bot is trying to scrape our -- is
16   trying to scrape or navigate our site, it will stop
17   them and require them to fulfill images, type in
18   special characters, or click a button with their mouse
19   to determine that it's a human.
20        Q.   Does a person or bot have to navigate a
21   CAPTCHA in order to submit this?
22             Where is the CAPTCHA on this page?
23        A.   It doesn't appear every time.
24        Q.   It doesn't appear every time?
25        A.   It doesn't appear every time.

**DIANA MEY vs LIBERTY HOME GUARD, LLC**
**Benjamin Joseph on 01/31/2024**

Page 154

1    Q.    So a person goes and does it, they don't
2    necessarily have to do a CAPTCHA?
3    A.    Correct.
4    Q.    How does the -- how -- how does the website
5    determine when to use CAPTCHA?
6    A.    A bunch of data points.  I think it has to
7    do with how you browse, browsing patterns, what they're
8    detecting, and user agent.  It's -- it's an algorithm
9    that I believe is owned or operated or affiliated with
10   Google.
11   Q.    Okay.  With respect to that technology and
12   how that works on your website, who at your company
13   would be the best person to testify?
14   A.    Probably me still.  We license it out to the
15   third party, and they provide the services and we don't
16   have bot problems as a result.  I don't know exactly
17   how it works.
18   Q.    Okay.  Well, you don't know exactly how it
19   works?  I'm trying to figure out who would.
20   A.    But it works.  You have to get CAPTCHA on --
21   on -- on to speak to it.
22   Q.    So there was a third party.
23   A.    It's a third party.
24   Q.    Who is that third party?
25   A.    I believe they're called CAPTCHA, C-A-P-T-C-

Page 155

1    H-A.
2    Q.    Okay.  Has your company been sued under the
3    TCPA before?
4    A.    I believe so, yes.
5    Q.    How many times?
6    A.    I believe once.
7    Q.    Okay.  Who would have a more definitive
8    answer to that question within the company?
9    A.    Charles.
10   Q.    Has that case been resolved or is it still
11   pending?
12   A.    It's been resolved.
13   Q.    How is it resolved?
14   A.    Settled.
15   Q.    Okay.  Where was that case pending?
16   A.    I believe it was either Utah or Arizona.
17   Q.    Okay.  And what were the allegations of that
18   case?
19         MR. O'SAILE:  Objection.  I believe this is
20   starting to get outside the scope again.  This is not
21   within the notice.
22         MR. FRANK:  I -- I also --
23         MR. DONOVAN:  It's literally within the
24   scope of topic number 5.
25         MR. FRANK:  You can answer.

Page 156

1         THE WITNESS:  What were the allegations?
2    BY MR. DONOVAN:
3    Q.    Yes.  If you don't know, you don't know.  I
4    don't want you to guess.
5    A.    I assume they were -- they were TCPA
6    related.
7    Q.    Do you know if they involved violations of
8    the Do Not Call Registry?
9    A.    I do not.
10   Q.    Okay.  Do you know if you asserted in that
11   case, the defense of prior express written consent?
12   A.    I don't.
13   Q.    Okay.  Do you maintain documents related to
14   that case?
15   A.    Yes.
16   Q.    Has your company ever been -- ever received
17   a complaint or notice of investigation by any
18   regulatory body related to outbound telemarketing?
19   A.    I have no knowledge of that.
20   Q.    Okay.  Have you ever received a complaint
21   from a consumer asserting violations of the TCPA that
22   did not result in a lawsuit?
23   A.    Not that I'm aware of.
24   Q.    So this complaint by Diana Mey and that
25   other lawsuit are the only times you've ever received a

Page 157

1    complaint, formal or informal, from any person
2    regarding telemarketing by Liberty Home Guard?
3    A.    Yes.
4         MR. FRANK:  Can I just ask for clarification
5    on that?  Do you -- do you mean anything outside of a
6    lawsuit?
7         MR. DONOVAN:  Yes.
8         MR. FRANK:  Okay.
9         MR. DONOVAN:  Yeah.  I'm talking about, for
10   example, like the e-mail.
11        MR. FRANK:  Yeah.  Right, right.
12        MR. DONOVAN:  Something like that.
13        MR. FRANK:  Yes, yes.  That was my
14   interpretation as well.
15   BY MR. DONOVAN:
16   Q.    Aside -- so aside from this lawsuit and that
17   lawsuit, not a single other complaint regarding --
18   okay.  When you mentioned earlier that you had
19   situations with bad leads where someone laid out that,
20   hey, I hadn't submitted this lead, would you not
21   consider that a complaint about telemarketing?
22   A.    I wouldn't define that as a complaint about
23   telemarketing.  I would define that as a, hey, I'm not
24   that person.
25   Q.    Right.  But the only way they would've known

DIANA MEY vs LIBERTY HOME GUARD, LLC
Benjamin Joseph on 01/31/2024

## Page 158

1 they weren't that person is if they had received the
2 telemarketing call or text message, right?
3     MR. O'SALIE: Object to form.
4     THE WITNESS: We're in communication with
5 them, obviously, right? We don't just make it up.
6 They -- they told us that they're not this person.
7 BY MR. DONVAN:
8     Q.    Exactly.   So I'm suggesting -- maybe rethink
9 my question to include also situations where a person
10 has said, hey, I received a telemarketing message.
11 This isn't me.  I didn't provide consent to receive
12 this.  Sounds like you must have received complaints
13 along those lines.
14     A.    They didn't say -- I -- I don't recall
15 anything about consent being spoken to.  Contact
16 doesn't mean you say, okay, do you want to be taken
17 off, very straightforward, very above board, asked and
18 answered.  They want to -- you called them.  I don't
19 want to be called anymore.  You're taken off.  You move
20 on.
21     MR. DONVAN: Why don't you give me -- let
22 me take a five-minute break and see if there's anything
23 else.  We're probably done.
24     THE WITNESS: Sounds good.
25     MR. DONVAN: Thanks, Ryan.

## Page 159

1     THE COURT REPORTER: Off the record at 3:22
2 p.m.
3     (OFF THE RECORD)
4     THE COURT REPORTER: Back on the record.
5 3:26 p.m.
6     MR. DONVAN: Ben, thank you very much for
7 your time today.  That's all the questions I have for
8 you.  And I'll pass the witness.
9     THE WITNESS: Oh, awesome.
10     MR. FRANK: Thank you for your time.
11     MR. DONVAN: Grayson, anything from you?
12     MR. FRANK: Ben, I don't have any further
13 questions for you.  Appreciate your time.
14     MR. DONVAN: Thanks.
15     THE WITNESS: Thank you all.  Thank you.
16 Ryan, nice to meet you.
17     MR. DONVAN: Yes.
18     THE WITNESS: Pleasure.
19     MR. DONVAN: Absolutely.  Thank you very
20 much.
21     THE COURT REPORTER: Would you like to read
22 or waive?
23     MR. O'SALIE: Ben, let's read.
24     THE WITNESS: Read.
25     THE COURT REPORTER: And regular delivery of

## Page 160

1 the transcript?
2     MR. FRANK: Yeah.  Just E-Tran.
3     MR. DONVAN: I'll take E-Tran.
4     MR. FRANK: Are there any copies?
5     THE WITNESS: Safe travels.  Enjoy your
6 time.
7     THE COURT REPORTER: Off the record at 3:27
8 p.m.
9     (DEPOSITION CONCLUDED AT 3:27 P.M.)

## Page 161

1     REPORTER'S CERTIFICATE
2
3     I, JOHN SHEFFIELD, a Court Reporter and
4 Notary Public in and for the State of Virginia, do
5 hereby certify:
6     That BENJAMIN JOSEPH, the witness whose
7 examination is hereinbefore set forth, was first
8 duly sworn by me and that this transcript of said
9 testimony is a true record of the testimony given by
10 said witness.
11     I further certify that I am not related
12 to any of the parties to this action by blood or
13 marriage, and that I am in no way interested in the
14 outcome of this matter.
15     IN WITNESS WHEREOF, I have hereunto
16 subscribed my name this 31st day of January, 2024.
17
18
19     JOHN SHEFFIELD
20     Court Reporter and Notary Public
21     Notary Commission No.
22     New York/01SH6435698
23     Commission Expires: July 5, 2026
24
25