**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**DIANA MEY,** on behalf
of herself and a class of others
similarly situated,

               Plaintiff,

    v.                                **CIVIL ACTION NO. 5:23-CV-281**
                                              Judge Bailey

**LIBERTY HOME GUARD, LLC,**
and **BENJAMIN JOSEPH,**

               Defendants.

## ORDER DENYING MOTION
## FOR SUMMARY JUDGMENT

Pending before this Court is Defendants' Motion for Summary Judgment [Doc. 95], filed on September 10, 2025.  Plaintiff filed her Response on October 9, 2025 [Doc. 112] and defendants filed their Reply on October 27, 2025 [Doc. 121].  The Motion is now ripe for decision.

Defendant Liberty Home Guard, LLC ("Liberty") is a home warranty company that sells warranty plans for home appliances and systems.  To market its products, Liberty places calls and sends text messages to prospective customers nationwide, including in West Virginia.

On February 10, 2022, plaintiff Diana Mey ("Mey") received the first call from Liberty.  She did not answer, so the call was forwarded to voicemail.  A live male caller indicated

that he was calling on behalf of Liberty, and was trying to reach Geoff, who supposedly made a recent online inquiry.  The caller requested a call back before terminating the call.

That same day, Mey received at least seven (7) additional calls from Liberty, each of which were forwarded to voicemail.  Several of the callers identified themselves as Liberty representatives and/or requested to speak with the individual referenced in the first call - Geoff.

Following those calls, from February 15 to February 22, 2022, Mey received at least four (4) promotional text messages from Liberty, referencing Geoff.

On February 23, 2022, Mey received another voicemail from a Liberty representative asking for the same individual referenced in the prior calls.  That call was then followed by two (2) additional promotional texts from Liberty on March 1 and 3, 2022.

On March 4, 2022, Mey emailed Liberty (service@libertyhomeguard.com), advising that she had received multiple telemarketing calls to her wireless number, which has been listed on the National Do Not Call Registry (the "DNC Registry") since 2003.  Noting that the solicitations were illegal absent her prior express written consent, Mey requested an explanation for the calls and evidence of consent.

Liberty did not respond to Mey's email. Instead, it continued to send Mey promotional texts, sending her nine (9) additional text messages from March 8 through April 7, 2022.

On July 14, 2023, Mey filed this action in the Circuit Court of Ohio County.  The case was removed to this Court on August 23, 2023 [Doc. 1].  On August 14, 2024, Mey filed an Amended Complaint [Doc. 44].  In Count I of the Amended Complaint, Mey alleges, individually and on behalf of a proposed class, violations of the Telephone Consumer

Protection Act's ("TCPA's") Do-Not-Call Rules, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2).    In Count II, she alleges individual claims under the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va. Code §§ 46A-6F-101, *et seq*. She seeks statutory damages under both the TCPA and WVCCPA.

Mey has voluntarily abandoned any claims tied to communications sent before her March 4, 2022 email notifying Liberty that her number was on the DNC Registry and that she had not consented to such outreach.    Her claims are thus limited to the nine (9) promotional text messages Liberty sent after that explicit notice.    Additionally, Mey voluntarily has abandoned any claim that Liberty failed to comply with the TCPA's caller-identification requirements at 47 C.F.R. § 64.1200(d)(4).

Defendants base their Motion for Summary Judgment on the following grounds:

1.    The allegedly offending calls were placed by mistake;

2.    That sufficient safeguards were in place to trigger the safe harbor provision of the TCPA;

3.    That Mey is not in the zone of interest to bring this case;

4.    Text messages are not calls within the TCPA;

5.    That defendants are not telemarketers within the meaning of the WVCCPA; and

6.    Defendants are entitled to the WVCCPA's safe harbor provisions.

With regard to defendants' claims that the calls were placed to Mey by mistake,  the relevant communications fall into two (2) distinct periods: those sent before Mey's March 4, 2022 email, and those sent after.    Even if the former communications can be attributed to error—intended for Geoff Skadra rather than Mey—the latter ones cannot.    By March

3

4, Liberty had clear notice that it was contacting the wrong person, yet it chose to disregard that notice by dismissing Mey's email as a "phishing attempt."  That excuse collapses under scrutiny.  Even then, once Liberty made the conscious decision to ignore her complaint, its subsequent solicitations were no longer inadvertent "errors" but deliberate acts beyond the reach of any safe harbor.

First, Liberty offers no real explanation for its suspicions.  It says only that Mey's email was "suspiciously worded and contained very little information." But Mey provided her phone number and identified the precise time period in which Liberty had contacted her.  Liberty's own records confirmed multiple calls to that exact number during that exact time frame.  If anything, the email's accuracy should have heightened Liberty's concern, not justified dismissing it as fraudulent.

Second, Liberty's supposed suspicion was unreasonable on its face.  Mey's email contained no links, no request for money, and no demand for sensitive personal information.  It simply stated that she had received calls despite being on the DNC Registry and asked that Liberty explain its basis for contacting her.  That is not a plausible phishing attempt but a textbook do-not-call complaint.  Liberty's fallback justification—that it could not provide the requested consent without divulging Mr. Skadra's private information—fares no better.  Liberty did not need to disclose Mr. Skadra's information to Mey in order to confirm internally that it was calling the wrong number and stop.

Third, if Liberty truly needed more information (it never says what), the obvious first step would have been to respond to Mey's email and request clarification.  It did not.  Instead, Liberty excluded the single most reliable source of information—Mey herself—from its supposed investigation.  Worse still, Mey sent her email on a Friday, and

4

by the following Tuesday Liberty had resumed sending her promotional texts. Whatever "investigation" Liberty claims to have undertaken was either perfunctory or entirely nonexistent.

Fourth, even if Liberty's concerns were genuine—a factual question for the jury—the ensuing communications were not "errors." Liberty weighed the risk that Mey's email was genuine, chose to disregard that risk, and pressed ahead with further solicitations. That was a deliberate judgment call, not an inadvertent mistake. The decision may have been wrong, but poor judgment is not an "error" that the TCPA's safe harbor was designed to excuse.

Ultimately, the text messages that followed Mey's March 4 email were deliberate and not inadvertent errors. It is for the jury to decide whether Liberty's "phishing" theory reflects a genuine concern or a post hoc excuse. A reasonable jury could reasonably find the latter, foreclosing any reliance on the TCPA's safe harbor and supporting a finding that the violations were willful and knowing.

With respect to the TCPA's safe harbor defense, because the solicitations between March 8 and April 7, 2022, were not a product of justifiable error, this Court's safe harbor analysis could end there. But even if those communications were a product of justifiable error, Liberty has not demonstrated that it had implemented the minimum compliance requirements at § 64.1200(c)(2)(I). *See **Benzion v. Vivint, Inc.**,* 2014 WL 11531368, at *6 (S.D. Fla. Jan. 17, 2014) (providing that the safe harbor is an affirmative defense for which defendant has the burden of proof).

"**Written Procedures**": Liberty must demonstrate that "[i]t has established and implemented written procedures to comply with the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(A).   To satisfy this element, Liberty relies upon the Declaration of Benjamin Joseph and its attached exhibits.  [Doc. 95-4].  But the declaration raises more questions than it answers.   For example, Joseph claims that Liberty "consistently implemented" compliance policies since its founding, yet concedes that Liberty "did not formally memorialize *all* of its policies and procedures" until 2023, after the calls in question.   [Id. at ¶ 12 (emphasis in original)].  Notably, Joseph does not identify which, if any, written procedures existed in Spring 2022, leaving it unclear whether Liberty had the required written policies during the relevant period.

"**Training of Personnel**": Liberty must demonstrate that "[i]t has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules." 47 C.F.R. § 64.1200(c)(2)(i)(B).  Again, Liberty's motion and declaration embrace strategic ambiguity.

Liberty points to the Sales Training Manual, which "represents the training manual provided to salespersons in early 2021."   [Id. at ¶ 16].  The unredacted portions of the manual, however, do not actually reflect training on DNC compliance or evidence any written DNC compliance procedures. [Id. at 7–31].  Rather, they simply describe the capabilities and features of Liberty's lead routing and customer management platforms. [Id. at 20–22].  The remainder of the manual is heavily redacted without explanation, preventing any verification that DNC training existed within the withheld sections.

6

Liberty points to a 15-slide training presentation, which, according to it, "represents the training presentation provided to salespersons since late 2021." [Id. at ¶ 17]. Yet, one slide carries an embedded 2024 copyright watermark. [Id. at 52]. Joseph explains that the watermark "indicates when the pdf of the document was compiled, not when the document itself was created or came into use." [Id. at ¶ 17]. But that makes little sense. Converting a PowerPoint to a PDF would not alter a copyright date embedded on a slide or simply add one from scratch. The more likely explanation is that the presentation—or at least the slide carrying the 2024 mark—was created or modified in 2024 or later. Even then, regardless of when the presentation was actually created, the content of the presentation has nothing to do with DNC compliance training. Aside from the cover slide and table of contents, only two (2) substantive slides are unredacted. One (1) of those (the one (1) containing the 2024 copyright) is simply a screenshot of the VanillaSoft user interface, and the second simply defines the various lead result descriptions used within that platform. [Id. at 52–53]. As the title "VanillaSoft/Sales Syco System Training" suggests, the presentation appears to train sales staff on Liberty's lead-management system, not DNC compliance.

Like the declaration, the motion itself is notably ambiguous as to what, if any, training was provided to its salesforce in Spring 2022. [Doc. 96 at 14–15]. The question is not whether TCPA compliance training is currently implemented, but whether it was implemented in Spring 2022 when the offending solicitations were made. Notably, Liberty's own expert noted in her report that Liberty reported to her "via telephone that [Liberty] trains its agents and employees on TCPA compliance but could not locate records of such trainings." [Doc. 112-8 at n.1].

"**Recording**": Liberty must demonstrate that "[i]t has maintained and recorded a list of telephone numbers that the seller may not contact." 47 C.F.R. § 64.1200(c)(2)(i)(C). Though it has demonstrated the technical ability to create an internal do-not-call list, Liberty's motion is devoid of any records or written procedures demonstrating actual creation and implementation of an internal do-not-call list in Spring 2022. Joseph's isolated statement—that "Liberty has always maintained an internal do-not-call list for individuals who request not to be contacted or to be removed from the call list"—standing alone is insufficient to satisfy this element as a matter of law. [Doc. 95-4 at ¶ 7].

"**Accessing the National Do-Not-Call Database**": Liberty must demonstrate that "[i]t uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process." 47 C.F.R. § 64.1200(c)(2)(i)(D).  Liberty admits it did not subscribe to the DNC Registry until 2024—long after the calls and texts to Mey.  [Doc. 95-4 at ¶ 13].  Its fallback, that scrubbing was unnecessary because it never cold-called consumers, is belied by its failure to attach a single consent record for any putative class member.

"**Purchasing the National Do-Not-Call Database**": Finally, Liberty must show that it lawfully purchased access to the DNC Registry from the administrator and did not participate in prohibited cost-sharing arrangements. 47 CFR § 64.1200(c)(2)(i)(E). Again, Liberty admits it did not purchase access to the DNC Registry until 2024 [id.], and the failure to do so is fatal to its safe harbor defense. *See **Morris v. Hornet Group**,* 2018

WL 4781273, at *8 (E.D. Tex. Sept. 14, 2018) ("Defendant has not and cannot present any evidence . . . that it 'purchases access to the relevant do-not-call data from the administrator of the national database' as required by the TCPA error defense regulations.").

In sum, Liberty has not shown compliance with any—let alone all—of the statutory or regulatory prerequisites of the safe harbor defense.  As the party asserting this affirmative defense, Liberty bears the burden of proving that it fully satisfied each element of the defense.  On this record, it has not come close.  At a minimum, the existence of factual disputes as to when Liberty's compliance measures were adopted, implemented, and applied preclude summary judgment.

With regard to Mey's falling within the zone of interest, it is strange that Liberty's Motion begins by patronizingly commending Mey for her consumer advocacy, only to quickly pivot and argue that this very advocacy disqualifies her from the TCPA's protections.  According to Liberty, consumers enjoy only a finite allotment of TCPA claims, and once they have exhausted that allotment, they somehow lose the right to enforce them ever again.  The contradiction is glaring: under Liberty's theory, the more effective a consumer is in enforcing the TCPA's protections, the sooner they forfeit them—eventually leaving themselves exposed to unlawful solicitations without any recourse.  Courts, including this one, have repeatedly rejected the notion that an individual's standing diminishes with each successive lawsuit.  *See, e.g.*, ***Murray v. GMAC Mortg. Corp.***, 434 F.3d 948, 954 (7th Cir. 2006) (rejecting "the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."); ***Dobronski v. Fam. First Life, LLC***, 2024 WL 1342668, at *5 (E.D. Mich. Mar. 29, 2024)

9

(Goldsmith, J.) ("Adopting [defendant's] position would require drawing lines regarding when a TCPA plaintiff becomes a 'professional' litigant and loses standing to bring any claims based on alleged violations of the statute"); ***Cunningham v. Rapid Response Monitoring Servs., Inc.***, 251 F.Supp.3d 1187, 1195 (M.D. Tenn. 2017) (Crenshaw, C.J.) ("Litigation is not college athletics: there is no 'amateurs only' rule"); ***Abramson v. Oasis Power LLC***, 2018 WL 4101857, at *5 (W.D. Pa. July 31, 2018) ("the Court rejects any suggestion that [plaintiff's] prolific history of filing TCPA lawsuits distinguishes this case and demonstrates the lack of an injury-in-fact"); ***Mey v. Venture Data, LLC***, 245 F.Supp.3d 771, 784 (N.D. W.Va. 2017) (Bailey, J.) ("While defendant is understandably frustrated by Ms. Mey's efficacy, she is doing exactly what Congress intended—enforcing the law").

Liberty likens this case to ***Stoops v. Wells Fargo Bank, N.A.***, 197 F.Supp.3d 782 (W.D. Pa. 2016), where the plaintiff openly admitted that she bought a shoe box full of phones solely to manufacture TCPA lawsuits.  That extreme scenario bears no resemblance to this case.  Mey did not invite, solicit, or manufacture Liberty's calls or texts.  To the contrary, she warned Liberty of its mistake, and Liberty ignored her.  Even under Liberty's own theory of the case, the solicitations were the result of its own error—not some trap laid by Mey.

In any event, this Court has already declined to follow ***Stoops***.  *See* ***Mey v. Venture Data, LLC***, 245 F.Supp.3d at 784 ("This Court declines to follow ***Stoops***.").  Undeterred, Liberty urges the Court to revisit ***Venture Data***, asserting that Mey's "lawsuit mill has grown in both size and sophistication" since that decision.  [Doc. 96 at n.7].  Liberty doesn't actually explain how it arrived at that conclusion (not that it would matter), suggesting only

that Mey has filed additional cases since *Venture Data*.  Yet, that argument simply repackages the same flawed premise this and other courts have rejected before: that standing diminishes with each successive enforcement.  That premise was illogical in 2017, and it remains illogical today.

What Liberty lacks in reasoned analysis, it makes up for in rhetoric, branding Mey a "professional plaintiff" who sets "flytraps" then "lies in wait" to "snare" and "entrap" "legitimate businesses." [Id. at 18–19].  Such caricatures do not reflect legal analysis, but rather frustration with the proficiency with which Mey enforces the TCPA once those protections have been violated.  The TCPA does not immunize offenders simply because their targets are vigilant.  And Mey's enforcement record shows persistence, not bad faith.  This Court has consistently rejected attempts to discredit Mey for successfully invoking the TCPA's protections and strip her of standing. The result here is no different.

With respect to the argument that text messages are not actionable under § 227(c), Congress authorized the Federal Communications Commission ("FCC") to establish the National Do Not Call Registry and, in doing so, expressly delegated rulemaking authority to prescribe regulations necessary "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c). Congress then created a private right of action for any person "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [those regulations]." 47 U.S.C. § 227(c)(5). Since the statute's enactment, courts across the country have consistently held that a text message constitutes a "call" within the meaning of § 227(c)(5).  Liberty nonetheless urges this Court to revisit that settled question in light of the recent decisions in *Loper Bright Enterprises v. Raimondo*,

11

603 U.S. 369 (2024) and **McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.**, 606 U.S. 146, 152 (2025). Regardless of the level of deference afforded, the result is the same: a text message is a "call" under the TCPA.

In **Loper Bright**, the Supreme Court overturned the **Chevron** deference doctrine, holding that courts must exercise independent legal judgment to determine the meaning of statutes and need not defer to an agency's interpretation of an ambiguous statute. 603 U.S. at 402. In **McLaughlin**, the Supreme Court held that the Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of a relevant statute is correct and that district courts should interpret the TCPA under ordinary principles of statutory interpretation, *"affording appropriate respect* to the agency's interpretation." 606 U.S. at 152 (emphasis added).

First, the statutory text supports treating texts the same as calls. Section 227(c) concerns "telephone solicitations," protecting consumers' "privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The TCPA defines "telephone solicitation" as "the initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. 227(a)(4) (emphasis added). By explicitly including "messages," Congress made clear that the statute's protections extend beyond traditional voice calls. *See **Hudson v. Palm Beach Tan, Inc.**,* 2024 WL 4190513, at *7 (M.D. N.C. Aug. 12, 2024) (Peake, M.J.) (explaining that the statutory text of the TCPA supports the conclusion that text message are actionable under Section 227(c)), *recommendation adopted,* 2024 WL 4188310 (Sept. 13, 2024) (Osteen, J.).

12

Second, the broader TCPA structure confirms that calls are inclusive of texts. The Supreme Court has assumed, and other courts have held, that "calls" under Section 227(b) encompass text messages. *See Facebook, Inc. v. Duguid*, 592 U.S. 395,400 n.2 (2021) (assuming that the TCPA's prohibitions extend to text messages); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Norton v. 1863 PAC, LTD.*, 2019 WL 5866102, at *2 (N.D. W.Va. July 9, 2019) (Groh, J.) (relying on *Campbell-Ewald* to conclude that "text messages are included in the definition of 'calls' under the TCPA"); *Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017) ("It is uncontested that text messages to a cellular phone constitute 'calls'"); *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) (Text messages to a cellular telephone qualify as a "call" within the meaning of the statute); *Breda v. Cellco P'ship*, 934 F.3d 1, n.1 (1st Cir. 2019); *Hall v. Xanadu Mktg., Inc.*, 682 F. Supp. 3d 1278, 1285 (N.D. Ga. 2023) ("A text message to a cellular telephone qualifies as a "call" under the TCPA"). There is no reason to assign the same word a different meaning in Section 227(c), given that both provisions protect the same core interest: the consumer's right to be free from unwanted intrusions. *See Gulden v. Liberty Home Guard LLC*, 2021 WL 689912, at *5 (D. Ariz. Feb. 23, 2021) ("[Liberty] fails to cite any law in support of its position that a text message is not a 'telephone solicitation.'").

Third, the FCC's interpretation remains entitled to respect. Consistent with its delegated authority, the FCC has long confirmed that text messages fall within the TCPA's restrictions on calls. *See Hudson*, 2024 WL 4190513, at 7 (detailing history of FCC

regulations and guidance); *Dawson v. Porch.com*, 2024 WL 4765159, at 4 (W.D. Wash. Nov. 13, 2024) (same). Congress expressly empowered the FCC to "evaluate alternative methods and procedures" and "develop proposed regulations" necessary to protect consumers' privacy, including "do-not-call systems." 47 U.S.C. § 227(c)(1)–(3). The FCC's inclusion of text messages is therefore not an expansion of statutory text, but a reasonable implementation of Congress's mandate.

Under *Loper Bright*, when Congress expressly empowers an agency to decide how to apply a statutory term to specific facts found by the agency—as here—the agency interpretation is entitled to "deferential review." *Loper Bright*, 603 U.S. at 388. Even if the FCC's interpretation were not entitled to "deferential review" under *Loper Bright*, this Court must, at a minimum, afford "appropriate respect to the agency's interpretation" under *McLaughlin*.

Fourth, the ordinary meaning of "call" also encompasses texts. As the Ninth Circuit observed, the FCC's conclusion that text messages are encapsulated with Section 227(b)'s use of the term "call" is consistent with the dictionary's definition of "call" in that it is defined as "to communicate with or try to get into communication with a person by telephone." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002)). Text messaging is indisputably communication by telephone. Courts applying ordinary-meaning principles have thus reached the same result "regardless whether deference to the agency's interpretation is appropriate or not." *Dawson*, 2024 WL 4765159, at 6.

14

Fifth, the TCPA's purpose compels the same result.  Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy." ***Wilson v. Skopos Fin., LLC***, 2025 WL 2029274, at \*4 (D. Ore. July 21, 2025).  Section 227(c) recognizes "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1).  "With those goals in mind, the 'basis' for the FCC's conclusion becomes abundantly clear: unsolicited text messages invade the privacy and disturb the solitude of their recipients." ***Wilson***, 2025 WL 2029274, at \*4.  They should therefore be included within the purview of the do-not-call protections. ***Gadelhak v. AT&T Servs., Inc.***, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (holding that invasion of privacy arising out of unwanted text messages is "the very harm that the Act is designed to prevent"); ***Cranor v. 5 Star Nutrition, L.L.C.***, 998 F.3d 686, 690 (5th Cir. 2021) ("Telemarketing text messages present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA") (cleaned up).

Finally, the overwhelming consensus is unchanged. Liberty suggests that "multiple" federal courts have revisited Section 227(c)(5) and concluded that text messages are not actionable, citing ***Jones v. Blackstone Med. Servs., LLC***, 2025 WL 2042764, at \*4 (C.D. Ill. July 21, 2025) and ***Davis v. CVS Pharmacy, Inc.***, 2025 WL 2491195, at \*1 (N.D. Fla. Aug. 26, 2025).  On the other hand, a greater number of federal courts have come to the opposition conclusion since ***Loper Bright***.  See ***Wilson***, 2025 WL 2029274, at \*4; ***Barton v. Delfgauw***, 2025 WL 2402131, n.1 (W.D. Wash. Aug. 18, 2025); ***Hudson***, 2024 WL 4190513, at \*7; ***Dawson***, 2024 WL 4765159, at \*5.

This Court agrees that a text message is a call within the ambit of the TCPA.

With respect to the claims under the WVCCPA, Liberty fares no better.  To begin with, Liberty seeks refuge from the WVCCPA based on an exception that doesn't actually exist.   The WVCCPA broadly precludes any "telemarketer" from engaging in abusive telemarketing practices. W.Va. Code §§ 46A-6F-101, *et seq*.  A "telemarketer" is broadly defined as "any person who initiates or receives telephone calls to or from a consumer in this state for the purpose of making a telemarketing solicitation as defined in section one hundred twelve of this article." W.Va. Code § 46A-6F-113(a).   That definition contains several limited exclusions. Relevant here, Liberty maintains that it falls within the exception at Subsection (d), which provides that "[a] telemarketer does not include a *salesperson* as defined in section one hundred fourteen of this article." (emphasis added).  Yet, at no point does Section 114 define "salesperson." Id. at § 114.

Instead, Section 114 defines "telemarketer in good standing"—an entirely different term and concept—which means "a telemarketer who, during the previous two years has continually been engaged in the business of telemarketing and who has not been convicted, or pled guilty or nolo contendere to racketeering, embezzlement, fraudulent conversion, misappropriation of property or any violations of state or federal securities laws, a theft offense, or any consumer protection law or telemarketing law." Id. at § 114. The term "salesperson" does not even appear within the definition of "telemarketer in good standing."  Nor does the term "salesperson" appear to be defined anywhere else within Article 6F ("Telemarketing").

Nevertheless, Liberty borrows the phrase "telemarketer in good standing" and substitutes it for "salesperson," effectively rewriting the statute to exclude itself from the

16

WVCCPA's reach.  As the party seeking shelter under one of the statute's exceptions, Liberty bears the burden of proving its entitlement to it.  *See **Cunningham v. Cornell Univ.***, 604 U.S. 693, 694 (2025) (noting the "well-settled" rule of statutory construction that the burden of proving an exception is upon the one asserting it).  Liberty has not—and cannot—meet that burden here.

In short, Liberty cannot rely upon an exception that does not actually exist.  And it certainly cannot create one, particularly when that proposed exception would gut the overarching act, turning a statute meant to curb abusive telemarketing into one that polices only the recently convicted.  For these reasons, this Court declines Liberty's invitation to create an exception where one does not exist.

Liberty claims in passing that Mey is not a "consumer," which is defined alongside "purchaser," as "a person who is solicited to become or does become obligated to pay for consumer goods or services offered by a telemarketer through telemarketing." W.Va. Code § 46A-6F-103.  Liberty reasons that it intended to contact Mr. Skadra and therefore did not solicit Mey.  But Mey was plainly "solicited" when Liberty directed telemarketing calls and texts to her number, regardless of Liberty's supposed intent to reach Mr. Skadra. The statute turns on the fact of solicitation, not the telemarketer's subjective belief about who was on the receiving end.

With regard to the West Virginia statutory safe harbor provision, the four (4) requirements under the WVCCPA's safe harbor are nearly identical to the TCPA's safe harbor requirements.  For the same reasons that it failed to satisfy the TCPA safe harbor defense, Liberty failed to satisfy the WVCCPA's safe harbor defense.  Liberty's discussion of the WVCCPA safe harbor defense is equally unclear as to when written procedures and

17

compliance trainings were actually implemented—in Spring 2022 or more recently. Liberty's discussion of personnel training and maintenance of an internal DNC list is conspicuously in the present tense.  But safe harbor compliance must exist at the time of the offending communications, not adopted afterward.  The statute makes this clear: only where "any *subsequent* call is the result of error" following implementation of the required compliance measures does the defense apply.  W.Va. Code § 46A-6F-601(b) (emphasis added).

For the reasons stated above, Defendants' Motion for Summary Judgment [**Doc. 95**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** January **5**, 2026.


**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**