No. 26-1096

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DIANA MEY,

*Plaintiff-Appellee,*

vs.

LIBERTY HOME GUARD, LLC and BENJAMIN JOSEPH,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of West Virginia, Wheeling Division
Civil Action No. 5:23-cv-281 (Bailey, J.)

**DEFENDANTS-APPELLANTS' MOTION FOR EXPEDITED RELIEF TO ENFORCE THE REMAND ORDER AND TO BAR THE USE OF CONFIDENTIAL DISCOVERY MATERIALS TO SOLICIT NEW CLASS REPRESENTATIVES**

William J. O'Brien, Esquire
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, West Virginia 26330
304-933-8000 / 304-933-8183 (Facsimile)
william.obrien@steptoe-johnson.com

Shaina L. Richardson, Esquire
STEPTOE & JOHNSON PLLC
1000 Swiss Pine Way, Suite 200
PO Box 1616
Morgantown, West Virginia 26507
304-598-8000 / 304-598-8116 (Facsimile)
shaina.richardson@steptoe-johnson.com

Ryan D. Watstein
ryan@wtlaw.com
Trishanda L. Treadwell
ttreadwell@wtlaw.com
WATSTEIN TEREPKA LLP
75 14th St NE, Suite 2600
Atlanta, Georgia 30309
(404) 905-6400

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

BACKGROUND ...................................................................................... 4

ARGUMENT........................................................................................... 8

    I.     This District Court Violated This Court's Limited
        Remand, and This Court May and Should Address
        That on an Expedited Basis. ....................................................... 8

    II.    The Operative Protective Order Prohibits the Proposed
        Solicitation, and Plaintiff's Bait-and-Switch Underscores
        the Need for Enforcement. .........................................................13

    III.   The One-Way Intervention Rule and the Existing
        Summary Judgment Order Compound the Irreparable
        Harm from the Expansive Discovery and Proposed
        Solicitation of Defendants' Customers. .....................................16

    IV.   Plaintiff's Proposed Conduct Independently Violates Rule
        26(b)(1), the West Virginia Rules of Professional
        Conduct, and the Doctrine of Judicial Estoppel. .......................17

CONCLUSION......................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Alig v. Quicken Loans Inc.*,
2016 WL 10490288 (N.D. W. Va. Aug. 25, 2016) .....................................17

*Allied Chem. Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980) ................................................................................ 9

*Balschmiter v. TD Auto Fin. LLC*,
2015 WL 2451853 (E.D. Wis. 2015) ................................................. 14, 19

*Beaton v. Verizon N.Y.*,
2020 WL 6449235 (E.D.N.Y. Nov. 3, 2020) ..............................................14

*Bonilla v. Ancestry.com Operations Inc.*,
628 F. Supp. 3d 812 (N.D. Ill. 2022) .......................................................18

*In re Pella Corp. Architect & Designer Series Windows Mktg. Litig.*,
2014 WL 12622421 (D.S.C. Nov. 20, 2014) ......................................... 15, 16

*In re Ralston Purina Co.*,
726 F.2d 1002 (4th Cir. 1984) ................................................................ 9

*In re Williams-Sonoma, Inc.*,
947 F.3d 535 (9th Cir. 2020) ............................................. 9, 11, 12, 16, 18

*Kaufman v. Am. Fam. Mut. Ins. Co.*,
601 F.3d 1088 (10th Cir. 2010) .......................................... 12, 13, 15, 16, 20

*Maracich v. Spears*,
570 U.S. 48 (2013) ..............................................................................19

*New Hampshire v. Maine*,
532 U.S. 742 (2001)......................................................................... 19, 20

*Nichols v. Noom Inc.*,
2021 WL 4150184 (S.D.N.Y. Sept. 13, 2021) ...................................... 14, 20

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)..............................................................................12

i

*Reed v. Bowen*,
849 F.2d 1307 (10th Cir. 1988) ...............................................................18

*Schwarzschild v. Tse*,
69 F.3d 293 (9th Cir. 1995)....................................................................17

*United States v. Pileggi*,
703 F.3d 675 (4th Cir. 2013) ...............................................................8, 9

**Rules**

Fed. R. Civ. P. 23...............................................................................passim

Fed. R. Civ. P. 26.........................................................................3, 12, 17, 18

West Virginia Rule of Professional Conduct 7.3 ....................................18, 19

West Virginia Rule of Professional Conduct 8.4 ....................................17, 19

## **INTRODUCTION**

The Court granted Liberty Home Guard's Rule 23(f) appeal after the district court copy/pasted the Plaintiff's certification briefing and summary judgment order nearly verbatim. It later granted a limited remand for one purpose: to see if Plaintiff could narrow the class definition, as she said she would. The district court did the opposite. It entered an order permitting limitless discovery and endorsing Plaintiff's counsel's express promise, made in open Court, to mine Liberty's confidential consumer records for new class representatives. In doing so, the district court vacated its own prior scheduling order, which permitted only expedited briefing on a new class definition, and which it had based on its own interpretation of this Court's remand.

The district court's new scheduling order is another copy/paste, granting Plaintiff's requested one-sided schedule in its entirety: an automatically extending 60-day discovery period, a Rule 30(b)(6) deposition of Liberty (which she didn't take during discovery), supplemental expert disclosures from Plaintiff only, and a 14-day window for Plaintiff to identify new class representatives. Dkt. 185. Plaintiff's counsel has confirmed—both to the district court and to Defendants' counsel—that they intend to identify those new representatives by contacting Liberty's own customers and prospects, identified through Liberty's confidential records compelled in discovery, to recruit them as clients.

1

The call records at issue are not public. Liberty produced them under the parties' Agreed Protective Order (Dkt. 13),[1] in this litigation brought by Diana Mey, for use only in Diana Mey's litigation. Plaintiff obtained them by representing that she needed the data to cross-reference telephone numbers against the National Do Not Call Registry and to effectuate class notice. Dkt. 81 at 2. She never said she would use Liberty's data to solicit—not in her motion to compel, her sanctions briefing, her certification briefing, her summary judgment briefing, anywhere in the appellate record, or in her indicative ruling request, or her motion for remand. Having obtained the confidential information based on her initial representations, she cannot now repurpose it for recruitment.

Recognizing that this is an issue of ethical and professional responsibility as well, Plaintiff's counsel stated at the June 9, 2026 scheduling conference:

> Well, I wanted to wait for this hearing today [to decide on the identity of new class representatives], simply because the defendants have raised issues about the propriety of doing that [using Defendants' confidential consumer information to recruit putative class members as clients and new class representatives]. I don't think there's any problem with us doing that, but I didn't want to get out over my skis in doing that and then have someone come in here and say, you're soliciting clients, blah, blah, blah.

June 9, 2026 Hr'g Tr. 12:14–19; 12:20–25, attached as Exhibit 1. Over Defendants' objection, the district court blessed that proposal anyway, even

---

[1] If citations to the appellate docket are given, they are listed as "ECF No. __." If citations to the district court docket are given as "Dkt. __."

though the solicitation violates the Protective Order, Rule 26, the West Virginia Rules of Professional Conduct, and the doctrine of judicial estoppel. Instead, without explanation, he vacated his own interpretation of this Court's remand order and entered Plaintiff's proposal—almost verbatim—with no restriction on Plaintiff's use of the confidential data.

Several circuits have granted mandamus to stop conduct like this by a district court. Other circuit courts have sanctioned plaintiffs' counsel for such conduct, holding that it violates protective orders substantively identical to the one at issue here. Of course, Defendants here do not need to satisfy a mandamus standard. Defendants merely seek to enforce this Court's limited remand, which the district court's order violates. This Court granted a "limited remand" for Diana Mey to narrow her class definition in *her* case, not for her counsel to solicit new people to file new claims. Indeed, the whole reason Plaintiff's counsel seeks to do this is to avoid the typicality and adequacy issues that precluded Mey from representing the class the district court certified.

Consider what this means: Plaintiff's counsel has engineered something the remand never authorized. He sued on behalf of Diana Mey, whose claim exists only because someone mistyped a phone number similar to hers when requesting a call from Liberty. On the supposed strength of that claim, he compelled production of over six million confidential consumer records. Now

3

he proposes to set Diana Mey aside and use those same records to telephone Liberty's customers and recruit someone new to sue. He has no plaintiff in hand. What he has is the data, a fourteen-day window, and an incentive payment to offer whoever agrees to lend their name to the case. It cannot be that this Court intended its limited remand—authorizing a narrowing of the class definition—to encompass what multiple circuits have held is so egregious that it justifies, on far less serious facts, mandamus and sanctions.

Making matters worse, the summary judgment order (Dkt. 153)—which violated the one-way intervention rule—remains. That means that any new plaintiff will walk into someone else's case with key defenses already adjudicated in their favor. This Court should not permit such a gross misuse of a limited remand under its continuing supervision. It should instead immediately require any solicitation to cease and, after full briefing, either (a) require the district court to comply with its limited remand order, or (b) reinstate the 23(f) appeal on the merits.

## **BACKGROUND**

Plaintiff Diana Mey filed this TCPA class action in August 2023 alleging that Liberty made telemarketing calls to numbers on the National Do Not Call Registry (which is permitted when people request contact, as those Liberty contacted did). Dkt. 93-1, Joseph Dep. at 43:9–11. On October 6, 2023, the

4

Court entered the parties' Agreed Protective Order (Dkt. 13), restricting any CONFIDENTIAL material to use "only for the purpose of this action" and prohibiting disclosure to any person beyond those actively engaged in working on the litigation. *Id.* ¶¶ I.C–I.D.

During class-wide discovery, Liberty objected to producing complete call records and unredacted consumer contact data on grounds of burden and privacy.[2] Plaintiff moved to compel and then for sanctions (Dkts. 53, 56, 74, 81). In her briefs, Plaintiff unequivocally stated her reasons for needing the data: "for Plaintiff's expert to cross-reference the data with the National Do Not Call Registry and confirm violations at the time of the offending calls," and to "effectuat[e] class notice." Dkt. 81 at 2; *see also* Dkt. 53 (similar).

The district court compelled production (Dkt. 57), finding the call records necessary "both in identifying class members and establishing key elements of the class claims." Dkt. 57 at 8. The court did not recognize any right to use those

---

[2] Liberty's consumer information included several spreadsheets detailing call and text logs and consumer contact lists with names, addresses, telephone numbers, email addresses, IP addresses, internal notes, and other information related to consumer requests for home warranty information. Watstein Decl., attached as Exhibit 2, ¶ 4. The data produced included over six million contacts. Defendant produced redacted versions of some of these spreadsheets in March, August, and September 2025, but all were produced in full, unredacted form by October 6, 2025, in response to a *post*-discovery order (Dkt. 82). Watstein Decl. ¶¶ 5–6. As a result, Plaintiff is in possession of records detailing millions of Liberty's confidential consumer contacts, including current and former customers.

documents to identify additional clients. And Plaintiff never disclosed any intent to use the produced data for that purpose.

Defendants moved for summary judgment and Plaintiff moved for class certification on the same day—September 10, 2025. On December 3, 2025, the district court certified a class. Liberty timely petitioned for Rule 23 (f) review. The petition identified problems with the certified class that turn on Diana Mey's own circumstances—including that her claim arises from a misdialed number unique to her, which makes her atypical of and inadequate to represent the class she was certified to lead. Then, on January 5, 2026, the district court ruled on summary judgment—rendering several adverse rulings against Defendants as a matter of law—before class notice, and after Defendants asked the district court to honor the one-way intervention rule and wait.[3] This Court granted the Rule 23 (f) petition on January 27, 2026 (ECF No. 2).

Defendants filed their merits brief in this Court on March 9, 2026 (ECF No. 16). Thereafter, at Plaintiff's request (Dkt. 165) and over Defendants' objection (Dkt. 167), the district court issued an indicative ruling stating that if

---

[3] At a case status conference on October 17, 2025, Defendants' counsel clarified for the district court that Defendants did not waive the one-way intervention rule and did not want a merits ruling before class certification issues were resolved. Dkt. 142-2 at 4:20–21. Judge Bailey indicated he understood and would respect that request, which he knew required waiting until after class notice and opt-out given his prior decision on the issue. *Id.* at 26:12–13; *see also infra* Section III.

6

the Fourth Circuit remanded, the court would (1) vacate the December 3, 2025 certification order and (2) enter an expedited schedule for renewed Rule 23 proceedings "directed to a modified and narrower class definition." Dkt. 173 at 11. Neither Plaintiff's request nor the district court's indicative ruling suggested additional discovery, much less the attempted creation of an entirely new case with a new plaintiff, much less using Defendants' confidential records.

On May 1, 2026, this Court remanded the case at Plaintiff's request (ECF Nos. 24, 30) "for the limited purpose of deciding the class-definition issue raised in the district court's indicative ruling." (ECF No. 32). On May 5, 2026, the district court read the remand order and interpreted it to mean an expedited briefing schedule, so that's what it entered. (Dkt. 175). That makes sense, since the sole predicate was a "narrower class definition."

On May 20, 2026, Plaintiff submitted a proposed scheduling order that included "depositions of any newly proposed class representatives"—in addition to an automatically and perpetually extending 60-day discovery period with written discovery and a new 30(b)(6) deposition of Liberty and Plaintiff's supplemental expert disclosure. Dkt. 176. Defendants opposed this schedule as beyond the scope of this Court's limited remand, unwarranted, and improper to the extent Plaintiff proposed to use Liberty's consumer data to contact its customers and prospective customers. Dkt. 178.

7

At the June 9, 2026 hearing regarding this schedule, Plaintiff's counsel stated on the record that he intended to use Liberty's records to contact putative class members. June 9, 2026 Hr'g Tr. at 12:20–21. Over Defendants' objections, the district court vacated the schedule it entered based on its own interpretation of this Court's order and adopted nearly verbatim—*again*—Plaintiff's proposal, with no restriction on use of the produced consumer data. Dkt. 185 (permitting "[d]epositions of any newly proposed class representatives, if applicable. In that regard, plaintiff shall disclose the identity of any new proposed class representative within fourteen (14) days of the date of this Order"). Since it copy/pasted Plaintiff's proposal again, the order didn't address Defendants' objection to use of Liberty's data. Dkt. 178 at 4.[4] This motion followed.

**ARGUMENT**

I.   **This District Court Violated This Court's Limited Remand, and This Court May and Should Address that on an Expedited Basis.**

"When this court remands for further proceedings, a district court must, except in rare circumstances, implement both the letter and spirit of the mandate, taking into account our opinion and the circumstances it embraces."

---

[4] Plaintiff's counsel represented on the June 15, 2026 telephone call that he would not contact class members using the data produced by Liberty in discovery until a ruling on this motion. Watstein Decl. ¶¶ 7–8. However, he is presumably still using the records to identify people and sharing the data with his expert for that purpose.

*United States v. Pileggi*, 703 F.3d 675, 679 (4th Cir. 2013) (cleaned up). That is the rule that applies when this Court remands and *relinquishes* jurisdiction. Here, the Court *retained* jurisdiction and supervisory authority over proceedings with a very specific, limited remand. The district court's order violates it.

That's because nothing in this Court's mandate contemplated, for example, using confidential records to find new class representatives to file what is effectively a new case on remand. In fact, circuit courts grant mandamus for district courts that permit such discovery—in cases not on appeal. *See In re Williams-Sonoma, Inc.*, 947 F.3d 535, 540 (9th Cir. 2020) (granting mandamus to vacate district court discovery order compelling production of customer lists the plaintiff intended to use to solicit customers). Although no mandamus is necessary here because the Court retained jurisdiction, the same considerations that would support mandamus, emergency, or expedited relief are met here: "no other adequate means to attain the relief [it] desires" and that its right to issuance is "clear and indisputable." *In re Ralston Purina Co.*, 726 F.2d 1002, 1004 (4th Cir. 1984) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980)).

First, Liberty has no other adequate means of relief, and proceeding first in the district court is impracticable. As with Plaintiff's class-certification and summary-judgment briefing, the district court copy/pasted Plaintiff's proposed scheduling order wholesale. That said, the district court's third copy/paste was

9

even more inexplicable than the first two, because it required the district court to first vacate its own, original interpretation of this Court's remand order, which was simply an expedited briefing schedule directed at a narrower class definition. Dkt. 175. It then replaced that order with Plaintiff's, which calls for expansive, perpetual one-sided fact and expert discovery, and the use of Defendants' consumer data to solicit clients, even over Defendants' objections. Indeed, Plaintiff requested—and the court granted—a 14-day period to "disclose the identity of any new proposed class representative." Dkt. 185; June 9, 2026 Hr'g Tr. at 13:25–14:1. Plaintiff's counsel confirmed that he intends to use that window to contact consumers identified through Liberty's confidential records. June 9, 2026 Hr'g Tr. at 12:20–21.

This doesn't comply with the "letter" and "spirit" of the remand. This Court adopted the district court's indicative ruling that renewed Rule 23 proceedings would be "directed to a modified and narrower class definition." Dkt. 173 at 11. But then, presented with Plaintiff's plan to comb through Liberty's consumer data and replace Diana Mey with new people with different claims, the district court adopted it wholesale. That is a gross misuse of this Court's limited remand.

Second, the damage would be irreparable and not correctable later. Once Liberty's customers are contacted and solicited to join litigation against their

10

home warranty provider, the damage to Liberty's reputation cannot be undone. Nor can the violation of those consumers' privacy—who gave their contact info to Liberty, not to opposing counsel—be undone. Consider what this case is about: Liberty alleging calling people on the national do-not-call registry without consent for solicitation purposes. Of course, that only happened to Diana Mey because someone mistyped their similar phone number when asking for a call from Liberty. So how is Plaintiff's counsel going to try to find someone else who doesn't suffer from the same unique circumstances that render Diana Mey atypical and inadequate to represent others? *They are going to contact people on the national do-not-call registry for solicitation purposes.* Even though they, unlike Liberty, were not given the contact information by the consumers and thus have no TCPA exemption. The irony of that proposition cannot be overstated.

Most importantly, if new plaintiffs recruited through improper solicitation were to file claims, the case would be permanently altered. That error could not be undone later because it would already be complete. As the Ninth Circuit recognized in *Williams-Sonoma*, "before a direct appeal could be taken and heard, the disclosure and damage to [Liberty's] (and its customers') interests would be complete—its claim would be mooted." 947 F.3d at 540.

Third, the conduct is clearly erroneous as a matter of law. The Supreme Court, Ninth Circuit, Tenth Circuit, and multiple district courts—including at

11

least one court within this Circuit—have all held that using discovery to find or recruit a named plaintiff is outside the permissible scope of Rule 26(b)(1), violates protective orders, and constitutes an abuse of the discovery process. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n.17 (1978) (superseded by statute on other grounds) ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied."); *Williams-Sonoma*, 947 F.3d at 540; *Kaufman v. Am. Fam. Mut. Ins. Co.*, 601 F.3d 1088, 1092–93 (10th Cir. 2010) (affirming imposition of sanctions on attorney who used class records to solicit new clients).

Liberty has no adequate recourse in the district court, which has now thrice adopted Plaintiff's erroneous positions verbatim. This time it went further, vacating its own scheduling order to enter Plaintiff's, steamrolling Defendants' objection to solicitation without analysis, and building in a specific provision regarding identifying the new class reps obtained from unethical solicitation. The harm—Liberty's customers contacted by opposing counsel using data they gave to Liberty, and the certification record permanently corrupted by improperly recruited representatives—is irreparable and will be complete before any other appellate relief could issue. Where the conduct clearly violates this Court's own remand mandate, this Court should act now.

## II.   The Operative Protective Order Prohibits the Proposed Solicitation, and Plaintiff's Bait-and-Switch Underscores the Need for Enforcement.

The extent to which the district court has violated this Court's limited remand is underscored by the district court's endorsement of a violation of the parties' Protective Order, something this Court's limited remand obviously does not countenance. (Dkt. 13). The Protective Order is unambiguous: Paragraph I.D restricts any confidential material to use "only for the purpose of this action." "This action" is Diana Mey's case against Defendants and it was produced for that reason, not to support Plaintiff's counsel's efforts to file *new claims* on behalf of *new plaintiffs* that *don't share* Diana Mey's characteristics and thus avoid her typicality and adequacy problems. Investigating Diana Mey's claims is one thing, but that is the exact opposite of what Plaintiff's counsel admitted they intend to do.

Courts enforcing identically worded orders have consistently prohibited this use. In *Kaufman v. American Family Mutual Insurance Co.*—the leading circuit-level authority on enforcement of protective orders against solicitation—the court affirmed sanctions against plaintiff's counsel for using confidential claims files to telephone and recruit class members. 601 F.3d 1088, 1094 (10th Cir. 2010). The court articulated the governing principle that counsel remained free to, "on its own initiative and as a result of its own investigation, locate, interview, and encourage others to join the suit." *Id.* The protective order did,

13

however, "prohibit [counsel] from employing the court's discovery authority to gain access to its adversary's confidential files and then using those files for its own pecuniary gain." *Id.* That's what's at stake here, and the Court should adopt the Tenth Circuit's reasoning.

In *Nichols v. Noom Inc.*, Noom produced customer contact information without redaction, relying on the protective order and an understanding that the unredacted information would not be used to solicit class members. 2021 WL 4150184, at *1 (S.D.N.Y. Sept. 13, 2021). When plaintiff later sought to use the information to contact putative class members, the court granted a protective order, finding that "it would be unfair to Noom to allow use of its customers' information in the way contemplated when Plaintiffs would have been denied discovery of such information for this purpose had the motion been teed up prior to Noom's production." *Id.* at *2. The court rejected the "fact witness" rationale as "too cute by half," noting the thin line between soliciting fact witnesses and soliciting class representatives. *Id.*; *see also Beaton v. Verizon N.Y.*, 2020 WL 6449235, at *3 (E.D.N.Y. Nov. 3, 2020) ("[C]ourts have 'refused to allow discovery of class members' identities at the pre-certification stage out of concern that plaintiffs' attorneys may be seeking such information to identify new clients, rather than to establish the appropriateness of certification'") (quotation omitted); *Balschmiter v. TD Auto Fin. LLC*, 2015 WL 2451853, at *4 (E.D. Wis.

14

2015) (enforcing a protective order against use of produced telephone data to contact class members because "[i]t is plainly disingenuous to argue that information derived from materials disclosed during discovery somehow escapes the grasp of the protective order" and condemning use of compelled materials to "dredg[e] up potential clients").

The facts here are stronger than in *Noom*. Liberty did not produce consumer contact data because of any assurance by Plaintiff's counsel; it did so because the district court compelled production, even though those records were irrelevant to Diana Mey's typo-based claim. Plaintiff's counsel—who gave no notice of this intended use of Liberty's records during discovery, certification, or the appellate proceedings—now proposes to use that compelled production as a solicitation database. This is precisely the bait-and-switch conduct those courts condemned and that resulted in sanctions against the attorney in *Kaufman*, 601 F.3d at 1092–93. Yet the district court endorsed it here.

And in *In re Pella Corp. Architect & Designer Series Windows Mktg. Litig.*, 2014 WL 12622421 (D.S.C. Nov. 20, 2014) the district court granted a protective order prohibiting use of defendant's confidential customer information "for the purposes of soliciting new clients or recruiting additional or superior class representatives in any existing or anticipated legal action," characterizing such conduct as "an abuse of the discovery process." *Id.* at *2. The court drew the

15

dispositive line: counsel may use confidential information to prepare for and conduct the plaintiff's litigation but may not "employ[] the court's discovery authority to gain access to its adversary's confidential files and then us[e] those files for its own pecuniary gain." *Id.* at *2 (quoting *Kaufman*, 601 F.3d at 1094).

Defendants have already pressed this argument and authority to the district court, Dkt. 178 at 4–5 (collecting cases), but the argument fell on deaf ears. The district court adopted Plaintiff's proposed order almost verbatim, imposed no restriction on the use of Liberty's confidential data, and offered no analysis of the authority Defendants cited. But that's consistent with the pattern in this case. This Court's intervention is the only adequate means of relief. *See, e.g.*, *Williams-Sonoma*, 947 F.3d at 540.

## III.   The One-Way Intervention Rule and the Existing Summary Judgment Order Compound the Irreparable Harm from the Expansive Discovery and Proposed Solicitation of Defendants' Customers.

The harm from the district court's violation of this Court's remand order is not limited to privacy and protective-order violations. It worsens the violation of the one-way intervention rule, which bars merits rulings before class members receive notice and a chance to opt out—already raised by Defendants in their opening brief (ECF No. 16 at 47–51). As Judge Bailey has previously recognized: "Rule 23 'clearly contemplates that the notice requirement will be met before the parties are aware of the district court's judgment on the merits.'"

16

*Alig v. Quicken Loans Inc.*, 2016 WL 10490288, at *7 (N.D. W. Va. Aug. 25, 2016)

(Bailey, J.) (quoting *Schwarzschild v. Tse*, 69 F.3d 293, 296 (9th Cir. 1995)

("[N]otice must be sent before a judgment has been granted.")).

The posture faced by Defendants now is worse than any normal one-way intervention issue. The certification order is vacated, but the district court's premature summary judgment order still stands—a ruling that already decided, as a matter of law, that text messages are calls under the TCPA and that Liberty can't invoke the safe harbor provisions of either the TCPA or the WVCCPA. Dkt. 153 at 4–5, 16–18. Any new class representative recruited through Plaintiff's proposed solicitation will walk into a case where those defenses are already gone. This exemplifies the issues the one-way intervention rule is designed to prevent in their starkest form: potential future solicited plaintiffs learn the court's exact merits rulings, pocket the favorable ones, and join with no reciprocal risk. This is an additional, independent basis for expedited relief.

**IV.    Plaintiff's Proposed Conduct Independently Violates Rule 26(b)(1), the West Virginia Rules of Professional Conduct, and the Doctrine of Judicial Estoppel.**

In addition to being outside the scope of this Court's limited remand, using discovery to obtain class members' names and addresses for a purpose other than those bearing on the issues in the case falls outside Rule 26 (b)(1) and violates the West Virginia Rule of Professional Conduct 7.3 and 8.4.

17

First, using class discovery to recruit a new named plaintiff is outside the scope of Rule 26(b)(1). Discovery reaches matters relevant to claims or defenses—not finding new clients. The Ninth Circuit granted mandamus to stop this kind of fishing expedition in *Williams-Sonoma*, 947 F.3d at 538–39 (discovery to find a named plaintiff "is not within the scope of" Rule 26(b)(1)), and the Tenth Circuit said the same decades earlier: "[n]o court has held . . . that counsel has a *right* to use the power of the courts . . . to find a client who could be intervened as a plaintiff" in a proposed class action. *Reed v. Bowen*, 849 F.2d 1307, 1313–14 (10th Cir. 1988). District courts agree. *See, e.g.*, *Bonilla v. Ancestry.com Operations Inc.*, 628 F. Supp. 3d 812, 820 (N.D. Ill. 2022) ("it is not the defendant's job to help a plaintiff or his attorneys recruit new clients"); *Douglas v. Talk Am., Inc.*, 266 F.R.D. 464, 467–68 (C.D. Cal. 2010) (similar).

The situation here is more egregious because counsel already possesses the data—obtained through compelled production—and proposes to repurpose it unilaterally as a client-development tool while on a limited remand that permits nothing of the sort, and even though the Protective Order prohibits it.

Second, West Virginia Rule of Professional Conduct 7.3(a) prohibits direct solicitation of prospective clients by in-person, live telephone, or real-time electronic contact when a significant motive is pecuniary gain, subject to narrow exceptions inapplicable here. The consumers in Liberty's call records are

18

persons Plaintiff's counsel claims are putative class members. Contacting them to recruit class representatives—with counsel's fee contingent on the size and success of the class—is solicitation motivated by pecuniary gain under Rule 7.3, and a violation of Rule 7.3 is professional misconduct under Rule 8.4.

The Supreme Court has already drawn the line Plaintiff would cross: attorney solicitation of prospective clients is a commercial activity distinct from an attorney's conduct as an officer of the court, and the litigation exception does not encompass solicitation even when it is to aggregate a class action. *Maracich v. Spears*, 570 U.S. 48, 60–64, 68 (2013). Using compelled call-record data to recruit class representatives is commercial activity dressed as litigation activity and violates the Rules of Professional Conduct. *See, e.g.*, *Balschmiter*, 2015 WL 2451853, at *4-5 (parties may not "compel confidential materials under the guise of furthering litigation, while actually doing nothing more than dredging up potential clients . . . to pressure the defendant into settlement or otherwise detriment their business").

Third, Plaintiff is judicially estopped from using the data for solicitation because she obtained it by representing to the district court that she needed it for two specific purposes: (1) cross-referencing telephone numbers against the National Do Not Call Registry, and (2) effectuating class notice—in *Diana Mey's* case against Defendants. *See New Hampshire v. Maine*, 532 U.S. at 749 (judicial

estoppel bars a party from taking a position that contradicts a position successfully taken in earlier proceedings). In her Reply in Support of Motion for Sanctions and Enforcement of Discovery Order, Plaintiff stated that explicitly. Dkt. 81 at 2. Plaintiff said nothing—in her motion to compel, in her sanctions motion, in her reply, or anywhere in the record—about using the consumer data to identify or solicit new class representatives. The court then compelled production for these reasons: "both [to] identify[] class members and establish[] key elements of the class claims." Dkt. 57 at 8.

Plaintiff's on-the-record representation is a judicial admission that estops her from now asserting a different and undisclosed use for the same data. *See New Hampshire v. Maine*, 532 U.S. at 749. Having obtained the data within those limits, Plaintiff cannot now pivot to a third, undisclosed purpose—solicitation—that neither her own representations nor the court's authorization covers.

This is the same bait-and-switch the Tenth Circuit condemned in *Kaufman*, where counsel represented they needed access to claims files "solely to establish numerosity" and then used the files to solicit clients. 601 F.3d at 1093–94; *see also Nichols*, 2021 WL 4150184, at *2 (finding it "unfair" to allow use that "would have been denied" had the motion been teed up with that purpose disclosed). This is not a belated discovery of a legitimate need. It is an opportunistic pivot, post-vacatur, to a use that was never authorized.

20

## **CONCLUSION**

For the foregoing reasons, Liberty respectfully requests that this Court:

1.    Issue an immediate order preserving the status quo and prohibiting Plaintiff's counsel from contacting any consumer using information produced pursuant to the Agreed Protective Order (Dkt. 13), pending resolution of this motion;

2.    Require Plaintiff's counsel to certify in writing within 48 hours of this Court's order whether any such contacts have already been made using produced data, and if so, to identify the nature, date, and recipients of those contacts;

3.    After briefing or on such expedited schedule as this Court determines, either (a) order the district court to comply with its limited remand order, including by specifying that remand does not include soliciting new plaintiffs to file new claims, or (b) reinstate the 23(f) appeal, which is already partially briefed.

4.    Grant such other and further relief as this Court deems just and proper.

21

Submitted June 18, 2026 by:

/s/Ryan D. Watstein
Ryan D. Watstein
ryan@wtlaw.com
Trishanda L. Treadwell
ttreadwell@wtlaw.com
WATSTEIN TEREPKA LLP
75 14th St NE, Suite 2600
Atlanta, Georgia 30309
(404) 905-6400

William J. O'Brien, Esquire (WVSB# 10549)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, West Virginia 26330
304-933-8000 / 304-933-8183 (Facsimile)
william.obrien@steptoe-johnson.com

Shaina L. Richardson, Esquire (WVSB #12685)
STEPTOE & JOHNSON PLLC
1000 Swiss Pine Way, Suite 200
PO Box 1616
Morgantown, West Virginia 26507
304-598-8000 / 304-598-8116 (Facsimile)
shaina.richardson@steptoe-johnson.com
*Counsel for Defendants-Appellants*

22

## LOCAL RULE 27(a) STATEMENT

Counsel for Plaintiff has been informed of the intended filing of this motion and has indicated that Plaintiff intends to file a response in opposition. Plaintiff does not oppose the requested expedited briefing schedule:

Motion filed:       June 18, 2026

Response due:       June 25, 2026

Reply due:           July 2, 2026

/s/ *Ryan D. Watstein*
Ryan D. Watstein
Counsel for Defendants-Appellants

23

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 4,959 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/*Ryan D. Watstein*
Ryan D. Watstein
Counsel for Defendants-Appellants

24

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, a true and correct copy of the foregoing

**DEFENDANTS-APPELLANTS' MOTION FOR EXPEDITED RELIEF
TO ENFORCE THE REMAND ORDER AND TO BAR THE USE OF
CONFIDENTIAL DISCOVERY MATERIALS TO SOLICIT NEW CLASS
REPRESENTATIVES** was served upon all counsel of record via the Court's

CM/ECF system, which will transmit electronic notification to all parties

registered to receive electronic service in this matter.


/s/ Ryan D. Watstein
Ryan D. Watstein
Counsel for Defendants-Appellants

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

Diana Mey,
          Plaintiff,
                    VS.                    CIVIL ACTION NO.
                                           5:23-cv-281
Liberty Home Guard, LLC,
et al.,
          Defendants.
                              - - -
     Proceedings had in the motion hearing of the above-styled
action on June 9, 2026, before Honorable John Preston Bailey,
District Judge, at Wheeling, West Virginia.

                              - - -

     APPEARANCES:

     On behalf of the Plaintiff:

     Ryan McCune Donovan
     Hissam, Forman, Donovan, Ritchie, PLLC
     PO Box 3983
     Charleston, WV  25339
     681.265.3802

     On behalf of the Defendants:

     Trishanda L. Treadwell (via Zoom videoconference)
     Watstein Terepka, LLP
     75 14th Street NE, Suite 2600
     Atlanta, GA  30309
     404.905.6400

     William J. O'Brien (via Zoom videoconference)
     Steptoe & Johnson, PLLC
     400 White Oaks Boulevard
     Bridgeport, WV  26330
     304.933.8181


     Proceedings recorded utilizing realtime translation.
     Transcript produced by computer-aided transcription.

Thursday Morning Session,

June 9, 2026, 10:00 a.m.

- - -

THE COURT:  Ask the clerk to call the case.

THE CLERK:  This is the case of Mey versus Liberty Home Guard, LLC, Civil Action Number 5:23-CV-281.

Will the parties please note their appearance for the record.

MR. DONOVAN:  Ryan Donovan on behalf of the plaintiff, Diana Mey.

MS. TREADWELL:  Trish Treadwell on behalf of the defendants Ben Joseph and Liberty Home Guard.  And Jamie O'Brien is also here on behalf of the defendants as local counsel.

THE COURT:  All right.  Mr. Donovan, why do you need more discovery?

MR. DONOVAN:  Because we didn't have it in the first place, Your Honor.  Just to sort of reset where we are in this case, obviously we're here at this particular moment in sort of a weird procedural posture, having been remanded to implement the Court's indicative ruling.  But this case was filed many years ago, was pursued as an individual action for about a year, until such time as we conducted an initial 30(b) deposition of the defendant and discovered there was a basis to amend the complaint to allege class allegations.

The very first thing we did years ago was seek production of the call records.  Call records, text logs, are the critical piece of information in a TCPA class action.  We sought those records in -- I want to say August of 2024, received nothing but objections, filed a motion to compel in December of that year.  The Court granted our motion to compel in January of 2025 and we received nothing, despite the Court's order compelling that discovery.

We continued to press ahead as best we could during the interim.  We filed some additional motions to compel which ultimately resulted not only in the Court's order compelling that discovery but in an order by the magistrate judge imposing sanctions for failure to produce additional class documents.  We received essentially nothing.  We received some redacted records for a limited window of time which were redacted such that we could not perform any kind of expert analysis, and that, I think, was the issue that ultimately led to the sanctions order.

So as the case progressed, we waited as long as we could to obtain those documents, and when the time came in the Court's scheduling order to file motions, we filed a motion for class certification based on the records that we did have and the information that we did have, with the understanding that hopefully at some point, after the class was certified, perhaps we would actually get the records that the Court had ordered be

produced nearly a year before.

Within days of filing our motion for class certification based on the incomplete records, Liberty obtained new counsel who entered in the case and immediately requested several long extensions of time to accommodate religious holidays.  Those extensions were granted.  This is after our motion was filed.  And only while the motion was pending, while the defendant used those extensions to produce for the first time the documents that we had requested in discovery, and it's safe to say those documents changed the dynamic of the case significantly.  Records of 7 million calls, I think, roughly, which obviously we were unable to perform any kind of analysis on before our briefing was due.

To answer your question, why we need the discovery, I think the Court answered that question -- I think you answered that question yourself in your order -- in your order granting the motion for class certification when you said it would be unfair and highly prejudicial to require the plaintiff to respond in class certification to millions of records and new affidavits, new interrogatory responses, new documents purporting to support previously unasserted affirmative defenses in the context of that class certification motion. That was back in December that the Court said that.

And in saying that, the Court effectively excluded those documents from consideration on class certification.  I

don't want to say excluded, because I don't think the Court made a ruling about whether they were excluded for subsequent stages, but the Court said it would be unfair and prejudicial to consider those on class certification, with which we agreed.

The defendant, of course, did not agree with that, and in seeking interlocutory review from the Fourth Circuit relied very heavily on those documents and relied very heavily on the defenses and asserted individualized issues and other obstacles to class certification that were raised from those documents, and that evidence that was produced only after our motion was filed.

And so the reason we need discovery now is to cure the prejudice that the Court identified itself. I mean, going forward we would maintain the position that those documents shouldn't be considered at class certification, but to the extent that the defendant is going to persist in relying on those documents and making arguments based on that evidence in what will almost certainly be another attempt at an interlocutory appeal if a class is certified, or if a class -- if they rely on those documents here and a class is not certified, in either event, those documents and evidence are going to be considered by the appellate court, and so we need to do the limited discovery into those documents and the issues that they raise that is necessary to cure the prejudice that the Court itself identified in the order granting class

certification.

THE COURT:  Didn't answer my question.  What do you need to do?

MR. DONOVAN:  What do I need to do?  Okay.  Sorry.  I misunderstood the question.

The "what" answer is I need to do a limited 30(b)(6) deposition to cover the new information that was raised at that late stage.  For example, I need to ask a 30(b)(6) representative to explain to me the codes and the processes that went into creating those records so that my expert can understand them.  I need to understand the process by which information went from an outgoing call, which we claim violates the Telephone Consumer Protection Act, to being put into those records.

It's been asserted, for example, that while the defendant cannot provide a document, you know, for any class member evidencing that that class member consented to the call, it's been asserted that because of the way their processes work, that class member's information could only be in the records if they had consented.  That's a big leap of faith on my part, and I think it would be a big leap of faith for any fact finder, and so I need to be able to test that assertion. I need to be able to ask what that process is.  Because what can't happen in terms of prejudice is that we move forward with another motion for class certification and the defendant

responds again and says, here's how that process worked, here's why the Court should believe that anyone who's in these records provided consent, and I've never had a chance to test that.

I mention this briefly, but on just a very mechanical level I need to have an explanation of what every column in these records means.  I can make some guesses, and my expert can make some guesses as to what the columns and codes mean based on experience in other cases, but we've never had a chance to ask that or to be told what that is.

I need to have an understanding of the -- what we've been referring to as consent channels in this case.  So at the time that we conducted our first 30(b)(6) and in the discovery responses prior to our motion for class certification, we were -- there was only one lead source.  When I say lead source, I mean a place from which the defendant obtained calling information.  Only one was identified.  That makes things simple, if there's only one, because it reduces the number of individualized issues.

However, in the documents that were provided after the motion for certification was filed, we were told there were several different consent sources and that, in fact, the existence of these multiple consent sources and differences in the ways that that information was processed, differences in the ways that consent was obtained from different sources, led to individualized issues, which is obviously what we're trying

to avoid having.  I need to be able to do discovery into exactly who those consent sources were, exactly how their processes worked, how many class members -- each consent source created, how the process for each of those worked.

The defendant also relied on those different lead channels and alleged consent sources to argue that there are arbitration provisions in the different agreements that would cause problems for class certification.  That was news to us. It was something that had never been disclosed previously in discovery.  It was never something that had been -- the defendant will say, of course, oh, there was a document buried somewhere in the 10,000 pages we provided to you, but we also asked them in our interrogatories, tell us what your affirmative defenses are and point to the evidence that you'll use to support that, and we never got anything.

They also were required to provide information about their affirmative defenses and the evidence supporting it in their mandatory Rule 26 disclosures, and that never happened. So that lead channel world and that -- to boil it all down, I could go on forever, as much detail as you want, and I don't want to be -- you know, one of the disputes we've had with the defendant in trying to meet and confer is the level of granularity with which they want to know exactly what we want to do discovery on.  I could go on, and I will.

But to boil it down, three basic things:

Understanding the records that were produced late, nine months after the Court compelled them to do so; understanding the consent -- or the channels, the lead channels that they disclosed; and understanding the arbitration issues that were raised for the first time post close of discovery and after our motion was filed.  Those are sort of the three big categories.

THE COURT:  What makes you think you can do that in 60 days?

MR. DONOVAN:  I've done it before.  I mean, it will obviously require cooperation of the defendants, and that's why, for example, we suggested in the schedule, sort of in A, that the reference to the magistrate be withdrawn so that we could save time on any discovery disputes and, B, that there would be sort of an extension of time that would go day for day for the amount of time that any discovery request -- or any discovery dispute was pending.  Idea behind that was to create an incentive for both of us to try to meet and confer and work through things.

That's just a suggestion.  That's obviously not something we're going to tell the Court how to handle.  That was just our idea.  But in terms of doing that, we have, I believe, all the documents now ready to be analyzed as soon as the Court tells us that's something that's worth spending class resources on.  We have -- we know where to find the defendant. I have a good idea who their 30(b)(6) reps will be.  I can get

a notice out within days of an order and hopefully get it scheduled soon thereafter.

So we're talking about one deposition, a limited set of written discovery that would give us the opportunity to follow up on documents that we haven't had a chance to test, and an amended expert report. So I understand the Court's skepticism that that can happen in 60 days. We believe that it can so long as everybody cooperates.

And, look, the 60 days, just to be clear, is our suggestion for doing something within a time frame that I would call expedited relative to normal discovery. That wasn't a deadline that the Fourth Circuit imposed or that anyone else imposed. We think, obviously, we need to take time to get it right. This is a significant case. A lot of issues were raised on the 23(f) stage that we want to make sure don't arise. And we think we would have had at least -- let me put it this way: Had they produced the documents within 30 days of the court order in January 2025, we would have had seven or eight months to conduct this discovery. So we're doing everything we can to expedite the schedule by proposing 60 days, but think that at a minimum is fair for the opportunity we should have had initially.

THE COURT: Why are you proposing additional class representatives?

MR. DONOVAN: So the conceptual framework for this

whole thing, the entire indicative ruling and remand, is this: We believe the Court's certification order was not in error and should have been affirmed. Nonetheless, because of the way things happened, the class was not even the class we would have wanted it to be. I'm not going to come to this Court with a seven million-member class. Had we not gone through the 23(f) process, the next thing we would have done, which we've done in several cases in front of Your Honor, would be to winnow down that class to something that we can handle more easily.

But the general idea in the indicative ruling and the remand is let's suppose the Court -- the Fourth Circuit reversed this certification order. What would we be entitled to do on remand and let's skip that step. Let's skip the nine months that it would take to have a ruling and go back.

And so one of the things we would have been able to do had the case gone to the Fourth Circuit, then reversed and remanded, is we would have been able to seek a new class representative to cure any issues that were raised or found by the Fourth Circuit related to the typicality and adequacy of our class representative. We've argued this issue over and over again in the context of discovery motions and class certification.

We believe Ms. Mey is typical, but if we can head off at the pass any concerns about her adequacy or typicality by adding another class representative who would solve those

potential concerns and take that issue off the table, we think that's something we should do for the benefit of the class and the Court and everyone involved, rather than -- let's say we don't have a class representative. We go up to the Fourth Circuit. They say Diana Mey is not typical. The case wouldn't be over. It would be remanded. And under Fourth Circuit case law, we would have an opportunity to add a new class representative who cured any of those concerns. And so we're thinking about that possibility now just to be more efficient and take that issue off the table.

THE COURT: Thinking about that possibility isn't -- even you're talking about a tight deadline. How soon are you going to make that decision?

MR. DONOVAN: Well, I wanted to wait for this hearing today, simply because the defendants have raised issues about the propriety of doing that. I don't believe there's any problem with us doing that, but I didn't want to get out over my skis in doing that and then have someone come in here and say, you're soliciting clients, blah, blah, blah.

We now have unredacted records. We are entitled to interview witnesses who appear in those records. Often those individuals ask, when we interview them, hey, can I get involved in this case, what can I do. There are also lots of other ways we can approach individuals in the records consistent with the Rules of Professional Responsibility, but

procedurally the way it would work is we would disclose to the defendant who those potential class reps are and give them an opportunity to depose them if they want, and then the way that it's typically done is that a motion to amend the complaint is filed, along with the motion for class certification.

And to the extent that the only amendment -- obviously, if we're amending the complaint to change everything, I would understand the Court having a problem with that, but to the extent that the only amendment is to add a new class representative who's been disclosed, the cases which we cited say that analysis of the amendment to add a class rep collapses into the Rule 23 analysis and can be done at the same time.  So it wouldn't require any additional time in the schedule if that's the route that we went.

THE COURT:  How soon does that happen?

MR. DONOVAN:  The class certification?

THE COURT:  No.  The -- you letting the defendants know who your new proposed class reps are.

MR. DONOVAN:  As soon as I have one.

THE COURT:  That doesn't answer my question.

MR. DONOVAN:  I understand it doesn't, Your Honor. It's the best answer I can provide.  I would think that in fairness to the defendants, it would not be reasonable to disclose new class representatives to them any closer to the deadline than 45 days.  If the Court entered an order tomorrow,

it's something I would anticipate doing in the next two weeks.

THE COURT:  All right.  Let me hear from the defendants.

MS. TREADWELL:  Thank you, Your Honor.  I want to say, first of all, I think that plaintiff would be benefited by reading Mr. Joseph's deposition transcript, because everything that he just identified for you was already raised and Mr. Joseph already answered questions about it in his deposition that was taken in January of 2024.  He reviewed records.  He went through every single column of those call records and asked Mr. Joseph about what every single column of those records meant.  He just told you, Your Honor, that he needed to understand what the columns in our call records meant.  It's in Mr. Joseph's deposition from 2024.

He also said he needed to understand the lead channels.  He asked Mr. Joseph about those lead channels in that deposition in 2024.  Mr. Joseph at that time testified under oath that they used Consumer Affairs and they also used another vendor that he could not think of the name of.  There was no follow-up done.  Even once this case became a class action, after they decided to amend the complaint and make it a class action, they did no follow-up on that.  They did not -- they could have done a follow-up deposition at that time.  They didn't.  They did no follow-up discovery on it, on whether or not what these other lead channels might be.

They could have taken the deposition of Consumer Affairs, who was identified for them at that time.  They did not.  They did not request a document subpoena from Consumer Affairs, which they had the opportunity to do.  All of this not only predated making this a putative class action; it certainly predated the motion for class certification.

So for them to say that this is all because we produced the unredacted call and text records after the close of discovery, that has nothing to do with anything.  The only thing those records told them are the names of the people who were called.  That's the only difference in those records.  They knew exactly how many potential class members there were, because in their class certification motion they said there were six million calls.  They identified the very specific number of the calls that are in those records.  So they knew that already.

So they're trying to say that, oh, we've made -- a bunch of documents were dumped on them after they had already filed the motion for class certification, but it's just simply not accurate.  The class records -- those call records were certainly produced in unredacted form, and we also provided declarations.  Again, that was the declaration from Consumer Affairs.  We provided a declaration from our own defendant and from some of the defendants' employees, and we provided declarations from consumers, which is pretty standard issue in

class certification, in order to establish that the claims will have -- that there will be some issues with predominance among the class, and that's what our consumer declarations were tailored to do.

The only additional was that we identified Modernize as one of the other vendors that Liberty Home Guard used to collect leads. That was the one that Mr. Joseph could not think of its name during the deposition, but there was no follow-up taken about that. And that's the only one.

And I would -- I think you can -- again, if he goes back and reads the declarations and the supportive information that was attached to those declarations, you can tell from there the time period that those two vendors did work with Liberty Home Guard, and you can tell that Modernize was a much far less used lead channel, but that's the only thing that would have been considered new that was produced in connection with defendant's opposition to class certification.

I'm just a little bit astonished, because we're talking about things that have been in plaintiff's possession for months and months, information that it has known since before this became a putative class action. But they keep trying to say that this is somehow related to belated discovery. And it's not. It's related to discovery that they just failed to take during the discovery period.

What he's asking you about, the lead sources and

the -- and needing another 30(b)(6) deposition about how the process of calls were generated, again, I direct him to the deposition that they took. I wasn't involved in this case when Mr. Joseph was deposed, but counsel for plaintiff was involved, and counsel for plaintiff asked him specifically about the process of how they take calls, how the consent process works. All of that has already happened.

So the fact that they're asking for additional discovery now tells me not that they actually need additional information. What this is, is stalling, because they got to the Fourth Circuit and realized that their case is not working. They were able to get everything they wanted back when they were moving for class certification. They said, no, Your Honor, we have everything we need.

We asked them to slow down. Defendants asked everything to slow down. They said no. We have everything we need to establish this class. And they continue to say that. They continue to say class rep is perfect, but also let me go get a new class rep. We have everything we need, but also I need a whole lot of discovery.

And as Your Honor asked with the 60 days, there is no way this would happen in 60 days. They're talking about now identifying not only would there need to be expert depositions, additional expert testimony, expert disclosures, rebuttal experts, but now we're also deposing -- and it sounds like more

than one possible new class representative, that they are going to mine defendants' discovery in order to identify new clients, which is wholly inappropriate.

So I see absolutely no basis for additional discovery. I don't think that's what the Fourth Circuit was intending. What they asked for was to narrow the class definition. That's what they wanted from the beginning. They said, oh, no, suddenly we have this giant, large class and we need to narrow the class definition. And that's what Your Honor granted them when you vacated your order and granted this -- and allowed for them to redo this class certification briefing.

And I think your original order reflected that, in the sense that you did the expedited briefing, which we're now ten days past the deadline that they should have filed their opening brief. We're already ten days past the deadline that Your Honor set. And they're still trying to get additional information.

And not only are they saying we want to be able to use the information that was produced last year or provided to them last year; they're now saying we need discovery on that information, which, again, it just makes no sense, because if they read the deposition they've already taken, this has already been done. It's either been done or they certainly had the opportunity to do it and failed to.

And it has nothing to do with any discovery request that defendants responded to or any production of documents, because they had the call record form, even if they didn't have the unredacted call records, all of the call records, because they went through it.  And I know that because I read the deposition.  And I read how they went through column by column with Mr. Joseph explaining exactly what those records do, exactly what those records show.

So I don't know why he's using that as an explanation for you, Your Honor.  I don't know why.  But that's what they're doing.  They did this in the class certification briefing.  They said, oh, a whole lot of documents have been dumped on us, but that was the same issue then.  And we said then, no, those are not new documents.  The only thing new is that the names are now unredacted and we've identified Modernize as the one vendor that he couldn't think of before. Nothing else was new.

They characterize it as new because they didn't do the work during discovery.  They didn't look at our terms of use, even though they were produced to them in discovery with the arbitration provision.  So that's not on us.

And in this explanation earlier they just said, oh, it was buried in 10,000 pages of documents, so now they're saying we provided them so much information that we buried information, or did we not produce anything.  So it's, again,

an example of them trying to have just everything.  Before they wanted class certification, they push, push, pushed.  Your Honor, you let them have everything they needed.  You gave them everything they asked for.  And when they got to the Fourth Circuit and they found that it was being questioned because the Rule 23(f) petition was granted, now suddenly they're saying they need all of this additional -- I don't even know.

But there's nothing more that they need.  We do not need more discovery.  If they need to narrow the class, you don't usually have more information.  If you're saying you want to limit it by time, we have no idea what they're going to do with the class.  We have no idea what their proposal is, because they haven't given anything.

Today -- what they've explained today, this is the most information we've ever heard about the potential for discovery, so had we had an order about what kind of discovery they wanted, maybe we could have come to an agreement, but they've never really been able to identify what this discovery is.  And the reason is they know we could say, you guys already have that information.  You had that information here.  And we could point to it and say, here it is, here it is, here it is.

In addition, Your Honor, what we offered to them, we said, I don't understand why you need discovery.  If there's a question you have about our documents, just ask us.  We can provide a stipulation.  We can provide a declaration.  There's

no need for discovery.  But instead what they're doing is reopening this so they can go on a fishing expedition, and that's why they had the automated -- the automatic extension's built in, so that this can just go on, because they know that this is draining and punishing on our clients and they're hoping that we just give up.

THE COURT:  Thank you.

Mr. Donovan.

MR. DONOVAN:  I certainly don't want to stall this.  It's been draining and punishing on this side as well.

I have no interest in stalling this, and I can't figure out how that could possibly be perceived to be to the plaintiff's benefit.

You know, opposing counsel is very skilled.  They do a lot of TCPA class actions.  They understand the name of the game for defeating certification is to create individualized issues by throwing evidence -- throwing everything out there.  That's good.  That's what they should try to do.  That's what the process is designed to test.

The problem is, we didn't have a chance to test it.  I mean, if a defendant could be allowed to defy court orders about producing discovery, defy sanctions orders, and then wait until the plaintiff files a motion for class certification, then throw all the individualized issues at the wall and say, hey, you don't -- look how bad all this stuff is, without any

opportunity for the plaintiff to say, well, maybe it's not so bad, maybe we can narrow this class.  If you say that this lead channel causes an individualized issue, let's get rid of that.  That's the process of these class cases.  That's what we do in class discovery.  We identify the possible issues.  We start with a huge class and we winnow it down to something that everyone can manage that doesn't have individualized issues.  If you're allowed to just throw all that stuff at the wall after the motion for class certification has been filed, no class will ever be certified.  It's a great road map.

To address some of these things, there's a lot of reargument of whether these documents were produced timely.  The Court already decided that in the class certification order, and the Court decided it correctly.  They say, oh, well, Benjamin Joseph said in his deposition that there might be other sources.  Well, that doesn't create an obligation on our part to go out and subpoena every potential lead source and figure out who they are.

It doesn't even require us to do more discovery, because at that time we had already submitted discovery asking them to identify these people.  There are two parts to discovery.  There's what we go ask for, and there's what the defendant is required to disclose and supplement, which they never did.

The argument is we could have taken more 30(b)s, we

could have done other things.  The reality is, until we had those call records, until we had all the information in them -- she says it's just the names.  It was not just the names.  There was other information missing.  You can look at the magistrate judge's sanctions order.  There were columns that were redacted entirely missing from the documents.  There were -- one of the things they got sanctioned for was that they didn't produce native data.  They produced records to us that were manipulated and re-created from the call records that they already had that they were ordered to produce.  So it wasn't like we're just sitting on these records.

And we couldn't do this -- it would have been crazy for us to do all this other discovery without those records, because the records are what tie everything together, so we could have done a 30(b)(6), but we would have been limited in what we could have asked, and we would have had to do another 30(b)(6) when we actually got the call records that tied everything together.

So to hear it said that we just didn't do the work is tough to answer, because we were expecting -- we were doing the work.  We were expecting them to do not just what their obligations are under the rules, but what they had been ordered to do by the Court.  So I don't think it's fair to say we didn't do the work when we were waiting for them to comply with the court order.

24

The number -- the changes, obviously, as I would expect that they described in the records, are minimized.  It wasn't just disclosure of another lead source, although that in and of itself would justify the discovery we're asking for.  There were new -- for the first time we were told that these terms and conditions -- we had received previously in discovery one set -- one page of terms and conditions.  We're now told for the first time -- maybe not one page; one document.  We're now told for the first time after certification, well, these terms and conditions changed over time, and they changed based on who the lead source was.

And both of those things interacted with one another to multiply the individualized issues, because we've got multiple lead sources and multiple updated sets of conditions, and so the idea that there's just this one little change is really minimizing the impact of that information on the class certification issue, especially in light of the arguments they raise about how that new information changes the analysis.

I mean, all we're asking for -- I wish we weren't in this weird situation.  This is new for me, asking to have my own class decertified, but all we're asking for here is a process that comes as close as possible to the process we were entitled to under the rules had the defendants simply complied with their disclosure obligations, their obligations to respond timely and supplement our discovery, and their obligations to

comply with this Court's orders regarding the production of that information.

To answer briefly this idea that -- I want to take this off the table. I thought we had a creative idea on these extensions to incentivize people to not engage in frivolous discovery disputes. We all -- seems like both we and the defendant want to get this done as fast as possible. Thought that was a good idea for doing that. It certainly wasn't a strategy for delay. That's the opposite of what we want. So I'm happy to take that issue off the table and take that out of our proposed order. We can deal with that in the ordinary course, although I think it will only result in things being drug out longer.

MS. TREADWELL: Your Honor, if I may.

THE COURT: You may.

MS. TREADWELL: Thank you.

He keeps bringing up the sanction order, and I just want to be clear, the only thing that defendants received a sanction was regarding the spoliation because a third party did not -- we did not alert the third party to retain some records. It had nothing to do with the redactions. It had nothing to do with the production of our call and text records.

So I want -- I just wanted to make sure that the record is clear that that sanction was solely related to the spoliation issue because a third party did not retain the

26

records as long as we thought they could retain records.  And so by the time we gave them notice to collect the documents, they had already -- some of them had already been deleted, again, by that third party.

I don't think that plaintiff has responded to any of the things that I said about the fact that all of this information had already come out in discovery.  They keep saying that they want what they were entitled to, but they got what they were entitled to.  They had a deposition of Mr. Joseph.  They did not take another deposition of Mr. Joseph.  They did not ask --

THE COURT:  You are repeating yourself.

MS. TREADWELL:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. DONOVAN:  No, Your Honor.  I could respond line by line, but I think it's all in front of the Court.

THE COURT:  Thank you.

MR. DONOVAN:  Thank you, Judge.

(Proceedings concluded at 10:42 a.m.)

CERTIFICATE

I, Cindy L. Knecht, Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 9, 2026, as reported by me in stenotypy.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 17th day of June 2026.

/s/Cindy L. Knecht

_____
Cindy L. Knecht, RMR/CRR
Official reporter, United States
District Court for the Northern
District of West Virginia

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DIANA MEY,

      Plaintiff-Appellee,

                                         Appeal No. 26-1096

v.                                       (5:23-cv-281-JPB)

LIBERTY HOME GUARD, LLC
and BENJAMIN JOSEPH,

      Defendants-Appellants

## DECLARATION OF RYAN WATSTEIN IN SUPPORT OF DEFENDANTS-APPELLANTS' MOTION FOR EXPEDITED RELIEF

1.     My name is Ryan D. Watstein. I am an attorney and co-founder of Watstein Terepka, LLP, an approximately 25-lawyer firm based at 75 14th Street NE, Suite 2600, Atlanta, Georgia 30309. I am over the age of 18, of sound mind, and competent to make this Declaration. I make this Declaration based on my personal knowledge.

2.     I am counsel of record for Defendants-Appellants Liberty Home Guard, LLC and Benjamin Joseph in this action. Based on my active participation and supervision of all material aspects of the defense of this action, I have personal knowledge of the matters set forth herein.

3.     I submit this declaration in support of Defendants-Appellants' Motion for Expedited Relief to Enforce the Remand Order and to Bar the Use

of Confidential Discovery Materials to Solicit New Class Representatives, ECF No. 35.

4.     The data Liberty produced in discovery include spreadsheets detailing call and text logs; consumer contact lists with names, addresses, telephone numbers, email addresses, and other confidential information; sales and customer representatives' notes regarding communications, sales, and claims; and other information related to consumer requests for home warranty services.

5.     Defendants produced redacted versions of most of these spreadsheets in March, August, and September 2025.

6.     Fully unredacted versions of the text and call logs and consumer contact lists were produced on October 6, 2025.

7.     On June 15, 2026, I spoke by telephone with Plaintiff's counsel, Ryan Donovan. During that call, Mr. Donovan confirmed that he intended to use the call data and consumer contact information Liberty produced in discovery to contact potential replacement class representatives, but that he had not yet done so.

8.     Mr. Donovan further stated that he would hold off on making such contacts pending a ruling on Defendants' Motion.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

Executed on June 18, 2026 in Atlanta, Georgia.


                                    /s/ Ryan D. Watstein
                                    Ryan D. Watstein

3